SHAUN M. CROSS
GERALD KOBLUK
GREGORY J. ARPIN
PAINE, HAMBLEN, COFFIN,
 BROOKE & MILLER LLP
717 W. Sprague Avenue Suite 1200
Spokane, WA 99201-3505
(509) 455-6000
Attorneys for the Debtor

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In Re: | ) |
| | ) Case No. 04-08822-PCW-11 |
| THE CATHOLIC BISHOP OF | ) |
| SPOKANE a/k/a THE CATHOLIC | ) Chapter 11 |
| DIOCESE OF SPOKANE, | ) |
| | ) |
| Debtor. | ) Adv. Proc. No. 05-80038 |
| | ) |
| COMMITTEE OF TORT | ) |
| LITIGANTS, | ) |
| | ) **CATHOLIC BISHOP OF** |
| Plaintiffs, | ) **SPOKANE'S MEMORANDUM** |
| | ) **OF AUTHORITIES IN** |
| vs. | ) **SUPPORT OF CROSS-MOTION** |
| | ) **FOR SUMMARY JUDGMENT** |
| THE CATHOLIC DIOCESE OF | ) |
| SPOKANE, ET AL. | ) |
| | ) |
| Defendants. | ) |

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................. 1

II.   SUMMARY OF ARGUMENT ................................................. 1

III.  SUMMARY JUDGMENT STANDARD ..................................... 3

IV.   UNDER § 541 OF THE BANKRUPTCY CODE, THE EQUITABLE
      INTERESTS OF NONDEBTORS CANNOT BE INCLUDED IN
      THE DEBTOR'S ESTATE. ...................................................... 3

      A.   Legal vs. Equitable Interests .......................................... 3

      B.   A Debtor's Property Rights Are Determined by State Law. ......... 6

V.    THE UNITED STATES CONSTITUTION REQUIRES JUDICIAL
      DEFERENCE TO RESOLVE DISPUTES CONCERNING THE
      OWNERSHIP AND CONTROL OF CHURCH PROPERTY ............... 8

      A.   Overview of The First Amendment's Religion Clauses and the
           Doctrine of Church Autonomy ....................................... 8

      B.   Case Authority Governing Judicial Inquiry In Church Property
           Disputes .................................................................. 10

           1.   U.S. Supreme Court ............................................ 10

           2.   Washington State Follows the Compulsory Deference
                Rule and Rejects the "Neutral Principles" Approach ........ 17

      C.   The Relevant Ecclesiastical Authority Clearly Establishes that
           the Diocese Cannot Usurp the Ownership Which a Parish
           Enjoys Over Its Property ............................................. 22

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

VI. THE RELIGIOUS FREEDOM RESTORATION ACT PROHIBITS
THE BANKRUPTCY COURT FROM RE-WRITING CANON
LAW, AND CONVERTING PARISH ASSETS ................................................. 25

    A.    General Overview of RFRA ....................................................... 25

    B.    RFRA Applies to and Amends the Bankruptcy Code ............................... 27

          1.    Avoiding a Trust and Converting Parish Assets In
                Contravention of Canon Law Would Substantially
                Burden the Practice of Religion ......................................... 28

          2.    There is No Compelling Governmental Interest in
                Maximizing the Creditors' Potential Recovery ............................ 31

          3.    RFRA Does Not Violate the Establishment Clause ......................... 33

VII. THE WASHINGTON STATE CONSTITUTION IS EVEN MORE
PROTECTIVE OF RELIGIOUS FREEDOMS THAN THE FIRST
AMENDMENT ................................................................................. 36

VIII. EVEN IF THE COURT WERE TO APPLY NEUTRAL
PRINCIPLES, THE DIOCESE HOLDS PARISH PROPERTY IN
TRUST ...................................................................................... 39

    A.    The Diocese's Articles of Incorporation, and The Code of
          Canon Law Clearly Establish a Trust ........................................ 40

    B.    Washington's Corporation Sole Statute Explicitly Creates a
          Trust ...................................................................... 43

          1.    The Purpose of the Corporation Sole Statute is to Allow
                the Diocese to Govern Itself ........................................... 44

          2.    RCW 24.12 Specifically Establishes a Trust ............................. 45

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

3. Canon Law Requires Parish Property to be Held in Trust for the Parishes .................................................................. 46

C. Washington Property and Trust Law Supports the Existence of a Trust. ............................................................................. 47

D. Under Washington Civil Law, the Parishes Have a Legal Capacity Separate from the Diocese. ...................................... 48

IX. CONCLUSION ................................................................................. 49

DIOCESE'S SUPPORT OF CROSS-MOTION - iii

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

# I. **INTRODUCTION**

In its Opposition to the Tort Litigants' motion, the debtor, Catholic Bishop of Spokane ("Debtor" or "Diocese"), has detailed why the Litigants are not entitled to summary judgment as a matter of law. Among the many reasons why the Litigants' motion must fail is they do not apply the correct law. Controlling Washington State and federal constitutional authority confirm that the Diocese holds title to parish property only "in trust." Therefore, as a matter of law, such parish property is not part of the Diocese's estate. This court should deny the Litigants' motion for partial summary judgment, and should grant the Diocese's Cross-Motion as a matter of law.

# II. **SUMMARY OF ARGUMENT**

Bankruptcy Code §541 specifies that the debtor's bankruptcy estate does <u>not</u> include property in which the debtor holds only legal title, and not an equitable interest. To determine the extent of the debtor's estate under §541, property rights are determined by state law. Washington State law expressly provides that the Diocese holds parish property in trust and in conformity with canon law. Even if part of the Diocese's estate, parish properties are held under such binding restrictions that they could not be subject to execution as unrestricted assets.

Washington State law also provides that civil courts are to resolve disputes regarding the ownership of church property by giving deference to the ecclesiastical rules and decisions of the hierarchical authority. This principle of church autonomy — based

DIOCESE'S SUPPORT OF CROSS-MOTION - 1

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

on the Constitution's First Amendment — has been referred to as "compulsory deference," or "church polity." Washington is one of seven states that has adopted a strict compulsory deference rule. Other states (including Oregon and Arizona) have adopted the more secular "neutral principles" approach in which the courts review the deeds, corporation statutes and church laws to determine if a trust was intended or created. Washington courts have expressly rejected the neutral principles approach.

Roman Catholic ecclesiastical authority provides that each parish is a "juridic person" separate and apart from the Diocese. Each parish owns and administers its own property, and the Diocese may not usurp the parishes' ownership interests. Parish property held in the name of the Diocese (as a corporation sole) is held only "in trust" and "in conformity with" canon law. Therefore, such parish property is not part of the Diocese's estate.

In addition to the church autonomy doctrine, the Religious Freedom Restoration Act provides that the Bankruptcy Code may not be applied to re-write canon law, change the polity of the Catholic Church, convert and dispose of entire parishes, or otherwise substantially burden religion.

Furthermore, the Washington State Constitution is even more protective of religious freedoms than its federal counterpart, and likewise supports church autonomy.

Moreover, even if the court were to ignore Washington state law and consider secular "neutral principles" as advocated by the Litigants, Washington's corporation sole

DIOCESE'S SUPPORT OF CROSS-MOTION - 2

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

statute, the Diocese's Articles of Incorporation, applicable canon law as authoritatively interpreted, and applicable Washington property and trust law, together with Washington's and the Bankruptcy Code's recognition of unincorporated associations, confirm that the Diocese holds parish property only "in trust." As a matter of both civil and canon law, parish property cannot be included in the Diocese's estate.

### III.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment must be granted when "the pleadings, depositions answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c); Fed.R.Bankr.P. 7056; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Porter v. California Dept. of Corrections, 383 F.3d 1018, 1024 (9th Cir. 2004).

The Diocese's legal arguments are not dependent on any factual issues, and this court should grant summary judgment in the Diocese's favor as a matter of law.

### IV.  UNDER §541 OF THE BANKRUPTCY CODE, THE EQUITABLE INTERESTS OF NONDEBTORS CANNOT BE INCLUDED IN THE DEBTOR'S ESTATE.

### A.  Legal vs. Equitable Interests

Section 541 of the Bankruptcy Code is the gatekeeper which governs what property is, and what property is not, property of the debtor's estate.  Section 541 divides

DIOCESE'S SUPPORT OF CROSS-MOTION - 3

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6880*

the universe of property interests into two categories: those which are legal in nature and those which are equitable in nature.

11 U.S.C. §541 provides in relevant part:

> (a) The commencement of a case . . . creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
>> (1) . . . all legal <u>or</u> equitable interests of the debtor in property as of the commencement of the case.

The use of the disjunctive "or" takes on greater significance in a later subsection of the statute which provides:

> (d) <u>Property in which the debtor holds</u>, as of the commencement of the case, <u>only legal title and not an equitable interest</u> . . . <u>becomes property of the estate</u> . . . <u>only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold</u>. (Emphasis added)

The Bankruptcy Code embraces the crucial distinction between a legal interest and an equitable interest in property. <u>Marrs-Winn Co. v. Giberson (In re Marrs-Winn Co.)</u>, 103 F.3d 584, 589 (7th Cir. 1996). The plain language of §541 (a) and (d), as well as the legislative history of those subsections, clearly delineates what is, and what is not, property of the estate.

> [O]nly the debtor's interest in such property becomes property of the estate. <u>If the debtor holds bare legal title or holds property in trust for another</u>, only those rights which the debtor would have

DIOCESE'S SUPPORT OF CROSS-MOTION - 4

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

otherwise had emanating from such interest pass to the estate under section 541. (Emphasis added)

124 Cong. Rec. H 11,096 (Sept. 28, 1978); S 17413 (October 6, 1978).

Section 541(d) of the House amendment is derived from section 541(e) of the Senate amendment and reiterates the general principle that <u>where the debtor holds bare legal title without any equitable interest</u>, that <u>the estate acquires bare legal title without any equitable interest in the property</u>. . . . Thus, as section 541(a)(1) clearly states, the estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. <u>To the extent such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate</u>. . . . (Emphasis added)

124 Cong. Rec. H 11,096 (Sept. 28, 1978).

As the 9th Circuit has held, the estate has "no greater rights in property than those held by the debtor prior to bankruptcy." <u>In re Coupon Clearing Service, Inc.</u>, 113 F.3d 1091, 1099 (9th Cir. 1997).

As a matter of Federal law, the debtor's estate in a Chapter 11 case does <u>not</u> include property to which the debtor holds only bare legal title, but has no equitable interest. *See also* 5 Collier on Bankruptcy, ¶ 541.27 (15th ed. rev. 2004). According to the Supreme Court:

Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'

<u>Begier v. IRS</u>, 496 U.S. 53, 59 (1990).

DIOCESE'S SUPPORT OF CROSS-MOTION - 5

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

05-80038-PCW    Doc 201    Filed 05/27/05    Entered 05/27/05 13:13:48    Pg 9 of 54

**B.    A Debtor's Property Rights Are Determined by State Law.**

The Bankruptcy Code leaves "the determination of property rights in the assets of a [debtor's] estate solely to state law.  Property interests are created and defined by state law."  Butner v. United States, 440 U.S. 48, 54 (1979).  The bankruptcy court is required to look to state law to determine the nature of the estate's property rights.  In re Keller, 185 B.R. 796, 800 (9th Cir. B.A.P. 1995).

For example, whether a trust has been established is "a question to be resolved under the law of the state that is the situs of the trust fund."  In re California Trade Technical Schools, Inc., 923 F.2d 641, 646 (9th Cir. 1991).  The 9th Circuit has applied state property and trust law to recognize and determine equitable interests that are not property of the debtor's estate under § 541(d).  *See* Diocese's memo in Opposition to Litigants' motion, Sec. II, B.

Further, even if considered property of the estate, parish assets are held under such binding restrictions that they could not be subject to execution as unrestricted assets.  *See* Diocese's memo in Opposition to Litigants' motion, Sec. III, E.

All of the real and personal property interests which are in dispute in this adversary proceeding are located within the State of Washington.  Section 541 directs this court to use the laws of the State of Washington to determine both the nature and the extent of the Debtor's legal and equitable interests in property, and whether specific interests (be they legal or equitable) either are or are not property of this estate.

DIOCESE'S SUPPORT OF CROSS-MOTION - 6

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

Washington State law also applies to define the scope of review that is constitutionally permissible in this adversary proceeding. The U.S. Supreme Court has determined that states may adopt either of two constitutionally permissible methodologies to resolve disputes over the ownership and control of church property: compulsory deference to ecclesiastical authority, or the neutral principles approach. Washington State has adopted the compulsory deference rule, and has expressly rejected the neutral principles approach. Southside Tabernacle v. Church of God, 32 Wn. App. 814, 820 (1982); Organization of Lutherans v. Mason, 49 Wn. App. 441, 446-447 (1987).[1]

Because the Debtor in this case is a religious entity, questions about what interest it has in certain ecclesiastical property — including parishes and schools — raise special

---

[1] Under Washington's rule of compulsory deference to ecclesiastical authority, the issue of who holds formal title, or question of ownership and control under corporate property or trust law are irrelevant. Southside Tabernacle, 32 Wn. App. at 822; *Civil Court Resolution of Property Disputes Among Religious Organizations*, 39 Am. U.L. Rev. 513, 533 (1990). Regardless, as detailed in the Diocese's Memo in Opposition to the Litigant's Motion, Sec. III, Washington's corporate, property and trust law supports the existence of a trust as a matter of law. Washington's corporation sole statute, under which the Diocese operates, expressly creates a trust. RCW 24.12.020, .030. The nature and extent of the trust is "in conformity with" canon law. RCW 24.12.010. By operation of state law, and *in fact*, the parish property at issue in this adversary proceeding is subject to both civil and ecclesiastical trust obligations. These trust obligations are concurrent and consistent. In addition to the statutory trust, Washington trust law supports the existence of an express, constructive and/or resulting trust. Either as unincorporated associations under civil law, or as separate legal entities under canon law (as recognized by Washington's corporation sole statute), parishes have sufficient legal capacity to hold an equitable interest in parish property.

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

concerns that must be considered and resolved in accordance with the federal and state constitutions. A comprehensive discussion of both federal and Washington State law is appropriate.

## V. THE UNITED STATES CONSTITUTION REQUIRES JUDICIAL DEFERENCE TO RESOLVE DISPUTES CONCERNING THE OWNERSHIP AND CONTROL OF CHURCH PROPERTY.

### A. Overview of The First Amendment's Religion Clauses and the Doctrine of Church Autonomy.

The First Amendment to the United States Constitution provides in part:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . .

The Establishment and the Free Exercise Clauses of the First Amendment have been applied to the several States by the Due Process Clause of the Fourteenth Amendment. Cantwell v. Connecticut, 310 U.S. 296 (1940) (Free Exercise); Everson v. Board of Education, 330 U.S. 1 (1947) (Establishment). The prohibitions concerning legislative acts have been extended to judicial actions. Kreshik v. St. Nicholas Cathedral, 363 U.S. 190 (1960).

The First Amendment's two religion clauses — the Establishment Clause and the Free Exercise Clause — are often at odds with each other. But one value that both clauses serve is to enforce government neutrality when deciding controversies arising out of religious disputes. One such area of dispute concerns church property, and the

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

question of which body or group within a church controls or owns the property of the church.

Courts have held that churches have autonomy in making decisions regarding their own internal affairs. This "Church Autonomy" doctrine precludes civil court review of church disputes involving matters of faith, doctrine, church governance, administration and polity. Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116-117 (1952). The church autonomy doctrine is rooted in both the First Amendment's Free Exercise Clause and the Establishment Clause. Bollard v. Cal. Province of the Soc'y of Jesus, 211 F.3d 1331, 1332 (9th Cir. 2000)(order denying rehearing en banc)("Though the concept originated through application of the Free Exercise Clause, the Supreme Court has held that the Establishment Clause also protects church autonomy in internal religious matters.")

Unlike the Free Exercise Clause's compelling governmental interest and least restrictive means analysis, and unlike the Establishment Clause's secular purpose, primary effect and excessive entanglement analysis, the doctrine of Church Autonomy involves no weighing of competing interests between church and state. Except in limited circumstances not relevant to property issues, the application of the doctrine of Church Autonomy simply inquires whether adjudication of the dispute touches upon matters of faith, polity, discipline, canon law or ecclesiastical relationships.

DIOCESE'S SUPPORT OF CROSS-MOTION - 9

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

**B.** **Case Authority Governing Judicial Inquiry In Church Property Disputes.**

    **1.** **U.S. Supreme Court**

The principle of deference to religious authority was first articulated in <u>Watson v. Jones</u>, 80 U.S. 679 (1871). <u>Watson</u> involved a property dispute between pro and anti-slavery factions of a divided Presbyterian church in post-Civil War Kentucky. The <u>Watson</u> court held that the first duty of the court is to give effect to any express trust applicable to property donated to the church. If no express trust is evident from the title documents, then the rights to control property will depend on the internal structure, or "polity" of the particular denomination to which the church involved in the dispute belonged. The court recognized two types of polities: the congregational polity and the hierarchical polity. If hierarchical, the courts must determine disputes by giving judicial deference to the ecclesiastical hierarchy:

> Whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

<u>Watson</u>, 80 U.S. at 727.

This deference respects the proper boundaries between church and state. Secular institutions are not subject to religious interference, and conversely, the government has

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

"secured religious liberty from the invasion of the civil authority." <u>Watson</u>, 80 U.S. at 730.

The <u>Watson</u> court further explained that a hierarchical church is in a much better position than a civil court to resolve disputes over ownership of ecclesiastical property. Each church

> has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usage and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with.

<u>Watson</u>, 80 U.S. at 729.  Accordingly, such matters of ecclesiastical law are "matters over which the civil courts exercise no jurisdiction."  <u>Id</u>. at 733.  The Supreme Court resolved the church property dispute in <u>Watson</u> by deferring to the established rules and decisions of the hierarchical authority.

As <u>Watson v. Jones</u> was decided prior to the application of the First Amendment to the states, it was decided on common law grounds without explicit reliance on the First Amendment.  The Supreme Court, however, later constitutionalized <u>Watson's</u> principles in <u>Kedroff v. St. Nicholas Cathedral</u>, 344 U.S. at 116 (1952):

> The [<u>Watson v. Jones</u>] opinion radiates . . . a spirit of freedom for religious organizations, and independence from secular control or manipulation – in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

In <u>Kedroff</u>, the court held unconstitutional a state statute that recognized the autonomy and authority of those North American branches of the Russian Orthodox Church which had declared their independence from the general church.  In striking down the legislation, the court recognized protections for "church administration," the "operation of . . . churches," and "polity" (<u>Id</u>. at 107, 117), and determined:

> There are occasions when civil courts must draw lines between the responsibilities of church and state for the disposition or use of property.  Even in those cases when the property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls.  This under our Constitution necessarily follows in order that there may be free exercise of religion.

<u>Kedroff</u>, 344 U.S. at 120-121.

This holding invalidating legislative action was extended to judicial action in <u>Kreshik v. St. Nicholas Cathedral</u>, 363 U.S. 190 (1960).

In <u>Presbyterian Church v. Hull Church</u>, 393 U.S. 440 (1969), a church property dispute arose when two local churches withdrew from a hierarchical general church organization.  The court reasserted the polity principles first developed in <u>Watson v. Jones</u> and concluded that civil courts had "*no* role in determining ecclesiastical questions in the process of resolving property disputes."  <u>Hull Church</u>, 393 U.S. at 447.  The Court indicated that the avoidance of judicial entanglement in religious doctrine itself serves free exercise values.

DIOCESE'S SUPPORT OF CROSS-MOTION - 12

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

The <u>Hull</u> court recognized that "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." 393 U.S. at 449. However, that court also recognized that not every civil court decision as to property claimed by a religious organization jeopardizes First Amendment values. <u>Id</u>. The court determined that there may be "neutral principles of law," developed for use in property disputes, which could be applied without violating the Constitution. But it cautioned that:

> . . . First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes; the amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. (internal citations omitted)

<u>Id</u>. at 449.

The next church property case to reach the U.S. Supreme Court was <u>Serbian Orthodox Diocese v. Milivojevich</u>, 426 U.S. 696 (1976). In that case, the court again reiterated that the organization of a diocese within a hierarchical structure involves solely a matter of internal church government, an issue at the core of ecclesiastical affairs. The

DIOCESE'S SUPPORT OF CROSS-MOTION - 13

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

court quoted extensively from the previous church property cases and reiterated the general rule that the First and Fourteenth Amendments require civil courts to defer to a hierarchical church's governing body with regard to questions of internal organization, or ecclesiastical rule, custom or law. "This principle applies with equal force to church disputes over church polity and church administration." Id. at 710.

The Serbian Orthodox Diocese court also determined that the Constitution prohibits any inquiry into whether the rules or decision of the church authority are "arbitrary."

> For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense "arbitrary" must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits; recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them.

Serbian Orthodox Diocese, 426 U.S. at 713.

And, finally, in Jones v. Wolf, 443 U.S. 595 (1979), a divided court again acknowledged the general rule that the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine or practice. In that case, however, the court determined that states are not required to follow a particular

DIOCESE'S SUPPORT OF CROSS-MOTION - 14

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

method of resolving church property disputes. For example, a state (in that case, Georgia) may settle church property disputes by adopting a "neutral principles of law" approach.

Under a "neutral principles" approach, the court relies exclusively on "objective, well-established concepts of trust and property law familiar to lawyers and judges." Jones v. Wolf, 443 U.S. at 603. These "neutral principles" include the consideration of (1) the language of the deeds, (2) the terms of the local church charter, (3) the provisions of the general church constitution or governing rules (canons) concerning the ownership and control of church property, and (4) the relevant state statutes governing the holding of church property to determine whether a trust was intended and/or created. Id. But even under this approach, any consideration of church rules or canons must be done without impairing free exercise rights or entangling the court in matters of religious controversy. The court recognized

> . . . the application of the neutral-principles approach is [not] wholly free of difficulty. The neutral-principles method . . . requires a civil court to examine certain religious documents, such as a church constitution, for language of trust in favor of the general church. In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust . . . If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court

DIOCESE'S SUPPORT OF CROSS-MOTION - 15

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body.

443 U.S. at 604 (*citing* Serbian Orthodox Diocese, 426 U.S. at 709). So even under a "neutral principles" approach, the court must defer to church authority to resolve any ecclesiastical or doctrinal disputes.

Importantly, while the court in Jones v. Wolf determined that states could constitutionally adopt a neutral principles of law approach to resolve church property disputes, it did not require this approach.

> The First Amendment does not dictate that a State must follow a particular method of resolving church property disputes. Indeed, "a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters. . ." (Emphasis in original)

Jones v. Wolf, at 602 (*citing* Md. & Va. Churches v. Sharpsburg Ch., 396 U.S. 367, 368 (1970) (Brennan J., concurring)).[2]

Of significance to the adversary proceeding presently before the court, the state of Washington has, for over seven decades, before and after Jones v. Wolf, followed a strict compulsory deference approach, and has expressly rejected a neutral principles of law approach.

---

[2] Jones v. Wolf is the latest U.S. Supreme Court decision involving church property disputes.

DIOCESE'S SUPPORT OF CROSS-MOTION - 16

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

## 2. Washington State Follows the Compulsory Deference Rule and Rejects the "Neutral Principles" Approach.

Washington State is one of at least seven states to reject the neutral principles of law approach in favor of a strict compulsory deference rule. *See* <u>Civil Court Resolution of Property Disputes Among Religious Organization</u>, 39 Am.U.L.Rev. 513, 531-532 (Spring 1990).

Washington's Supreme Court first recognized the general rule of judicial deference to church authority over 70 years ago. In <u>Wilkeson v. Rector, etc. St. Luke's Parish</u>, 176 Wash. 377 (1934), the court was faced with a dispute regarding the ownership and control of real property given to a church in trust to be used for "religious purposes." Almost 50 years after the original gift, the church leaders, "acting under due ecclesiastical authority," acted to sell the existing church, and use the proceeds to build a new parish house. <u>Id</u>. at 383. A member of the parish challenged the transaction as a violation of the trust. In giving effect to the trust previously imposed, the Washington Supreme Court cited and followed the polity approach of <u>Watson v. Jones</u>, and deferred to the "ecclesiastical authority's" determination that the disposal of the building was within the express terms of the gift. <u>Wilkeson</u>, 176 Wash. at 384-385.

> [I]n a trust of the character here involved, where no restraint is imposed on the right to alienate, the courts will not interfere further than to see to it that the proceeds from the sale of the trust property are not diverted from the use for religious purposes of the faith or denomination to which the property was dedicated. <u>Watson v. Jones</u>, *supra.*

DIOCESE'S SUPPORT OF CROSS-MOTION - 17

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

<u>Wilkeson</u>, 176 Wash. at 386.

The Tort Litigants incorrectly assert that <u>Wilkeson</u> stands for the proposition that "trusts for the benefit of a religion do not restrict the trustee's right to sell the subject property." Litigants' Brief, p. 10. The <u>Wilkeson</u> court clearly gave effect to the trust in that case, and would not allow the trust funds to be diverted in a way inconsistent with the trust.

> If the purpose of respondents was to divert the funds to be received from the sale of the property to other than religious purposes of the Episcopal Church, the court could and would enjoin them. <u>Watson v. Jones</u>, *supra*.

<u>Wilkeson</u>, 176 Wash. at 385.

Fifteen years later, the Washington Supreme Court was faced with a church property dispute involving a landlord, a local church and its general church. <u>Hoffman v. Tieton View Meth. Church</u>, 33 Wn.2d 716 (1949). The landlord sued to recover property abandoned by Tieton View, a local Methodist church. After quieting title to the real property in the landlord, the court was left to decide who owned the building and personal property as between the local church and the general Methodist Church. The Court again cited and followed the polity approach of <u>Watson v. Jones</u>, and determined that the local church acquired and held its property in trust for the general Methodist Church. In resolving the questions of ownership and control of ecclesiastical property as between hierarchical religious entities, the court deferred to the church's Articles of

DIOCESE'S SUPPORT OF CROSS-MOTION - 18

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

05-80038-PCW    Doc 201    Filed 05/27/05    Entered 05/27/05 13:13:48    Pg 22 of 54

Incorporation, and the Discipline (Book of Law) of the Methodist Church.  <u>Hoffman</u>, 33 Wn.2d at 728-730.

In <u>Presbytery of Seattle v. Rohrbaugh</u>, 79 Wn.2d 367 (1971), *cert. denied*, 405 U.S. 996 (1972), the pastor, trustees, all but one of the elders, and a substantial number of members of the Laurelhurst United Presbyterian Church of Seattle voted to withdraw as a body from the United Presbyterian Church.  They argued they were the record title holders of the property of their church and sought to keep that property for themselves. The Washington Supreme Court again cited and followed the polity approach and the compulsory deference rule, noting that "this court has adopted the rule of <u>Watson v. Jones</u>, *supra*, in cases of this kind."  <u>Id</u>. at 372.  The <u>Rohrbaugh</u> court deferred to the Church Constitution and the decision of the Presbytery of Seattle to resolve the question of which entity had the right to control and use local church property.

Likewise, in <u>Southside Tabernacle v. Church of God</u>, 32 Wn. App. 814 (1982), the appellate court decided an intrachurch property dispute by deferring to church rules and decisions, rather than by looking at who held title to the contested property.  In that case, church property was held in the name of a local branch of a national religious organization.  Division I of the Appellate Court recognized that the First Amendment prohibits the courts from becoming entangled in matters of church doctrine and practice. That court discussed the Supreme Court's analysis in <u>Jones v. Wolf</u>, and recognized that

> the United States Supreme Court has recognized three methods
> for resolving church property disputes: (1) The approach taken

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

in <u>Watson v. Jones</u>, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1872); (2) the so-called "neutral principals of law" approach; and (3) through legislation governing church property arrangements in a manner that precludes state interference in doctrine.

\* \* \*

The Supreme Court has made it clear that the three are alternative methods for resolution: ". . . a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters . . ."

The Washington Supreme Court has had occasion to rule on church property disputes. *See* <u>Presbytery of Seattle, Inc. v. Rohrbaugh</u>, <u>supra</u>, and cases cited therein . . . **The court rejected this [neutral principles] analysis, reaffirming its prior adoption of the rule in <u>Watson v. Jones</u>**. (Emphasis added, internal citations omitted)

<u>Southside Tabernacle</u>, 32 Wn. App. at 818-820.

That court referred to the <u>Watson v. Jones</u> rule as **"the doctrine of total deference by civil courts to the decision making body of religious organizations."** <u>Southside Tabernacle</u>, 32 Wn. App. at 818. The court then remanded the case for determination of whether the polity of the church at issue was congregational or hierarchical. If the church was hierarchical,

The court must defer to the decision of the highest ruling body to which the matter was taken . . . **the issue of who holds formal title has no relevancy under this theory.** (Emphasis added).

<u>Southside Tabernacle</u>, 32 Wn. App. at 822.

DIOCESE'S SUPPORT OF CROSS-MOTION - 20

Finally, in <u>Organization of Lutherans v. Mason</u>, 49 Wn. App. 441 (1987), the court was asked to interpret an election provision in a church Constitution. Although strict property rights were not at issue, Division II of the Court of Appeals analyzed the constitutional principles using the line of property cases outlined above. That court again acknowledged that a state may choose for itself which approach to use for settling church property disputes:

> [O]f the constitutionally permissible approaches, only two have been distinctly identified – the "polity" approach and the "neutral principles" approach.
>
> The polity approach focuses upon the organizational structure of the church in question to determine whether the local church is congregational (independent) or whether it is a subordinate unit of a hierarchical organization. <u>Watson v. Jones</u> . . .[if hierarchical] the court must defer to and enforce a decision of the highest church tribunal that has ruled on the question.
>
> The neutral principles approach, on the other hand, relies exclusively upon objective, well established concepts of trust and property law and is flexible enough to accommodate all forms of religious organizations and polity.
>
> When the Washington Supreme Court had the opportunity to rule upon a church property dispute, **the court expressly rejected the neutral principles method and, instead, reaffirmed the polity approach of <u>Watson v. Jones</u>**. (Emphasis added, internal citations omitted).

<u>Organization of Lutherans v. Mason</u>, 49 Wn. App. at 446-447.

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

That court concluded that "civil courts must defer to the church hierarchy's resolution" of church property disputes "despite the fact that this type of dispute could otherwise be resolved by a civil tribunal." Id. at 447-448.

The Watson v. Jones compulsory deference rule was most recently cited and followed in Elvig v. Ackles, 123 Wn. App. 491, 496 (2004)("civil courts must defer" as a matter of law to the hierarchical authority's resolution of a church-related dispute "despite the fact that the dispute could be resolved by a civil court").

**C.    Relevant Ecclesiastical Authority Establishes that the Diocese Cannot Usurp the Ownership Which a Parish Enjoys Over Its Property.**

It is undisputed that the Roman Catholic Church is hierarchical. *See* Southside Tabernacle, 32 Wn. App. at 818-819. In accordance with Watson v. Jones and its progeny, and as adopted in Washington, civil courts are directed to defer to the rules and decisions of the church authority with regard to ecclesiastical law.

The Catholic Church is governed by the 1983 Code of Canon Law. *See* Affidavit of Cafardi, ¶10. While the court may not constitutionally interpret Canon Law, it may take judicial notice of the Code's provisions. Fed. R. Evid. 201.[3]

Under the 1983 Code of Canon Law, a parish and a diocese are separate canonical entities in the internal structure of the Roman Catholic Church. The canonical term for a

---

[3] Canon Law is cited as CIC, which is derived from the Latin title, *Codex Iuris Canonici*. All references to canon law are supported by the Affidavit of Cafardi.

DIOCESE'S SUPPORT OF CROSS-MOTION - 22

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

distinct legal entity created by an act of competent ecclesiastical authority or by canon law itself is a "juridic person." Every diocese is a juridic person. CIC 373. Likewise, every parish is a separate juridic person. CIC 515, §3.

Each separate juridic person exists independently of others, is endowed with its own rights and duties, and owns its own property, apart from the property of other juridic persons. CIC 113-116, 1255. The pastor of a parish, not the diocesan bishop, is the administrator of parish property. CIC 532, 1279. Each parish has the right to acquire, retain and administer its own property. CIC 1254, 1255, 1259.

All church property is considered ecclesiastical property, and is held by one juridic person or another. CIC 1257 §1. What belongs to one juridic person cannot simultaneously belong to another juridic person. The Code of Canon Law makes clear that the property of a parish is <u>not</u> the property of the Diocese:

> Under the Supreme authority of the Roman Pontiff, ownership of goods belongs to that juridical person which has lawfully acquired them.

CIC 1256.

The ecclesiastical agency responsible for interpreting the laws of the Roman Catholic Church is the Pontifical Council for the Interpretation of Legislative Texts. *See* Affidavit of Cafardi, ¶¶11-13. In 2004, the Pontifical Council determined that the ownership of ecclesiastical property is always in individual juridic persons, and not some confused mingling of them. *See* Exhibit D to Affidavit of Cafardi. In the case of a parish

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

bankruptcy, the property of the diocese (or the Roman Pontiff) could not be used to satisfy parish creditors. **To make the goods of one juridic person available for the debts of another contradicts the autonomy of juridic persons, one from another**. <u>Id</u>.

This ruling applies equally to whether the assets of a parish are available to creditors of a diocese. Canon Law simply does not allow the assets of one juridic person to be converted and used to satisfy the debts of another juridic person. *See* Affidavit of Cafardi, ¶¶25-27, 38, 43.

The Diocese may not usurp the ownership which a juridic person, such as a parish, enjoys over its own property. CIC 1256. While the diocesan Bishop has rights and duties of supervision and oversight over entities within his diocese, such supervisory rights are limited by canonical norms that provide that each juridic person owns and administers its own property. *See* Affidavit of Cafardi, and Report of Pontifical Council for the Interpretation of Legislative Texts, attached as Exhibit D.

When the Diocese, as corporation sole, takes legal title to parish property, it may do so <u>only</u> "in conformity" with canon law. RCW 24.12.010. For that reason, the Diocese can only hold bare legal title to parish property, that is, the Diocese holds such property "in trust." RCW 24.12.030. Under canon law, as officially interpreted by ecclesiastical authority, the beneficial interest in parish property is with and remains in the juridic person of the parish. Report of Pontifical Council for the Interpretation of Legislative Texts, p. 2.

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

The Diocese's control over parish property is <u>very</u> limited under canon law. These limitations carry beyond the filing of a Chapter 11 petition. As stated in the legislative history of Bankruptcy Code §541, "to the extent such an interest [in property] is limited in the hands of the debtor, it is equally limited in the hands of the estate." 124 CONG. REC. H 11,096 (Sept. 28, 1978).

As a matter of law, this court must defer to the ecclesiastical authority and give effect to the canonical trust relationship.

## VI. THE RELIGIOUS FREEDOM RESTORATION ACT PROHIBITS THE BANKRUPTCY COURT FROM RE-WRITING CANON LAW, AND CONVERTING PARISH ASSETS.

Separate and apart from the church autonomy doctrine, which flows from the religion clauses of the First Amendment, federal statutory law provides a defense against the Litigants' attempt to have this court interpret the Bankruptcy Code in such a manner as to re-write canon law, change the polity of the Catholic Church, and deprive parishes, schools and other charitable organizations of their assets.

### A. General Overview of RFRA

The Free Exercise Clause of the First Amendment to the U.S. Constitution limits the federal government's power to interfere with religious matters. For decades, when considering whether government action violated the Free Exercise Clause, the Supreme Court applied a strict scrutiny test. In <u>Sherbert v. Verner</u>, 374 U.S. 398 (1963), the Court held that facially neutral laws that "substantially burden" the practice of religion violate

DIOCESE'S SUPPORT OF CROSS-MOTION - 25

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6666*

the Constitution unless the government could show that the law (1) furthered a compelling government interest, and (2) is the least restrictive means to fulfill that interest. *See also*, Wisconsin v. Yoder, 406 U.S. 205 (1972).

In 1990, however, the Court abandoned the compelling interest requirement. Employment Div. v. Smith, 494 U.S. 872 (1990). The Court in Smith applied a new standard, stating the Free Exercise Clause does not "relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability,'" even if it incidentally burdened religion.[4] Id. at 879.

In response to Smith, and in order to enhance the level of protection given by law to the free exercise of religion, Congress passed the Religious Freedom Restoration Act (RFRA) 42 U.S.C. §§ 2000bb–2000bb-4 (1993). Recognizing that the free exercise of religion was an "unalienable right" secured by the First Amendment, the Act restored the compelling interest test set forth in Sherbert and its progeny. The stated purpose of the Act was

> (1) . . . to guarantee its [the compelling interest test's] application in all cases where free exercise of religion is substantially burdened; and (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb(b).

---

[4] Smith applied to individuals, and did not address the scope of free exercise protections for religious groups. It is not clear what effect (if any) this case has with regard to the Diocese.

DIOCESE'S SUPPORT OF CROSS-MOTION - 26

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

Soon after RFRA was passed, its constitutionality was challenged. In <u>City of Boerne v. Flores</u>, 521 U.S. 507 (1997), the Supreme Court declared RFRA unconstitutional as applied to state and local law because Congress exceeded its authority under the Fourteenth Amendment. But RFRA is constitutional as applied to federal law. *See* <u>Christians (In re Young) v. Evangelical</u>, 141 F.3d 854, 860-861 (8th Cir. 1998); <u>Guam v. Guerrero</u>, 290 F.3d 1210,1221 (9th Cir. 2002) and cases cited therein.

The Tort Litigants assert that RFRA is "not implicated." Litigants' memo, p. 27. But this conclusion is not supported by any analysis, and is contrary to the case authority that has applied RFRA to protect religious freedoms in the bankruptcy setting.

**B.  <u>RFRA Applies to and Amends the Bankruptcy Code</u>.**

One of the first cases to test the constitutionality of RFRA as applied to federal law involved the interaction between the Bankruptcy Code and a debtor's religious practice. <u>Christians (In re Young) v. Evangelical</u>, 82 F.3d 1407 (8th Cir. 1996), *affirmed* 141 F.3d 854 (8th Cir. 1998). In that case, the Youngs filed a Chapter 7 bankruptcy petition. During the year preceding the filing, they contributed over $13,000 to their church in regular tithes. The bankruptcy trustee filed an adversary proceeding against the church to recover the tithes as "fraudulent transfers" or preference payments under 11 U.S.C. §548.

The 8th Circuit first determined that the tithes were avoidable transfers recoverable by the trustee under §548 of the Bankruptcy Code. <u>Young</u>, 82 F.3d at 1416. Despite the apparent application of the Code, the court ruled that the trustee was not constitutionally

DIOCESE'S SUPPORT OF CROSS-MOTION - 27

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

05-80038-PCW    Doc 201    Filed 05/27/05    Entered 05/27/05 13:13:48    Pg 31 of 54

allowed to recover these payments to the church, as such a recovery would substantially burden the Youngs' religious practice.  Id. at 1420.

In determining RFRA to be constitutional as applied to federal law, that court stated:

> . . . RFRA is an appropriate means by Congress to modify the United States bankruptcy laws. . . RFRA . . . has effectively amended the Bankruptcy Code, and has engrafted the additional clause to § 548(a)(2)(A) that a recovery that places a substantial burden on a debtor's exercise of religion will not be allowed unless it is the least restrictive means to satisfy a compelling governmental interest.

Young, 141 F.3d at 861.

The 9th Circuit has repeatedly cited and followed Young: *see* Sutton v. Providence St. Joseph Med. Cntr., 192 F.3d 826, 832 (9th Cir. 1999); Worldwide Church v. Philadelphia Church, 227 F.3d 1110, 1120-21 (9th Cir. 2000)("the court found RFRA amended the Bankruptcy Code, precluding the bankruptcy trustee from avoiding a debtor's tithes to his church."); Guam v. Guerrero, 290 F.3d at 1219 (9th Cir. 2002)("RFRA is an appropriate means by Congress to modify the United States bankruptcy laws.").

## 1. Avoiding a Trust and Converting Parish Assets In Contravention of Canon Law Would Substantially Burden the Practice of Religion.

The threshold inquiry under RFRA is whether the governmental action in question "substantially burdens" a person's religious practice.  The government action at issue in

DIOCESE'S SUPPORT OF CROSS-MOTION - 28

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

05-80038-PCW   Doc 201   Filed 05/27/05   Entered 05/27/05 13:13:48   Pg 32 of 54

this proceeding would be the order of the Bankruptcy Court regarding the interpretation and application of the Bankruptcy Code. <u>Young</u>, 82 F.3d at 1418. In order to be considered a "substantial" burden,

> the governmental action must "significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion." (Internal citations omitted)

<u>Id</u>. The question of whether there is a substantial burden on the practice of religion is a question of law. <u>Id</u>. at 1419.

The Tort Litigants assert that all church property held in the name of the Diocese should be included as property of the estate under §541. Among other arguments, the Litigants attempt to avoid a trust relationship and defeat the parishes' equitable ownership of parish property through the application of the strong-arm and avoidance powers of Bankruptcy Code §§ 544, 545, 547, 548 and 550. *See* Litigants' motion for avoidance powers, filed February 8, 2005. But the Bankruptcy Code may not be applied by the court to re-write canon law, reform internal church polity, or change the ecclesiastical rules and regulations of the Church governing the ownership, administration and transfer of ecclesiastical property.

When recently amending some strong-arm and avoidance provisions of the Bankruptcy Code, the legislature made clear that the Code remained subject to RFRA.

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

> Nothing in the amendments made by this Act (amending this section [§ 544] and sections 546, 548, 707, and 1325 of this title) is intended to limit the applicability of the Religious Freedom Restoration Act of 1993 (42 U.S.C. § 2002bb (2000bb) et seq.).

Pub.L. 105-183, Sec. 6, June 19, 1998, 112 Stat. 519.

The interpretation of §541 or the application of strong-arm or avoidance powers to ignore or avoid the existence of a trust in order to convert parish property is <u>vastly more onerous</u> on the free exercise of religion than is the application of avoidance powers to recover tithes. If the recovery of $13,000 in tithes substantially burdens the exercise of religion, surely, depriving the Catholic community and the people of Eastern Washington of *entire* parishes, schools and charitable institutions would likewise substantially burden the practice of religion. This would not only curtail the ability to engage in religious activity, but would prevent it altogether.

Further, any court order requiring the Diocese to convert parish property — that is, property of a separate juridic entity — to pay Diocesan debts would put the court in the position of using state authority to compel the Diocese to do an act not "in conformity" with church law, and in violation of the rules and canons of the Church. Compelling the Diocese to violate its religious faith to the detriment of numerous Catholic parish communities would also substantially burden the practice of religion.

DIOCESE'S SUPPORT OF CROSS-MOTION - 30

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

## 2. There is No Compelling Governmental Interest in Maximizing the Creditors' Potential Recovery.

Because forcing the Diocese to violate ecclesiastical law, and depriving the Catholic community and the people of Eastern Washington of entire parishes, schools and charitable entities would substantially burden the practice of religion, this can be done only if such a drastic action is in furtherance of a compelling governmental interest. Whether there is a compelling governmental interest is also a question of law. <u>Young</u>, 82 F.3d at 1419.

Only governmental interests of grave importance are considered "compelling." In applying RFRA to the Bankruptcy Code, the <u>Young</u> court determined that neither the Bankruptcy Code in general, nor the particular application of its rules to maximize creditors' recovery is compelling:

> . . . the interests advanced by the bankruptcy system are not compelling under RFRA. . . [W]e agree that bankruptcy is not comparable to national security or public safety. We also agree that allowing debtors to get a fresh start or protecting the interests of creditors is not comparable to the collection of revenue through the tax system or the fiscal integrity of the social security system, which have been recognized as compelling governmental interests in the face of a religious exercise claim.

<u>Young</u>, 82 F.3d. at 1420. As stated earlier, this 8th Circuit case has been favorably cited and followed by the 9th Circuit. *See* <u>Sutton v. Providence St. Joseph Med. Cntr.</u>, 192 F.3d

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

at 832; <u>Worldwide Church v. Philadelphia Church</u>, 227 F.3d at 1120; <u>Guam v. Guerrero</u>, 290 F.3d at 1219-1221.

In reaching the conclusion that the interests of the bankruptcy system were not compelling under the free exercise analysis, the court stated further:

> [W]e cannot see how the recognition of what is in effect a free exercise exception to the avoidance of fraudulent transfers can undermine the integrity of the bankruptcy system as a whole; <u>its effect will necessarily be limited to the debtor's creditors, who will as a result have fewer assets available to apply to the outstanding liabilities</u>. . . (Emphasis added)

<u>Young</u>, 82 F.3d at 1420.[5]

Even if the government's interest in maintaining the bankruptcy system as a whole is considered compelling, application of specific Code provisions to enhance a creditor's recovery is not. In a district court case out of Idaho in which the bankruptcy court considered the application of RFRA to the Bankruptcy Code in the context of the trustee's attempt to avoid the debtor's tithes, the court determined:

> [T]he Bankruptcy Code subordinates the interests of creditors to the interests of debtors and other public policy interests in numerous circumstances. <u>For this reason, maximizing the recovery of creditors cannot be considered an interest of the highest order</u>. (Emphasis added)

---

[5] RFRA would likewise apply to preclude the Litigants' from using § 544's strong-arm powers to strip the parishes of their equitable interests in parish property.

DIOCESE'S SUPPORT OF CROSS-MOTION - 32

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

<u>In re Hodge</u>, 220 B.R. 386 (Idaho 1998)(finding that the Bankruptcy code itself served a compelling interest under RFRA, but the specific application of the Code to maximize recovery of creditors did not) (*citing* <u>Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah</u>, 508 U.S. 520, 547 (1993)).

The Tort Litigants have available to them millions of dollars in unrestricted diocesan assets that are part of the Diocese's estate.  The Litigants want more.  But this is not a sufficiently compelling state interest to justify an order forcing the Diocese to disregard Roman Catholic polity, re-write canon law, usurp the ownership interests of separate juridic entities, and ultimately deprive the Catholic community and the faithful of the ability to practice their religion.  Because the substantial burden on the free exercise of religion is not furthered by a compelling governmental interest, RFRA provides a defense against <u>any attempt</u> to interpret the Bankruptcy Code, or apply strong-arm or avoidance powers, to ignore or overcome a trust, or to otherwise require the Diocese to convert parish property to pay Diocesan debts.

### 3.    RFRA Does Not Violate the Establishment Clause.

Without any citation to authority, nor any analysis whatsoever, the Tort Claimants assert that the Diocese's RFRA defense "would violate the Establishment Clause . . . by treating a religious debtor more deferentially than a non-religiously affiliated debtor." Litigants' memo, p. 27-28.  The simple response to this assertion is that courts that have addressed the constitutionality of RFRA — including the 9th Circuit — have specifically

DIOCESE'S SUPPORT OF CROSS-MOTION - 33

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

determined that RFRA is constitutional and does not violate the Establishment Clause. *See* Young, 141 F.3d at 861-863; Guam v. Guerrero, 290 F.3d at 1221. But because this is an important constitutional concept, the Diocese will provide the court with the analysis lacking in the Litigants' brief.

In enacting RFRA, Congress sought to preserve First Amendment values by protecting the exercise of religious beliefs from substantial burdens imposed by the operation of otherwise neutral laws, and to provide a claim or defense to those so burdened by government. 42 U.S.C. § 2000bb(b). This statute does not violate the Establishment Clause simply because it may arguably benefit religion.

In analyzing whether a law violates the Establishment Clause, courts apply the traditional three-part test set out in Lemon v. Kurtzman: (1) the law must have a secular purpose, (2) it must have a primary or principal effect that neither advances nor inhibits religion, and (3) it must not foster an excessive government entanglement with religion. 403 U.S. 602, 612-13 (1971).

The first requirement, that a law must have a secular purpose,

> does not mean that the law's purpose must be unrelated to religion – that would amount to a requirement that the government show a callous indifference to religious groups, and the Establishment Clause has never been so interpreted. (quotations and citations omitted).

DIOCESE'S SUPPORT OF CROSS-MOTION - 34

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

05-80038-PCW   Doc 201   Filed 05/27/05   Entered 05/27/05 13:13:48   Pg 38 of 54

<u>Corporation of Presiding Bishop v. Amos</u>, 483 U.S 327, 335 (1987).  Although it was designed to protect religious rights, RFRA does have a secular purpose.  As explained in <u>Young</u>:

> Congress's purpose in enacting RFRA was not to benefit a particular religious sect, but rather to protect one of "the most treasured birthrights of every American" – the "right to observe one's faith, free from Government interference," S. Rep. No. 103-111, at 4, reprinted in 1993 U.S.C.C.A.N. at 1893-94. This effort to protect First Amendment values is "neutral in the sense of the Establishment Clause." <u>Gillette</u>, 401 U.S. at 453.  The Supreme Court has explained that "it is hardly impermissible for Congress to attempt to accommodate free exercise values, in line with our happy tradition of avoiding unnecessary clashes with the dictates of conscience." <u>Id</u>.

<u>Young</u>, 141 F.3d at 862.

Likewise, RFRA does not advance or inhibit religion under the second prong of the <u>Lemon</u> test.  RFRA does not affirmatively benefit any religion, but merely protects individuals from laws that "substantially burden a person's exercise of religion."  42 U.S.C. § 2000bb-1(a).  The Supreme Court has noted that "a law is not unconstitutional simply because it allows churches to advance religion, which is their very purpose." <u>Amos</u>, 483 U.S. at 337.  It is not significant that the Act arguably benefits religious entities and not secular ones.  Where government acts

> with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption come packaged with benefits to secular entities.

DIOCESE'S SUPPORT OF CROSS-MOTION - 35

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

Id. at 338.

Finally, RFRA does not foster an excessive entanglement with religion. On the contrary, RFRA was designed to prevent such entanglement by limiting the impact that neutral laws have on religion. *See* Amos, 483 U.S. at 339: "It cannot be seriously contended that [the statute] impermissibly entangles church and state; the statute effectuates a more complete separation of the two and avoids . . . intrusive inquiry into religious belief . . . The statute easily passes muster under the third part of the Lemon test."

Accordingly, despite the Litigants' unsupported claim to the contrary, RFRA is constitutional and does not violate the Establishment Clause. *See* Young, 141 F.3d at 861-863; Guam v. Guerrero, 290 F.3d at 1221.

## VII.   THE WASHINGTON STATE CONSTITUTION IS EVEN MORE PROTECTIVE OF RELIGIOUS FREEDOMS THAN THE FIRST AMENDMENT

The Tort Litigants completely ignore the Washington State Constitution. This is a mistake, however, as both the Washington Supreme Court and the United States Supreme Court have recognized that Washington's Constitution provides more protections for religious freedoms than does the United States Constitution.

The Free Exercise and Establishment Clauses of the First Amendment to the United States Constitution are contained in one broad sentence. The corresponding

DIOCESE'S SUPPORT OF CROSS-MOTION - 36

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

provisions of the Washington State Constitution, contained in Article I, § 11, are significantly more specific.

The Supreme Court of Washington established a test to determine if provisions of the state constitution should be interpreted as more protective than the corresponding provisions in the federal constitution.  <u>State v. Gunwall</u>, 106 Wn.2d 54 (1986).  Under this test, referred to as the <u>Gunwall</u> factors, the court considers six nonexclusive, neutral criteria:  (1) The textual language of the state constitution; (2) significant differences in the texts of parallel provisions of the federal and state constitutions; (3) state constitutional and common law history; (4) preexisting state law; (5) differences in structure between the federal and state constitution; and (6) matters of particular state interest or local concern.  <u>Id.</u>, at 61-62.

With regard to the Establishment Clause,

> The Washington State Constitution affords greater protection to religious freedom than the United States Constitution. <u>First Covenant Church v. City of Seattle</u>, 120 Wn.2d 203, 226, 840 P.2d 174 (1992).  More specifically, the United States Supreme Court has held that article I, section 11 of the Washington State Constitution is "far stricter" than the Establishment Clause of the First Amendment. <u>Witters v. Washington Dep't of Services for the Blind</u>, 474 U.S. 481, 489, 106 S.Ct. 748, 753, 88 L.Ed.2d 846 (1986)(citing <u>Witters v. Commission for the Blind</u>, 102 Wn.2d 624, 626, 689 P.2d 53 (1984)).

<u>Saucier v. Employment Sec.  Dep't.</u>, 90 Wn. App. 461, 465 (1998); *see also* <u>Malyon v. Pierce Cnty.</u>, 131 Wn.2d 779, 793 (1997).

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

Likewise, the provisions of the Washington Constitution are also more protective of religious freedom than the Free Exercise Clause of the Federal Constitution. First Covenant Church of Seattle v. Seattle, 120 Wn.2d 203 (1992); Munns v. Martin, 131 Wn.2d 192 (1997). In those cases, the court ruled that it continues to recognize and apply the strict scrutiny (compelling interest) test of Sherbert v. Verner, 374 U.S. 398 (1963) in free exercise cases, despite the fact that the U.S. Supreme Court adopted a less protective standard in Employment Div. v. Smith, 494 U.S. 872 (1990) that applies in the federal context. First Covenant, 120 Wn.2d at 223-229; Munns, 131 Wn.2d at 199; *see also* State v. Balzer, 91 Wn. App. 44, 52 fn. 3 (1998).

The United States Supreme Court recently recognized that Washington's constitution is more protective than the federal Free Exercise Clause. *See* Locke v. Davey, 540 U.S. 712, n.8 (2004)("Washington has also been solicitous in ensuring that its constitution is not hostile toward religion. . . and at least in some respects, its constitution provides greater protection of religious liberties than the Free Exercise Clause.")

Because the State Constitution is more protective of religious freedom than the First Amendment to the U.S. Constitution, courts in Washington (and courts applying Washington law) should be more inclined to enforce government neutrality when deciding controversies infringing on religious rights. To give effect to the state's "far stricter" protections, courts should avoid direct or indirect interference with the internal structure and governance of the church, and refrain from direct review and revision of the

DIOCESE'S SUPPORT OF CROSS-MOTION - 38

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

rules and decisions of the church on matters of religious doctrine and practice, including those that relate to ownership and control of church property. By adopting and applying a strict compulsory deference rule, Washington courts have given effect to the stricter protections afforded by the State Constitution.

## VIII. EVEN IF THE COURT WERE TO APPLY NEUTRAL PRINCIPLES, THE DIOCESE HOLDS PARISH PROPERTY IN TRUST

As previously discussed, when adjudicating church property disputes, Washington has adopted the Watson v. Jones polity/compulsory deference rule, and rejected Georgia's neutral principles approach discussed in Jones v. Wolf. Accordingly, the issue of who holds formal title to property is irrelevant. Southside Tabernacle, 32 Wn. App. at 822. Likewise, questions of ownership and control under corporate, property or trust law is irrelevant. *See Civil Court Resolution of Property Disputes Among Religious Organization*, 39 Am.U.L.Rev. 513, 533 (1990).

Regardless, even if the court were to utilize the neutral principles approach that is discussed in Wolf, and were to consider the (1) deeds, (2) state statutes, and (3) church documents and canons to determine whether a trust exists, the result would be the same. The property of the parishes, schools and other separate entities are held in trust by the Diocese, and should not be included in the Diocese's estate.[6]

---

[6] Under Jones v. Wolf, states can adopt either Watson's polity/compulsory deference rule or the neutral principles approach to constitutionally resolve intra-church property disputes. If there is no intra-church dispute, *neither* approach would apply. In such a case, Washington corporate, property and

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

The Tort Litigants discuss the deeds in cursory and general terms. And they include a narrow and strained interpretation of the corporation sole statute. But the Litigants ignore completely the secular evaluation of the church documents and governing rules (canons) concerning the ownership and control of ecclesiastical property. The Diocese's analysis will begin with what the Litigants conveniently omit.

## A. The Diocese's Articles of Incorporation, and The Code of Canon Law Clearly Establish a Trust.

Even in those states and cases in which secular neutral principles are applied to religious institutions to evaluate whether a trust was intended or created, courts must consider whether the religious documents and ecclesiastical laws governing the church establish an intention to create a trust. <u>Jones v. Wolf</u>, 443 U.S. at 604. The Supreme Court cautioned, however, that such an evaluation must be done in a purely secular manner, without relying on religious precepts. <u>Id</u>. If the interpretation of the ecclesiastical documents and laws "would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." <u>Id</u>.

A consideration of governing religious documents includes the church's charter or its Articles of Incorporation. <u>Hoffman</u>, 33 Wn.2d at 728-730. The Catholic Bishop of

---

trust law would still support the existence of a trust as a matter of law. *See* Diocese memo in Opposition to Litigants' motion, Sec. III and IV.

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

Spokane was first incorporated as a corporation sole in 1915. According to its Articles of Incorporation ("Articles"), it was

> formed for the purpose of transacting business **and holding property in trust** for that certain religious denomination or society known as the Roman Catholic Church . . . (Emphasis added).

Article III, attached as Exhibit B to the Affidavit of Bishop Skylstad.

Likewise, Article V provides that

> all property held by it [the corporation] **being in trust** for the use, purpose, benefit and behoof of the Roman Catholic Church of the Diocese of Spokane. (Emphasis added).

This language was taken almost verbatim from Washington's then newly enacted corporation sole statute. In fact, that statute, defining the corporate powers and authorizing it to "transact business and **hold property in trust**," was specifically referenced in Article IV.

These Articles of Incorporation and the explicit trust language are not only consistent with the state corporation sole statute, they are also consistent with ecclesiastical law. This trust relationship has been recognized since the founding of the Diocese. The Spokane Diocese's second Bishop, Bishop White, stated:

> I would state further that in every case I hold each Parish responsible for its own obligations. Even when parish properties are held under the title of the diocesan corporation, the Catholic Bishop of Spokane, (the title of nearly all our parish properties) this form of tenure does not change the fact that they are parish properties, the diocesan

DIOCESE'S SUPPORT OF CROSS-MOTION - 41

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

05-80038-PCW    Doc 201    Filed 05/27/05    Entered 05/27/05 13:13:48    Pg 45 of 54

corporation being a mere non-profit holding corporation which holds the various parish properties in trust for the faithful of the respective parishes.

Bishop Charles White correspondence dated November 30, 1935, attached as Exhibit L to the Affidavit of Fr. Barnett, ¶15, submitted by the Association of Parishes.

As provided herein at sec. V, B, 3, and confirmed through the affidavits of Dean Cafardi and Bishop Skylstad, canon law provides that each parish, school, service organization or other charitable organization is considered a juridic entity separate from the Diocese itself.  As a separate juridic entity, each is capable of acquiring, holding and administering its own property.  The Diocese holds legal title only in trust for the parishes and other juridic entities, and may not usurp the ownership or control which each enjoys over its own property.  As confirmed by the Pontifical Council for the Interpretation of Legislative Texts — the official ecclesiastical authority for the interpretation of Roman Catholic Canon Law — the assets of one juridic person cannot be converted and used to satisfy the debts of another separate juridic person.

These ecclesiastical authorities governing the relationship between Catholic entities and the ownership and control of ecclesiastical property are sufficient by themselves to establish a trust relationship, independent of the deeds and corporate statutes.  The United States Supreme Court acknowledged as much in Jones v. Wolf when discussing the neutral principles analysis.  In Wolf, the court cited favorably the analysis as "refined by" the Georgia Supreme Court in Carnes v. Smith, 236 Ga. 30, 222

DIOCESE'S SUPPORT OF CROSS-MOTION - 42

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

S.E.2d. 322, *cert. denied*, 429 U.S. 868 (1976).  In that case, a property dispute arose when a local congregation withdrew from the United Methodist Church.  As discussed by the U.S. Supreme Court:

> . . . the court found no basis for a trust in favor of the general church in the deeds, the corporate charter, or the state statutes dealing with implied trusts.  The court observed, however, that the constitution of The United Methodist Church, its Book of Discipline, contained an express trust provision in favor of the general church.  On this basis, the church property was awarded to the denominational church.

Jones v. Wolf, 443 U.S. at 601, *citing* Carnes v. Smith, 236 Ga. at 39, 222 S.E.2d at 328.

Thus, even if the deeds are silent, and we ignore the express trust language in the Articles of Incorporation and Washington's corporation sole statute, the court may still determine as a matter of law that a trust exists in accordance with a purely secular reading of the relevant provisions of the 1983 Code of Canon Law as officially interpreted by the Pontifical Council for the Interpretation of Legislative Texts.

**B.**  **Washington's Corporation Sole Statute Explicitly Creates a Trust.**

Unlike the Georgia statute at issue in the Carnes v. Smith case discussed above, Washington's statute governing how a religious corporation holds church property — the corporation sole statute, RCW 24.12 — expressly creates a statutory trust.

DIOCESE'S SUPPORT OF CROSS-MOTION - 43

**1.    The Purpose of the Corporation Sole Statute is to Allow the Diocese to Govern Itself  "In Conformity With" Canon Law.**

A corporation sole is a one-person corporation, usually used in the religious context.  The corporation consists of the head of a church and the successors to his particular office or station.  The Catholic Bishop of Spokane is a corporation sole.  The corporation is embodied by the office of the bishop rather than the person.  Upon the current bishop's death or departure, the successor bishop becomes the corporation.  *See* RCW 24.12.010.

The corporation sole is a unique legal construct which gives religious entities legal capacities and advantages under civil laws (particularly that of perpetuity) without infringing on religious rights.  James O'Hara, The Modern Corporation Sole, Dick.L.Ev. (Fall 1988).  The powers of the corporation are exercised within the statutorily defined purpose of the corporation sole.   Washington's corporation sole statute specifically provides that the diocese may incorporate as a corporation sole

> in conformity with the constitution, canons, rules, regulations or discipline of [the] church.

RCW 24.12.010.  Thus, the ecclesiastical laws and internal structure or polity of the church are safeguarded by civil law.  *See* Anson Phelps Stokes, Church and State in the United States, Vol. III (1950), pp. 403-405, 408-413.  By explicit statutory incorporation of church law in the corporation sole statute, canon law defines the identity and scope of

DIOCESE'S SUPPORT OF CROSS-MOTION - 44

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

authority of the corporation sole in regard to church property for which it is the record owner.

This statute, like the compulsory deference rule, recognizes the importance of church autonomy and religious freedom. General corporate law does not apply. General corporate law requires a governance structure, including directors and officers. Additionally, corporations typically have shareholders (or in the case of non-profit corporations, members) who have an ownership interest or control over the assets of the corporation. And those governing the corporation have fiduciary duties to the shareholders or members and to the corporation itself. These laws, however, directly conflict with Canon Law rules concerning the governance and hierarchical structure or polity of the Church.

The corporation sole statute eliminates this conflict by allowing the church to govern itself "in conformity" with its own ecclesiastical laws. As a corporation sole, the Diocese incorporates the office of the bishop (not as an individual), and there are no shareholders or members. The bishop, as corporation sole, has no fiduciary duties under general corporate law. The duties of the bishop are found exclusively under Canon Law.

## 2. RCW 24.12 Specifically Establishes a Trust.

Given the history and purpose of the corporation sole statute, it is more in the nature of a trust, rather than a modern corporation. This trust relationship is expressly confirmed by the terms of the statute itself. RCW 24.12.020 provides that "every

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6860*

corporation sole shall, **for the purpose of the trust,"** have the same powers as a natural person.  Additionally, RCW 24.12.030 provides:

> **All property** held in such official capacity by such bishop, overseer or presiding elder, as the case may be, **shall be in trust for the use, purpose, benefit and behoof of his religious denomination, society or church.**  (emphasis added).[7]

The legislative history likewise confirms that one of the purposes of the statute is to authorize the corporation sole "to transact business **and hold property in trust** for religious denominations, societies or churches."  Session Laws, 1915, Ch. 79 [S.B. 188].

The express trust provisions in Washington's corporation sole statute are not limited simply to restrict the Bishop's personal interest in church property as suggested by the Tort litigants.  The express trust provisions must be given effect as written in the statute.  *See* Diocese's Opposition to Litigants' motion, Sec. III, A.  As a matter of law, property held in the name of the Diocese (as a corporation sole) is held "in trust."

### 3. Canon Law Requires Parish Property to be Held in Trust for the Parishes.

The powers of the corporation can only be exercised validly within the capacity and purpose of the corporation sole.  The capacity and purpose of the office deemed the

---

[7] Although <u>all</u> property is held in trust, the use of unrestricted diocesan property to satisfy diocesan creditors would be consistent with such trust.  The use of *parish* property to pay *diocesan* creditors would not.  In the case of unrestricted Diocesan assets, the Diocese holds both the legal and the equitable interest (like a self-settled trust), whereas in the case of parish assets, the Diocese holds only bare legal title, and the parishes have the equitable interests.

DIOCESE'S SUPPORT OF CROSS-MOTION - 46

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

corporation is "in conformity" with church law. RCW 24.12.010. Therefore, the statutory scheme created by the legislature makes canon law relevant to the existence of the corporation sole and to the authority that the corporation sole has in regard to property titled in its name.

Since a corporation sole is to govern itself "in conformity" with its own ecclesiastical rules and canons, the nature of the statutory trust in this case is defined by the 1983 Code of Canon Law. Under Canon Law, each parish is its own juridic entity, "capable of acquiring, retaining, administering and alienating property." CIC 515, 1255. Parish assets belong to the parishes that acquired them, and those assets are entrusted to the care of the bishop who oversees the diocese. CIC 1256, 1267, 1273, 1279, 1282-1284. (*see* sec. V, C herein). So even though the Diocese holds nominal title to property belonging to the parishes, it has no equitable title to this property.

This conclusion follows from the "neutral" application of the civil corporation sole statute. Since that statute establishes a trust governed by the law of the church, the issue can be settled entirely under civil law. Of course, the conclusion that the Diocese holds parish property "in trust" is entirely consistent with the result that follows if the court were to defer to church authority.

## C. Washington Property and Trust Law Supports the Existence of a Trust.

The remaining neutral principle (although irrelevant under Washington law), is a consideration of the deeds themselves. Given the circumstances of the various gifts,

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

bequests and property transfers, Washington's property and trust law supports the conclusion that the Diocese holds parish property in trust, or that such parish assets are held under binding restrictions so as not to be subject to execution as unrestricted assets. At the very least, this is an issue that cannot be determined on summary judgment in the Litigants' favor absent extensive factual discovery, going back over a hundred years in some cases, into the facts and circumstances surrounding each and every gift or transfer, the intention of the donors, how the property was held and used over the years, and other factors relevant to the existence of a trust. A full discussion of trust and property law issues is contained in the Diocese's memorandum of authorities in opposition to the Litigants' motion for summary judgment.

### D. **Under Washington Civil Law, the Parishes Have a Legal Capacity Separate from the Diocese.**

The Tort Litigants assert that the parishes are "unincorporated associations." Litigants' Statement of Facts, No. 23. Washington State and the 9th Circuit recognize the legal capacity of an unincorporated association to be the beneficiary of a trust, to be a debtor in bankruptcy, and to sue and be sued. *See* Diocese memo in Opposition to Litigants' motion, Sec. IV. Likewise, the Bankruptcy Code recognizes that unincorporated associations have legal status. Code Section 101(9)(A)(iv). As such, there is simply no legal prohibition under Washington State or federal law to prevent this court from determining that the parishes, which are separate and distinct from the diocese

DIOCESE'S SUPPORT OF CROSS-MOTION - 48

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*

under canon law, retain an equitable ownership in ecclesiastical property held "in trust" by the Diocese.

## IX.   CONCLUSION

As stated by Bishop Skylstad in his affidavit, the Diocese of Spokane, established by the Holy See in 1913, is a collection of people of faith seeking to live their faith through worship, works of mercy, educational endeavors, commitment to a just society and promotion of all those deepest values in the human heart. Each parish represents a separate community of the Catholic faithful. The 80 parishes in the Diocese of Spokane, 15 parochial and inter-parochial schools, and one high school came about and exist today because of the desire of the Christian faithful to live the vision and mission of the Church. Each parish community responds to the basic imperatives of the Gospel. The charitable works of the Gospel, which constitute the vision and mission of the Catholic Church, do not simply grow like weeds in an uncultivated field. They are God's garden, planted and watered under the supervision of pastors, with the collaboration of councils and advisory boards, and through the financial, physical and moral support of the Christian faithful.

In engaging in this Chapter 11 Reorganization case, the Diocese is striving to seek balance between obtaining justice and compensation for the victims of clergy sexual abuse and honoring its sacred obligations to the many separate faith communities of Catholics in Eastern Washington. In pursuit of that goal, the Diocese recognizes, as it

DIOCESE'S SUPPORT OF CROSS-MOTION - 49

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA  99201 PHONE: (509) 455-6000*

must as a matter of both civil and ecclesiastical law, that it holds title to the property of the parishes which make up the separate faith communities only in trust and, under the applicable law, those properties are not property of the Diocese's estate in the Chapter 11 Reorganization case. Summary judgment should be entered in the Diocese's favor as a matter of law.

RESPECTFULLY SUBMITTED this 27ᵗʰ day of May, 2005.

PAINE, HAMBLEN, COFFIN,
BROOKE & MILLER, LLP

By_____
Shaun M. Cross
Gerald Kobluk
Gregory J. Arpin
Attorneys for Debtor
The Catholic Bishop of Spokane a/k/a
The Catholic Diocese of Spokane

I:\Spodocs\33029\00036\plead\00319161.DOC

DIOCESE'S SUPPORT OF CROSS-MOTION - 50

*PAINE, HAMBLEN, COFFIN, BROOKE & MILLER LLP*
*717 WEST SPRAGUE AVENUE, SUITE 1200*
*SPOKANE, WA 99201 PHONE: (509) 455-6000*