

ORIGINAL
Filed by [signature]
AUG 1 5 2005

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WASHINGTON

In Re:

TORT LITIGANTS, COMMITTEE OF,

MICHAEL SHEA,

          Plaintiffs,

v

CATHOLIC BISHOP OF SPOKANE,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 04-08822-PCW11

Adv. No. 2-05-80038
(Tort Litigants, Committee of)

Adv. No. 2-04-00291
(Michael Shea)

**Spokane, Washington**
**June 27, 2005**
**ORIGINAL**

VERBATIM REPORT OF PROCEEDINGS

BEFORE THE HONORABLE PATRICIA C. WILLIAMS
BANKRUPTCY JUDGE
**VOLUME 1**

**MOTIONS FOR TORT LITIGANTS, COMMITTEE OF, ADV: #2-05-80038**

1. Tort Litigants' Committee's Motion for Partial Summary Judgment
2. Defendant Parishes' Motion to Dismiss
3. Joinder of Defendants Catholic Charities, Morning Star Boys Ranch, Catholic Cemeteries, d/b/a Holy Cross Cemetery & St. Joseph Cemetery & Immaculate Heart Retreat House in Parish Defendants' Motion to Dismiss
4. Saint Philip's Villa's Joinder in Motion to Dismiss Party
5. Defendant Catholic Bishop of Spokane's Cross-Motion for Summary Judgment

**MOTIONS FOR MICHAEL SHEA, ADV: #2-04-00291**

1. Michael Shea's Motion for Summary Judgment
2. Defendants' Cross-Motions for Summary Judgment
3. Defendant Catholic Diocese of Spokane's Motion to Dismiss

SHERRIE T. WRIGHT, TRANSCRIBER
2129 E MARSHALL AVENUE
SPOKANE WA 99207
509-534-9186

| | | |
|---|---|---|
| 1 | **APPEARANCES:** | |
| 2 | For Catholic Diocese of Spokane: | MR. SHAUN M. CROSS |
| 3 | | MR. MARK CHOPKO |
| 4 | For Association of Parishes: | MR. FORD ELSAESSER |
| | | MR. JOHN MUNDING |
| 5 | For Tort Litigants Committee: | MR. JAMES STANG |
| 6 | | MR. JOHN CAMPBELL |
| 7 | | MS. MARCI HAMILTON |
| | For Tort Claimants Committee: | MR. JOSEPH SHICKICH, JR. |
| 8 | For Michael Shea & Estate of | |
| 9 | James McGuire: | MR. FRANK CONKLIN |
| 10 | For Tort Litigant Plaintiffs: | MR. DILLON JACKSON |
| 11 | For Catholic Charities, Morning Star | |
| 12 | Boys Ranch & Catholic Cemeteries: | MR. JIM KING |
| 13 | For Immaculate Heart Retreat Center: | MR. KEVIN O'ROURKE |

SHERRIE T. WRIGHT, TRANSCRIBER
2129 E MARSHALL AVENUE
SPOKANE WA 99207
509-534-9186

1                          · **INDEX**

2                                                            Page

3    **JUNE 27, 2005**

4    ARGUMENT
           By Mr. Conklin                                       3
5          By Mr. Stang                                        13
           By Mr. Cross                                        47
6          By Mr. Munding                                      85
           By Mr. Elsaesser                                    92
7          By Mr. Campbell                                    109
           By Mr. King                                        111
8          By Mr. O'Rourke                                    112
           By Mr. Munding                                     112
9          By Mr. O'Rourke                                    116
           By Mr. Campbell                                    121
10         By Mr. O'Rourke                                    140
           By Mr. King                                        140
11         By Mr. Munding                                     142
           By Mr. Hamilton                                    146
12         By Mr. Conklin                                     154
           By Mr. Stang                                       156
13         By Mr. Cross                                       165
           By Mr. Chopko                                      175
14         By Mr. Elsaesser                                   179
           By Mr. Shickich                                    187
15         By Mr. Jackson                                     192

16

17   COURT'S COMMENTS                                         193

18   ATTORNEY'S COMMENTS
           By Mr. Cross                                       197
19         By Mr. Chopko                                      212
           By Mr. Stang                                       214
20         By Mr. Elsaesser                                   219
           By Mr. Cross                                       222
21         By Mr. Stang                                       231
           By Mr. Munding                                     232
22

23   COURT'S COMMENTS                                         239

24   ATTORNEY'S COMMENTS
           By Mr. Stang                                       240
25         By Mr. Arpin                                       241

                              i

05-80038-PCW   Doc 312   Filed 08/15/05   Entered 08/15/05 12:23:13   Pg 3 of 50

| | |
|---|---|
| 1 | **INDEX (Continued)** |
| 2 | Page |
| 3 | |
| 4 | ATTORNEY'S COMMENTS (Continued)<br>By Mr. Stang |
| | 243 |
| 5 | By Mr. Elsaesser 244<br>By Mr. Stang 246 |
| 6 | COURT'S COMMENTS |
| 7 | 248 |

**INDEX (Continued)**

Page

ATTORNEY'S COMMENTS (Continued)
By Mr. Stang                    243
By Mr. Elsaesser                244
By Mr. Stang                    246

COURT'S COMMENTS               248

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ii

THE CLERK: Okay. We're here today on two different matters. The first matter is the Tort Litigants Committee versus Catholic Diocese of Spokane, adversary case number 05-80038. We're here to hear several matters.

The first one is the Tort Litigants Committee's motion for partial summary judgment. The second matter, is the defendant parish's motion to dismiss.

The third, is the joinder of defendants Catholic Charities, Morning Star Boys Ranch, Catholic Cemeteries d/b/a Holy Cross Cemetery and St. Joseph's Cemetery, and Immaculate Heart Retreat House in the parishes defendants' motion to dismiss.

Another matter to be heard is St. Philip Villa's joinder and motion to dismiss party. And the last one in this adversary is defendant Catholic Bishop of Spokane's cross-motion for summary judgment.

The second adversary to be heard today is the Michael Shea versus Catholic Bishop of Spokane, adversary case number A 04-00291. We're hearing three matters today.

The first one, Michael Shea's motion for summary judgment. The second, is the defendant's cross-motion for summary judgment, and the third is defendant Catholic Diocese of Spokane's motion to dismiss.

The attorneys present in the courtroom that will be

1

1   arguing today, the attorneys representing the Catholic
2   Diocese of Spokane, we have Shaun Cross, and also Mark
3   Chopko. The attorney arguing for the Association of
4   Parishes, we have Ford Elsaesser and John Munding.

5       The attorneys arguing and representing the Tort
6   Litigants Committee, we have James Stang, John Campbell, and
7   I believe Marci Hamilton. Has she showed up? Okay.

8       Arguing for the Tort Claimants Committee, we have
9   Joseph Shickich, Jr. Arguing on behalf of Michael Shea and
10   the estate of James McGuire, we have Frank Conklin. Arguing
11   on behalf of the tort litigant plaintiffs, we have Dillon
12   Jackson.

13       Arguing on behalf of the Catholic Charities, Morning
14   Star Boys Ranch, and Catholic Cemeteries, we have Jim King.
15   And also arguing on behalf of Immaculate Heart Retreat
16   Center, he's not present in the courtroom at this time, but
17   will be coming in the afternoon is Kevin O'Rourke.

18       Have I missed any counsel that are going to be arguing
19   today?

20       Okay. And we may proceed.

21       THE COURT: All right. Well, before we start a couple
22   of housekeeping announcements we need to make. First of
23   all, counsel, you have to come to the podium if you want to
24   say anything, because that's the only place our record is
25   going to be able to record what you say. So make sure you

2

1    argue from the counsel table.

2        Secondly, my new laptop was delivered last week.  I
3    have only had one occasion to use it, so I'm still a little
4    slow on the laptop.  So you know, I'm kind of looking for
5    some of the buttons they've rearranged, so if I stop you,
6    I'm just trying to figure out where I am in my programs.

7        Now, are there any other-- oh, at the end of the day,
8    I'm going to ask the counsel whether they've had an
9    opportunity to discuss and decide how we ought to resolve
10   the evidentiary objections that are pending, because I
11   certainly want to get that done before I do my decision.
12   And let's see, that's the only housekeeping matters I had.

13       Does anybody else have a housekeeping matter?  All
14   right.

15       Neal, how's the record?  Is it okay?  All right.
16       Okay.  Well, I guess, Mr. Stang, you're up.

17       MR. CONKLIN:  May it please the court and counsel, my
18   name is Frank Conklin.  I'm representing the O'Shea claim on
19   the motion for summary judgment.

20       There is no ministerial dispute on the facts.  We have
21   submitted a list of parishes and the deeds in which-- all of
22   the deeds, the property is owned in fee simple by the
23   corporation of the Diocese of Spokane corporation sole.  So
24   since there's no dispute on the facts, we contend that we're
25   entitled to judgment as a matter of law, and that the

                            3

1  motions of the Diocese for summary judgment and to dismiss
2  should be denied, and judgment granted in our favor.

3      So at the outset, I want to emphasize that this is not
4  an intrachurch dispute as the Diocese initially contended.
5  If it were, this court would have no jurisdiction to
6  adjudicate and that's critically important.

7      The purpose we're here, of course, is for a definition
8  of the property of the estate.  We contend the parishes and
9  school are part of the property of the estate.  We concede
10 that the First Amendment guarantees that the Bishop of
11 Spokane has absolute authority to interpret canon law and we
12 can't question it.

13     We mentioned in our brief Gonzalez v Archbishop, in
14 which the Supreme Court had indicated that a decision by a
15 hierarchical Bishop could be challenged because it was
16 arbitrary.  That challenge took place in the Orthodox
17 Diocese v had he had.  He was the Bishop of the Serbian
18 Orthodox Church in the Central United States.

19     They split up his Diocese.  I maintain that they acted
20 arbitrarily and thereby violated the canon law of the
21 Serbian Orthodox Church.  The United States Supreme Court
22 specifically overruled Gonzalez and said that when there is
23 an issue with the hierarchical church, the civil courts
24 cannot question the decision and interpretation by the
25 authorities of that church as far as canon law is concerned.

4

And that's where we find ourselves.

Now, the property of the estate issue before the court at the present time is a dispute between the Diocese and potential judgment creditors. It is not an intrachurch dispute. In the Catholic Bishop of Yakima case, the Supreme Court of Washington rejected the argument that the First Amendment of the United States Constitution and the Washington State Constitution, its counterpart, insulated the church from liability. So that issue has been determined. There is liability for-- once it is shown that there were acts committed which were concealed from authorities. And that's the allegations in all of these complaints.

In other words, the claim is that the Diocese breached its fundamental duty to protect innocent children and that's why they're being held accountable. Now, in their pleadings, the Diocese has said Mr. Shea did not introduce any evidence from experts in canon law. And we didn't, and we don't intend to, because it is our position that canon law and its interpretation is completely up to the Bishop, not-- and this court can't second guess his interpretation, so it's irrelevant.

What's at issue here is the question of the ownership of these parishes' properties and that's a question of Washington State law. Throughout the memorandum filed by

05-80038-PCW   Doc 312   Filed 08/15/05   Entered 08/15/05 12:23:13   Pg 9 of 50

1   the Diocese, the Diocese contends that this court must be
2   bound by and adopt the juridic person concept, which is in
3   the canons which they cite.

4        We contend that such a construction would violate the
5   state and federal free exercise and non-establishment
6   clause.  So the lines are clearly drawn.  At the outset, and
7   we said this in our brief, we said it at the very start of
8   this proceeding, this controlling question of state law is
9   of first impression.  It's a question of interpreting the
10  Washington State corporation statute.  And we'd request this
11  court to certify this question to the Supreme Court of
12  Washington, because it's a cardinal rule of federal
13  constitutional construction that a court does not interpret
14  a constitutional issue until it's clear that it can't be
15  avoided.

16       And if the Supreme Court of Washington agrees with Mr.
17  Shea, then there is no federal constitutional issue to be
18  decided.  So that is why we believe that from the very
19  outset that what this court should do is certify this
20  question where it has to go eventually.  Our position, of
21  course, is that the parishes are not any type of voluntary
22  organizations, they're not voluntary associations, they are
23  simply administrative geographic subdivisions of the Roman
24  Catholic Church.

25       And if his-- attached to his affidavit, the Bishop

                               6

1    has attached the canons which we cite in our brief, which
2    says it's only for the Diocese and Bishop to erect,
3    suppress, or alter parishes.

4        Now, the point is, this is a curious type of trust
5    they are advocating, wherein the trustee can eliminate the
6    beneficiaries.  And there is absolutely no question, but
7    what the Bishop, before the bankruptcy was filed, could have
8    sold all of these parties and sent the proceeds to the
9    Vatican and no court in the United States could challenge
10   his judgment.  That's what Willojalevitch (phonetic) stands
11   for.  He has absolute and unfettered control over those
12   properties.

13       He does have to consult people as he says, but who he
14   consults and whether he complies with the canons is a
15   decision which can't be pried into by a civil court.  And
16   essentially this was what the courts held.  We cite the EEOC
17   v St. Francis Xavier Parochial School case, and the question
18   was whether the parish and school could be sued as a
19   separate entity.  And the court said they can't.

20       And the reason they can't is they have no existence
21   apart from the Diocese.  They simply have no legal existence
22   recognizable in American law.  And that was the same
23   decision which was given in the Seventh Circuit case, FEL
24   Publications v the Catholic Bishop of Chicago, that the
25   parishes and schools have no legal independent recognizable

7

existence, even though under canon law they are supposedly juridic entities.

Consequently, in this state and the Diocese hasn't responded to this. In <u>Weise v Bruno</u> (phonetic), which was the landmark case on giving state funds for books, school supplies, buses to the parents of children attending parochial schools. The Supreme Court of Washington went out of its way to enter a specific finding that all of the schools were owned by the Catholic Bishop of Spokane, who happened to be the lead plaintiff in that litigation. And for that reason, the granting of any kind of financial benefit to the schools is absolutely prohibited.

We pointed out in our brief, and I'll try to be very brief that the historic purpose of the corporation sole arose because after the American Revolution, the Roman Catholic Church had no civil rights and couldn't own property. And little by little they started to purchase property in the names of individual priests or Bishops, then they tried lay trustees and that didn't work. And what eventually happened, of course, was that the corporation sole was developed as the legal vehicle to hold the title to all of this property.

And the reason that they adopted the concept of the property being placed in trust was because, as we pointed out, there were two instances where the Bishops died, their

8

1  heirs sued, and had to be paid off because the title to the
2  property was in the name of the Bishop, without any
3  reference to a trust of any kind.  And the same way when one
4  Bishop died and left very large personal financial debts in
5  Ohio, he was also sued, or the estate was sued.  And it's
6  because of that that the concept of putting the property in
7  trust evolved, and that's what we have today.

8        And as a consequence, the argument by the Diocese that
9  the--  the corporation sole has to be created in conformity
10  with the canons of the church, simply means that the Bishop,
11  when creating, it has to be properly authorized to do so.
12  It does not automatically, as they're claiming incorporate
13  canon law into this particular--  into the law of this
14  state.

15        Likewise, when they say that the property is held in
16  trust, common sense is it's in trust so you don't have those
17  transmission problems when the Bishop dies.  That's what the
18  trust is all about.  And finally, the whole purpose of the
19  trust is that it's to safeguard--  the legislative intent is
20  to safeguard the property, not of the individual parishes,
21  but of the Roman Catholic Church in the State of Washington,
22  which is precisely what their articles of incorporation say.

23        As I indicated, we contend that the, both the free
24  exercise clause and the non-establishment clause would be
25  violated if the court were to adopt the position advocated

9

1 by the Diocese. And the free exercise clause, of course,
2 was formed in the <u>Mormon</u> cases before the turn of century,
3 and those cases are very good law today. They stand for the
4 proposition you can believe anything you want, but any act
5 can be prohibited by the government and religious freedom is
6 not a defense.

7 Now, the Diocese faults us and says we didn't talk
8 about the Religious Freedom Restoration Act. This case has
9 nothing to do with the Religious Freedom Restoration Act.
10 The Religious Freedom Restoration Act was an attempt by
11 Congress to overturn the decision of the US Supreme Court in
12 the <u>Smith</u> case, which held that it was-- a criminal was to
13 be punished for using peyote in a religious service.

14 The US Supreme Court said the statute is-- the
15 congressional statute is unconstitutional. The Diocese also
16 says we haven't talked about the strict scrutiny test. But
17 the strict scrutiny test for regulation of religious
18 practices was addressed clearly in the <u>Yakima</u> decision. And
19 the court said that the Bishop can be held liable for
20 concealing evidence of child abuse.

21 So, as a consequence, it's for this reason that we
22 want to turn to the non-establishment clause, because I
23 think that's where the whole point comes into focus. The
24 separation of church and state, of course, is a phrase that
25 originated with Thomas Jefferson, but it was adopted by the

10

Supreme Court in the Reynolds case as an authoritative
definition of the First Amendment.

3     And as we pointed out, our own State Constitution,
4 which has a much stricter doctrine of separation of church
5 and state arose out of the turmoil in the last century-- in
6 the 18th century, or 19th century, when various Popes issued
7 edicts condemning freedom of speech, freedom of the press,
8 et cetera, and declared that the proposition that every man
9 is free to follow his conscience and adopt a religion he
10 deems is true was theological heresy.

11     And that created-- and then went onto say that it's
12 heresy for schools not to be under the control of Bishops,
13 which prompted President Grant to ask Congress to amend the
14 United States Constitution and ban any kind of-- in other
15 words, bring a much higher bar of church and state than
16 previously existed.  That amendment failed, but it is in the
17 Washington Constitution and it can't be changed by the
18 citizens of Washington without the consent of Congress.
19 That's how strongly they felt about it.

20     So, once again, we-- turning back for the moment to
21 the Mormon cases, we pointed out that in the debates about
22 the Mormon religion and when they didn't mix any words, they
23 were introduced into Congress as the Anti-Mormon Act of 19--
24 or 1872, the Anti-Mormon Act of 1873.  Throughout those
25 debates, the big concern was theocracy or ecclesiastical

```
 1   hegemony.  And in the opinion of the court in Reynolds, the
 2   court refers to, that this is a very serious problem.  So to
 3   say that the people who adopted that amendment would have
 4   allowed canon law to become a part of the law of Washington
 5   and these juridic persons to be recognized, which exist at
 6   the whim of the Bishop, or at the pleasure of the Bishop,
 7   however you want to put it, is simply not reading the
 8   history of our non-establishment clause in context.
 9        As a consequence, once again I reiterate, I think the
10   most efficient method is for this court to certify this
11   under, I think it's RAP 16.16, through the Supreme Court of
12   Washington and have it decided there once and for all.
13        Do you have any questions?
14        THE COURT:  I'm going to reserve those for later, Mr.
15   Conklin.
16        MR. CONKLIN:  Okay.  Thank you, Your Honor.
17        THE COURT:  Go ahead, Mr. Stang.  And let me indicate
18   to the audience, I promise we will take a break this
19   morning, but if any of you need to leave, other than at a
20   break time, I expect you to do it quietly and discreetly,
21   and only when we've got a break in the presentation of
22   counsel.
23        All right.  Just a moment, Mr. Stang, I have to finish
24   my note.
25        MR. STANG:  Okay.
```

12

```
 1          THE COURT:  All right.  Hold on, Mr. Stang, I'm--

 2          MR. STANG:  I'm fine, Your Honor.

 3          THE COURT:  --  just not--  not as good on this laptop

 4     as I was with my older one.  I should have just waited--

 5          MR. STANG:  Did you give it back?

 6          THE COURT:  --  till next week to set this up.  I'm

 7     not quite as fast as I used to be.  Very frustrating.  All

 8     right.

 9          MR. STANG:  Your Honor, we have created some boards

10     with some concepts on them.  Can you see them where you are,

11     or should I bring them up closer?

12          THE COURT:  No, they're fine.

13          MR. STANG:  They're fine.  Okay.  Your Honor, this

14     real property controversy should be determined by the very

15     same mutual rules of law that you apply on a daily basis in

16     this courtroom.  The federal law, the bankruptcy code, and

17     the laws of the state and local governments.

18          These laws provide the debtors and the creditors with

19     predictability and stability in their property

20     relationships.  But unlike the committee, the Diocese and

21     the parishes do not want to be governed by these mutual

22     principles of law.  They want you to determine this

23     controversy by applying religious doctrines and religious

24     dogmas that they refer to as laws.  But we all know that

25     these so-called laws were not enacted by any government
```

13

1  authority in the United States.  And they are not laws that
2  govern our secular conduct.

3       Bishop Skilstad says in his declaration that the net
4  effect of these doctrines is to create something more like a
5  form of government than any other kind of secular legal
6  structure.  That form of government that he refers to is a
7  monarchy, in which the canons, in which the laws of that
8  government are decided exclusively by the Pope.  While the
9  Dioceses and the parishes are free to subject themselves to
10 a form of religious government, this court is governed by
11 the secular laws of the United States.  And the sex abuse
12 survivors are entitled to pursue their rights and remedies
13 under those secular laws and not the laws of this Diocese.

14      The committee's motion is based on three concepts, and
15 as we go through the issues today, you will, I believe
16 inevitably conclude that the motion for summary judgment
17 should be granted.  These are the principles on the board.

18      First, the court has jurisdiction and can use
19 jurisdiction and can resolve the real property dispute
20 without violating anyone's First Amendment rights.  Second,
21 the corporation sole statute does not create a statutory
22 trust.

23      The corporation sole statute differentiates between--
24 it differentiates between the Bishop and his personal
25 capacity and the Bishop in his official capacity.  As Dr.

14

```
 1   Franklin--  as Dr. Conklin pointed out, this reflects the
 2   history of the relationship between church property and the
 3   Bishop, and the statute provided a secular vehicle for the
 4   church to function in our secular society.  It did not
 5   create a statutory trust.
 6        Next, the beneficiary--  the parishes cannot be
 7   beneficiaries of a trust.  As unincorporated divisions of
 8   the corporation sole, the parishes simply cannot be
 9   beneficiaries of any trust.  And if you reach that
10   conclusion, Your Honor, you do not have to go through any of
11   the other analysis regarding an express trust under the
12   articles of incorporation, or whether there is a
13   constructive trust, or whether there's a resulting trust,
14   because without beneficiaries, there can be no enforceable
15   trust against third parties.
16        Next, the Diocese's articles of incorporation do not
17   create an expressed trust.  The articles simply are
18   instruments provided for by the corporation sole statute,
19   which itself was not intended to create a formal trust
20   concept in the fashion described by the Diocese.
21        Fifth, there is no resulting trust over the disputed
22   real property.  By virtue of parishioner gifts, the
23   parishioners did not acquire an ownership interest at the
24   time that the real property was acquired or at the time that
25   building improvements were made.  They didn't because they
```

15

1 | weren't buying something.

2 | Finally, Your Honor, there is no constructive trust
3 | over the disputed real property. A constructive trust is a
4 | remedy to right a wrong. This Diocese did not obtain any of
5 | the disputed real property by fraud, or by misconduct, nor
6 | is it unjustly enriched by the ownership of these
7 | properties.

8 | Your Honor, at one of the status conferences you said
9 | you wanted to hear a lot about jurisdiction. Well, you're
10 | about to. If you'll allow me, I'm just going to-- Your
11 | Honor, as you go through the jurisdictional analysis, there
12 | are three principles that should be kept in mind. It's not
13 | the ones on the board. We'll get to those in a minute.

14 | First, this controversy can be addressed without
15 | resolving any religious issues, principle number one.
16 | Principle number two, under the guise of the right of the
17 | free exercise clause, no religious organization has ever
18 | been allowed to dictate the laws of the United States.

19 | And third, there is a compelling state interest to
20 | ensure predictability and stability of property
21 | relationships, especially so in a bankruptcy proceeding.
22 | And there is a compelling state interest to protect the
23 | community from the sexual abuse of children.

24 | The jurisdictional argument, we'll break down into
25 | essentially three headings. First, constitutional

16

1   limitations on your jurisdiction arise only when a court is
2   compelled to determine religious doctrine. Second, somewhat
3   related, this is not an intrachurch dispute. And finally,
4   mutual principles of law should be applied to resolve this
5   controversy.

6       Your Honor, <u>Jones v Wolf</u> provides you with the
7   jurisdiction to determine the ownership of the disputed real
8   property by the application of mutual principles of law. If
9   you use those principles, you will not be infringing on
10  anyone's First Amendment rights. These mutual principles
11  prevent infringement of the free exercise of religion and
12  they avoid violations of the establishment clause.

13      The Diocese asserts that you do not have jurisdiction
14  to determine the complaint, because the dispute is in fact
15  an intrachurch dispute, a dispute between the parishes and
16  the Diocese. As such, it argues that the only way to
17  constitutionally determine the dispute is to defer to its
18  position regarding ownership of the real property.

19      Now, intrachurch disputes are First Amendment sensitive
20  because they implicate either issues of doctrine or matters
21  of religious governance, importantly now between parties who
22  have subjected themselves to those rules. When you look at
23  a dispute through the First Amendment lens, you have to be
24  careful not to use a label like intrachurch dispute as a way
25  of defining the court's jurisdiction. You have to look

17

behind it.

The constitutional limitation arises in those cases when the court is compelled to determine a religious doctrine. Most of the litigation that we're faced with in the classic intrachurch dispute involves breakaway factions who then dispute the ownership and control of certain property. Thus, in identifying the opposing parties as religious entities, there are issues of who is the true church and who is the breakaway faction.

The courts, having to make that religious doctrine determination as to who the true church was, we try to classify the parties as either a hierarchical church or a congregational church. Because, under either classification, the court easily can determine who the decision maker was and then would defer to the authority of that decision maker.

For similar reasons, the courts have avoided employment disputes between clergy and religious denominations. The concerns are wise, not because they're necessarily intrachurch, but because the resolution of the dispute could require the court to make judgment calls about how the church's mission is carried out and in the context in which the parties have agreed to govern themselves by those rules. So, when a priest argues for one reason or another that he has an employment dispute with the Diocese,

18

the priest has agreed by virtue of his relationship with the church to be governed by those rules.

Now, we know that notwithstanding constitutional concerns, the courts rarely decide property issues involving religious organizations. In fact, it was a property dispute that was the subject of a litigation in Jones v Wolf. And that was the case in which the Supreme Court held that courts could constitutionally determine intrachurch disputes by the application of mutual principles of law. Likewise, courts regularly address, more frequently now, but regularly still address disputes between secular parties and religious organizations. And the courts do it without violating First Amendment principles.

We cite a number of those cases at page 48 of our responsive brief. And we challenge the Diocese to cite one case, just even one case in which a dispute between the church, or a church and secular creditors was ever decided by deference to a decision making body of a given religion. They did not cite one case because no such case exists.

Now, does this case raise the red flag of an intrachurch dispute? The committee believes that viewing this litigation from any perspective, the answer is clearly no. It does not. The Diocese says that this is an intrachurch dispute because it involves who own the property. But we all know that this litigation does not

19

1    represent a dispute between the Diocese and the parishes.

2         If we learned anything from the hundreds of pages that

3    were filed by the Diocese and the parishes, we learned that

4    they are absolutely aligned in support of the proposition

5    that the Diocese only has legal title and does not have an

6    equitable or beneficial interest in the property.

7         They insist that this is an intrachurch dispute,

8    nonetheless.  And I think of it as really a red herring.

9    They predict that if you rule on this matter, that there

10   will be a schism of historical portions in the Catholic

11   Church.  This is simply an effort to intimidate you from

12   applying mutual principles of law and to compel you to defer

13   to Bishop Skilstad's views of this case.

14        If the Diocese and the parishes lose this litigation,

15   the estate will be in--  will include the equitable and

16   beneficial interests in the disputed real property, at least

17   if you would make that determination.  We think it does now.

18   But even after you render that decision, the Diocese and the

19   parishes will be no less aligned on this issue than they are

20   today.  They will not have a dispute between themselves as

21   to who owns this property.

22        In our responsive brief, we illustrate how this would

23   have played out if the Diocese would not have filed

24   bankruptcy.  One of the plaintiffs presumably would have

25   obtained a judgment, they would have gone to state court,

                                20

1   and sought to enforce that judgment in a proceeding.  The
2   Diocese and/or the parishes would have opposed the efforts
3   to execute upon this disputed real property, and the court
4   by procedures set forth under Washington law would have
5   determined the issue.  It was a creditor versus judgment
6   debtor, i.e. Diocese dispute.

7        They don't deny that.  Nowhere in their papers do they
8   challenge that that is a scenario that would have arisen if
9   the bankruptcy had not been filed.  They argue that because
10  the claimants of the sex abuse survivors have been sent down
11  to state court that there is no jurisdiction here to
12  determine the property issue.  But those matters are really
13  apples and oranges.

14       The allowance of a claim in bankruptcy has nothing to
15  do with what is property of the estate.  If mutual
16  principles of law could be applied in Jones v Wolf, which
17  was a dispute between religious entities regarding property,
18  they are even more appropriately applied in a case involving
19  a secular party holding a personal injury claim.

20       It is one thing to impose a religious doctrine on
21  parties who have agreed to submit themselves to that
22  religion's rules, but it is entirely another thing when the
23  interaction between the parties is based on a physical
24  assault.  In such a case, you do not have an option that
25  adopts their faith based views of property relationships,

21

1  and you do not have the option to accept the Diocese's
2  contention that the corporation sole statute somehow
3  incorporates by reference all Catholic religious doctrine.

4      If you did that, you would be violating the
5  establishment clause in a manner that has never before been
6  heard of in an American court.  The Diocese does not address
7  our position of a violation of the establishment clause.
8  And on that basis alone, you should dismiss their insistence
9  that you defer to their religious authority.

10     The only analysis that you should apply to this
11 controversy is one that employs mutual principles of law.
12 In applying those mutual principles, you should look at
13 three things.  The corporation sole statute, their articles
14 of incorporation, and the deeds relating to the properties.
15 While they would have you, under the authority of Jones v
16 Wolf, look at their internal operating rules because Jones v
17 Wolf said that that could be done.

18     Based on that argument, the Diocese would have you use
19 religious canons to interpret their articles of
20 incorporation filed with the secretary of state under
21 Washington State law.  But you should not consider their
22 self-enacted canons when a judgment creditor addresses the
23 ownership issue of disputed real property.

24     Jones did state that the court could look into a
25 church's statutes.  That each case in which the courts have

22

1  authorized the consideration of such statutes is a property
2  dispute between the religious entities who subjected
3  themselves to the governance of those statutes.

4      The Washington State Supreme Court recognized this
5  distinction in <u>Presbytery of Seattle v Rohrbaugh</u>, at 79
6  Wn.2d, at 367.  The court said, "The United States Supreme
7  Court took notice of all these matters of church structure,
8  obviously not regarding them as ecclesiastical or doctrinal
9  in nature, but rather matters of agreement between members--
10  among members concerning their self-government which it was
11  necessary to examine in order to determine the right to
12  control the property."

13      The controversy before you, Your Honor, is not an
14  issue of who controls the disputed real property as between
15  members of religion who have reached agreement regarding
16  their self-government.  We do not have to give more than a
17  second thought to the difference between that kind of
18  property dispute and the circumstances under which claims
19  arose in this case.

20      The Diocese says that an adverse determination would
21  modify its relationship with the parishes and thereby
22  prejudice its First Amendment rights.  But, as I said
23  before, this court does not have to determine any issue of
24  religious doctrine that offends anyone's free exercise
25  rights.  The court's ruling today would have no effect, and

23

```
 1   here I'm paraphrasing Judge Brennan in Maryland v Church of
 2   God, would have no effect on any ritual.  Your opinion would
 3   have no effect on any liturgy of worship and it would have
 4   no effect on any tenet of faith.

 5        What your decision will impact is how much a
 6   bankruptcy debtor will have to pay unsecured creditors and
 7   how this Diocese will effect a plan of reorganization.  Your
 8   decision, vis-à-vis secular third party creditors holding
 9   tort claims, does not unconstitutionally dictate the
10   government structures of the Catholic Church.

11        It is true that your resolution of this case may
12   somehow transgress an adherence of beliefs regarding the
13   proper religious governance.  But every church property case
14   determined on mutual principles of law, necessarily involves
15   the rejection of someone's views of church governance.  In
16   fact, Jones v Wolf is a perfect example of that outcome.
17   For in that case, the hierarchy's views of governance were
18   rejected by the court.

19        Likewise, Chief Justice Renquist, in General Counsel v
20   Superior Court of California, upheld the state court's
21   rejection of testimony by church officials and experts
22   regarding the contents of the Methodist Book of Discipline,
23   including its constitution and bylaws.  The fact that the
24   church's leadership may lose this case does not mean that
25   you have violated their First Amendment rights.  And that is
```

24

especially true when they came to this court on a voluntary basis.

We know that the First Amendment does not guarantee and never has guaranteed an absolute right to be free of any restriction on religious practices. In the Smith case, the court concluded that generally applicable religious mutual laws that have an effect of burdening a particular practice need not be, need not be justified by a compelling governmental interest.

You also need to remember that when we discussed the effect of this court's ruling, the Diocese's current position is diametrically opposed to the position it took in the Munse case and the Miller decisions. In the Munse case, in its appellate brief, the Diocese specifically denied that parishioners had an interest in the parishes' real property.

And in Miller, the Diocese specifically advocated that it was both the owner and possessor of the parish real property. And we only have to spend a few minutes perusing the newspapers over a given week to remember that this Diocese's position regarding interest and real property are diametrically opposed to the views of the Bishop in Boston who denies that the parishioners have any interest in the real property, and who has been successful in his litigation. Copies of the reported decision are attached to our papers, have been successful in having a court reject

25

1 any concept of constructive trust, or implied trust, or
2 resulting trust for parishioners in parish real properties.
3      In the context of RIFRA, your ruling on what is-- at
4 §541 decision, what is property of the estate, will not have
5 as much an impact as to constitute a substantial effect on
6 the exercise of religion.  If it is considered to have a
7 substantial effect, there is a compelling government
8 interest in enforcing the bankruptcy code and specifically
9 its core section, §541, and making determination under it,
10 and Washington State law.
11      The Diocese trivializes what's going on here by saying
12 this is nothing more than maximizing a return to creditors,
13 trying to parrot the In Re Young language.  But what is also
14 going on here today is the protection of the community from
15 childhood sex abuse.  For litigation of this sort, and
16 Mr.Chopko points this out in his law review article,
17 litigation of this sort has an effect on how religious
18 organizations operate.
19      Your Honor, the parishes, but not the Diocese, contend
20 that you do not have jurisdiction under §157.  We've cited
21 three Ninth Circuit cases holding that the court has core
22 jurisdiction over the determination of what constitutes
23 property of the estate.
24      Your Honor, since you have jurisdiction to make the
25 decision, you should determine that the parishes are not

```
 1    separate legal entities.  If you make that determination,

 2    you have no need to go on to analyze the rest of the trust's

 3    arguments.  The so-called trusts would be in effect self-

 4    settled trusts and unenforceable against the interests of

 5    third parties because the church would have put it into

 6    trust for itself.

 7         Your Honor, the Diocese tries to make much of the fact

 8    that we said in our statement of undisputed facts that the

 9    parishes are unincorporated associations.  In our responsive

10    brief, we explained that the parishes are unincorporated

11    divisions of a larger corporation.  The distinction between

12    unincorporated divisions and unincorporated associations is

13    that the divisions operate under a corporate umbrella, and

14    that umbrella is the state recognized vehicle for property

15    ownership.

16         In contrast, unincorporated associations do not have

17    the overriding corporate umbrella, and therefore, we have

18    certain court decisions that would allow such associations

19    certain rights.  The analogy that somehow--  sometimes it

20    gets used, if not in the pleadings, then in conversations

21    between parties is that the parishes are as to the Diocese

22    like Oldsmobile is to General Motors.  It is simply there is

23    governing corporate structure and that governing corporate

24    structure is how the business, or the entities operate and

25    interact with the outside world.
```

```
 1        Federal law recognizes that the parishes are not
 2   separate legal entities.  And to repeat Dr. Conklin's cite,
 3   EEOC v St. Francis Xavier Parochial School is right on
 4   point.  The court looked at the financial submissions made
 5   by the parishes and said that such financial submissions do
 6   not dictate the conclusion that the parishes are separate
 7   entities.

 8        The court looked at the corporation sole statute in
 9   the District of Columbia, which is not unlike the
10   corporation sole statute in the State of Washington, and
11   said that because it was only through the corporation that
12   the Archbishop of DC could own property that the parishes
13   could not.  Similar situation here, there's no provision
14   under the Washington statutes for the parishes to own real
15   property.

16        The court looked at the financial controls that the
17   Archdiocese of DC had over the parishes, not unlike those
18   that exist in the Spokane Diocese Policy Manual.  It looked
19   at personal controls that the Archbishop, not unlike those
20   set forth in the Spokane Diocese Policy Manual, and it
21   concluded having considered all of those things that the
22   parishes did not exist as separate entities.  But, under
23   Washington law, the parishes are not separate legal
24   entities.

25        Again, unlike any of the unincorporated associations
```

28

1  discussed in any of the Diocese cases, these parishes
2  operate under a corporate umbrella of the corporation sole.
3  And it is that corporate umbrella that is the civil law
4  vehicle for holding property interests.

5      This result is consistent with the general rule stated
6  by the Washington Supreme Court in the Shorter case, in
7  which it said an unincorporated association is not
8  ordinarily a legal entity distinct from its component
9  individuals.  Now, they try to dismiss Schroeder (phonetic)
10  as old law, but it's never been overruled by the Washington
11  Supreme Court.

12      The Diocese's response to this argument is with a
13  number of cases that allegedly hold that unincorporated
14  associations can sue or be sued.  Notably, not one of those
15  cases involved an unincorporated association which operated
16  under a corporate umbrella like the parishes operate under a
17  corporation sole umbrella.

18      Let's just pick them off real quickly.  Hispanic Taco
19  Vendors v the City of Pasco.  Well, while it's true that the
20  appellate court of the Ninth Circuit did not address the
21  association's standing, if you go to the trial court
22  decision, which interestingly was in the Eastern District of
23  Washington, the court said Hispanic Taco Vendors of
24  Washington has yet to establish that it has standing to sue
25  as an association, however, the individual plaintiffs do

29

1   have standing.  And so the association's standing was not an
 2   issue in the case, and in fact had not been established.

 3       Your Honor, that trial court decision is at 790
 4   Fed.Sup 1023.  In fact, most of the cases do not even
 5   address the issue of the unincorporated association's
 6   ability to sue or be sued.  That is true in the Bacon v
 7   Gardner case, where in fact the association was not
 8   appearing on its own behalf, but appearing through a woman
 9   who described herself as a trustee.

10       It is true in the Harriston v Pack Ten Conference
11   (phonetic) case, associational standing was not addressed by
12   the court.  In the Church of Christ Center Individual
13   Centerville v Carter (phonetic) decision, that was an
14   intrachurch dispute of associations.  Not surprising that
15   they did not discuss associational standing when each of
16   them arguably might have had a defect in their litigation.

17       The Diocese cites a number of union cases for the
18   proposition that these unincorporated associations can sue
19   or be sued.  I would suggest to you that labor unions are
20   something of a special animal.  We know that they are highly
21   regulated.

22       We know that the whole area of employment relations is
23   highly regulated, and the fact of the matter is that the
24   courts had to deal with employees who were picketing, or
25   striking, or taking some other kind of job action, had to

                              30

```
 1   deal with that number of people in some orderly way.  And so
 2   to the extent that sue or be sued is even relevant to the
 3   doctrine of whether the parishes could be beneficiaries, I
 4   suggest to you that labor unions are just special.

 5        Now, one of the labor unions cases that's cited is
 6   International Association of Firefighters v Spokane
 7   Airports.  It's interesting to note that that case did not
 8   even state the nature of the union.  It described it as an
 9   employee organization or association, but did not state that
10   it was an unincorporated association.  I have no idea what
11   kind of entity that local was.

12        Also, that case was not about the union's ability to
13   bring a suit.  It was about the union's ability to sue on
14   behalf of third parties.  Likewise, in Save v City of
15   Bothell, it was about the Save Association's ability to sue
16   on behalf of its members.  What's even more interesting is
17   that entity was a nonprofit corporation.  It's not even an
18   unincorporated association case.

19        But even in the parishes can sue or be sued, that
20   issue is not relevant to their ability to hold real
21   property.  In the American Juris Prudence Treatise, under
22   the title associations, §13, it states, "A rule authorizing
23   suit by or against an unincorporated association in its
24   common name, for the purpose of defending or enforcing a
25   substantive right, does not create in that entity the
```

31

```
 1   ability to hold real estate.  The right to sue or be sued
 2   does not equal the ability to hold real estate."

 3       Thus, it is understandable why the Diocese does not
 4   cite to one case in which an association itself appears as
 5   the grantee of real property.  Now, the one case they do
 6   really focus on is the Leslie v Legate (phonetic) case.
 7   That case had interesting facts.  You have a husband and
 8   wife, the husband at least was acquiring real property for
 9   the purposes of a joint venture to develop the real
10   property, and the joint venture agreement contemplated that
11   the property would rollover into a corporate entity.

12       And the husband and wife decided that they were going
13   to make a grab and say, oh, when it went through the
14   husband's hands, he acquired a 25 percent interest in the
15   property.  The corporation has 75 percent, of which they are
16   also a shareholder, so they kind of doubled up, versus the
17   opponent's position, which was no, simply the corporation
18   owns the property and we have whatever stake you have by
19   virtue of your shareholder status.

20       The trust interest that's described in that case, in
21   actuality was never held by the unincorporated association
22   in its own right, that being the joint venture that preceded
23   the corporation.  It was really only a temporary vehicle for
24   ultimate corporate ownership.

25       Quoting the court now, "As to a corporation's capacity
```

32

1    to be the beneficiary of a trust even though not in
2    existence when the trust agreement was executed or when the
3    trust property was acquired, Scott on Trusts, volume two of
4    Stocks states, "Just as a trust may be created in favor of
5    an unborn child, so also it can be created in favor of a
6    corporation not yet organized."

7         If there was a trust in that case, it was a trust for
8    the benefit of the corporation, and not a trust for the
9    benefit of an unincorporated association.

10         Your Honor, the Diocese contends-- we're going to
11   move on, Your Honor, to the trust arguments for a second.
12   The Diocese contends that the corporation sole statute
13   creates a statutory trust for the parishes.  But the history
14   of the corporation sole concept demonstrates, as Dr. Conklin
15   said, it demonstrates that it was meant to deal with the
16   division of personal beneficial capacities of church
17   representatives.  And it provided a secular vehicle for
18   social-- secular interactions with the community.

19         It simply could not incorporate by reference all of
20   the dogmas and rules of the Catholic Church and still be in
21   compliance with the constitution and the establishment
22   clause.  So when the statute refers to trusts, it is
23   addressing the distinction between the standard of conduct
24   for the Bishop vis-à-vis church property, and he has a
25   fiduciary duty standard vis-à-vis that property versus his

33

own personal possessions which he may use as he desires.

So, Your Honor, I'm going to put up the statutes and just look at the language of the statutes as we go through them. Your Honor, the first of the corporate sole statutes is RCW 24.12.010. It is a law of general applicability to all religions and must be interpreted from that perspective.

Now, the Diocese contends that its canon laws are incorporated by reference in this statute, because it says that the Bishop may in conformity with constitution, canons, so and so of the church become a corporation sole. The phrase "in conformity with" is important. The statute cannot create governmentally endorsed trusts pursuant to the canons of the Catholic Church. That would violate the establishment clause.

In addition, as I noted earlier, no secular party has ever been held to the rules of the Catholic Church in connection with a tort claim against that church. The plain language of that statute says that this section deals with the formation of the corporation's sole. It does not deal with the corporation sole's powers. That's the next section, which in fact is entitled powers of the corporation.

As we stated in our brief, the holy Cee specifically authorized American Bishops to use a corporation sole. That's what "in conformity" means. The corporation sole

34

concept is not found in the canons, and so there had to be
authorization for the Bishop to use them. And that
authorization came from papal permission in the late 1800s.

Also, the idea that this statute incorporates the
canons makes no sense from a time line perspective. This
statute was passed in 1915. The canons, the most-- you
know within the last hundred-plus years, the canons were
enacted two years later in 1917. And then there were new
canons in 1983.

Does the Diocese seriously contend that the laws of
the State of Washington are kind of a moving target and that
every time that new canons are issued somehow the laws of
the state are magically rewritten to be in conformity and to
incorporate by reference those canons? That argument we
contend is not reasonable. It certainly is not
constitutional.

The next code section, §020. Your Honor, this is the
second of the three statutes and it says in the first line
that the corporation shall for purposes of the trust have
certain powers. This is the first time the word "trust"
appears in the corporation sole section. So it's kind of
like, what I call a non-entity. We're not quite sure what
trust is referring to because .010 doesn't talk about a
trust. But it's interesting to note in the case of County
of San Luis Obispo v Ashurst (phonetic), which is a

35

1  California decision that talks about the California
2  corporation sole statute. It's cited in our brief. And
3  that statute is similar, it's not quite diagrammed out the
4  same way, but it says that the powers of the corporation are
5  for the trust.

6      And the court in that case said, "The powers of the
7  corporation sole to administer the property are extensive
8  and almost unfettered, except for the qualification that the
9  property must be used for the purposes of the office,"
10 equating the term "office" with the concept of trust in the
11 California statute, which is essentially similar-- actually
12 it's identical to this statute in using the term "the
13 trust". So we get back to what we were talking before, the
14 trust is really just the differentiation between Bishop
15 Skilstad's personal assets that he can pass onto his sister,
16 or brother, or nephew, and the assets that he holds and must
17 conduct himself as a fiduciary towards that are in fact
18 church property.

19     The final of the three statutes, Your Honor, and the
20 important language there, I think by consensus is at the
21 end, which is that the Bishop, in his official capacity
22 shall-- that the property, I'm sorry, held in such official
23 capacity by the Bishop shall be in trust for the use,
24 purpose, benefit, and behoof of the church.
25     It is clear, because this is a Washington State law

36

that constitutionally must be religiously neutral, as far as
the establishment clause is concerned, is not referring to
the Catholic Church or any particular section of the
Catholic Church. It simply refers to churches, religious
denominations or societies, whatever they may be.

In applying mutual principles of law, no particular
church organization is intended there. It doesn't say shall
be in trust for the use, purpose, benefit, behoof of
parishes. It doesn't say for parishioners. It doesn't say
mosques, and it doesn't say synagogues. It says church, in
a mutual sense. Now, the Diocese will then have you believe
that relying on these mutual statutes that an express trust
is-- was created through its articles of incorporation.

Your Honor, we tried to have them blow it up, but they
said Mr. Cross' project had priority over mine. No, I'm
only kidding. But what it says is that the property is held
in trust for the Roman Catholic Church of the Diocese of
Spokane.

These articles simply reinforce the distinction
between the personal and official capacities of the Bishop
as provided in the statute. Now, the Diocese wants you to
read into the definition of church, its canons. But as we
noted in our jurisdictional discussion, you must rely on
mutual principles of law and keep in mind that the parties
to this dispute have not consented to the governance of

37

1  their relationship with the religious law of this Diocese.

2       Now, the express trust argument also fails, because

3  the deeds to the disputed real property do not evidence a

4  trust relationship.  They generally provide that the

5  property is vested in the Bishop of Spokane, a corporation

6  sole.  The statute of frauds provides that a beneficial

7  interest in real estate must be evidenced in writing and

8  cannot be established by oral evidence.

9       The Diocese argues that there's a partial performance

10  exception that takes this case out of the statute of frauds.

11  We have addressed in our responsive brief why the exception

12  does not apply and the Diocese did not reply to that

13  analysis.  So we've taken care of the statutory trust

14  argument, we've taken care of the express trust argument.

15       Now, let's move onto the implied trust argument, which

16  is broken down into two segments, constructive trusts and

17  resulting trusts.  And in thinking about implied trusts, we

18  have to remember that they are a remedy.  When we talk about

19  implied trusts, think about the interests that are being

20  protected and think about what right--  I'm sorry, what

21  wrong the court is trying to set right.

22       In the resulting trust, the interest is that of a

23  person who paid the purchase money for the property with the

24  expectation that they would own the property.  I think in

25  that sense calling it a purchase money trust was as a

38

```
 1   resulting trust probably goes-- describes the concept more
 2   accurately.  In the case of the constructive trust, the
 3   interest is that of a person who-- the defendant, if you
 4   will, who unjustly receives or retains property and should
 5   be required to give the property back.

 6       All of the cases that are discussed by the Diocese and
 7   the parishes are disputes between the person who transferred
 8   the property and the person who received it.  Those disputes
 9   are pigeonholed then into whether they are resulting trusts
10   or constructive trusts.  But in this case, Your Honor, there
11   is no wrong to remedy.

12       No one misrepresented anything to a parishioner when
13   they were asked to donate their money.  No one defrauded a
14   parishioner when they were asked to donate their money.
15   There was no wrong, there was no unjustness, there was no
16   fraud, there was no unjust enrichment when that money was
17   voluntarily given by the parishioners.

18       The Ninth Circuit Bankruptcy Appellate Panel made
19   clear that a donation of money does not translate into an
20   implied trust on the object for which the money was spent.
21   In In Re Carmel of St. Joseph of Santa Inez (phonetic), the
22   Ninth Circuit dealt with a set of facts where a relative of
23   a nun decided to use family trust funds to help build a
24   monastery for her order.  And that property was at least
25   acquired, and the order filed bankruptcy.
```

The brother, the nun's blood brother, came back and said, hey, I have an implied trust on the property that my family trust money bought. The court rejected that and said the donor's interest, if any, was only in the money. He did not obtain a beneficial interest in the property. The donor has no rights to the property and there is no basis for the imposition of a constructive trust or a resulting trust.

Likewise, Your Honor, we cite to a District of Columbia Court of Appeals decision shorthanded as Save Immaculata, where using mutual principles of law, the court considered the resulting trust, implied trust, constructive trust arguments of alumni, students, and parents, who are trying to keep an order of nuns from shutting down a school and using the sale proceeds to fund their retirement fund, which was being depleted.

The court specifically found that that money had been raised by those plaintiffs to purchase the property, to build the improvements, and was used-- and was given for the purpose of maintaining the educational functions of the school. The court said that those people had no constructive or resulting trust interests in the properties themselves.

We cite seven other cases involving religious entities, in which the subordinates in a hierarchical church assert interests under an implied trust theory. Not a

40

single one of those cases has that subordinate winning on an
implied or resulting trust theory. There is not one
citation from the Diocese or the parishes of a subordinate
entity, or person, or whatever you want to call them,
winning that fight.

What the parishioners got, Your Honor, for their money
is succinctly stated in the Conavero case cited in our
brief. In that case, we had members of a parish who had
given money for their acquisition, the building, and
maintenance of that property. And the Pennsylvania Supreme
Court said, having considered that testimony, you know what
you were really doing was donating money for worshipping the
glory of God. You weren't acquiring-- these are my words,
they weren't acquiring an interest in real property when
they made those donations.

Secondly, Your Honor, remember the implied trust is a
remedy that rights a wrong. The remedy is not just the
declaration that the wronged party is the beneficiary of the
trust. Bogart's, a handbook on trusts, the sixth edition
says, at sections 74 and 77, Your Honor, this is the one
volume edition, that the judicial decree establishing the
resulting or constructive trusts will require the defendant,
this is the party who did the wrong, to deliver possession
of the property and convey title to the property.

Nowhere has the Diocese ever contended or the parishes

41

1  themselves for that matter, but the parishes could hold full
2  title to the property in their own name.  They never say
3  that they can do that.

4      Yet if this were a case where you were ruling that a
5  constructive trust existed for their benefit, you would have
6  to order the Diocese to put the property in their name, to
7  convey a deed to them.  But they are legally incapable of
8  taking that deed in their own name.  And for that reason,
9  just simply the function of the remedy itself, they cannot
10  successfully contend their argument.

11      Your Honor, the resultant trust, as I said was what we
12  call a purchase money trust.  And the Washington Practice
13  Book says that there's a presumption of a resulting trust
14  when the property is transferred to one person and the
15  purchase price paid by another.  But there are exceptions to
16  that presumption, actually there are two that are relevant
17  here.

18      The first is that the transfer-- if the transfer was
19  intended as a gift or a loan, no resulting trust arises.
20  Though the parishioners own affidavits there is evidence
21  that they intended to make a gift when they made their
22  donations.  And with that evidence the presumption of the
23  resulting trust ceases to exist.  That is the holding of
24  Bradley v SL Savage, at 13 Wn.2d 28.

25      The second exception is whether the payor provided all

42

```
1   of the consideration or only part of the consideration.
2   Well, in no instance do we have a declaration that the
3   parishioner, there's usually one per parish, has supplied
4   all of the money that went to the acquisitions of the
5   properties.  And if you go through the time line on some of
6   those declarations, those parishioners came in years after
7   the property was acquired, or the building improvement was
8   made.  And so they couldn't possibly satisfy the second
9   requirement, or deal, if you will, with the second
10  exception.
11          Your Honor, the constructive trust is not--  cannot
12  be employed here because there is no wrong to remedy.  As I
13  said, the money was used for the purposes that it was
14  intended.
15          There was no fraud or deception involved.  When a
16  parishioner wanted its money to go to the building
17  construction of a roof, it went to the construction of the
18  roof.  And when they wanted to have a new school or church
19  built with their money, that's what was done.  The school
20  was built, or the real estate was acquired.
21          There was no wrong here.  And even if it wasn't
22  acquired, because I know there's a parish or two that had
23  money that they say deposited with the DLF, that money was
24  not obtained wrongfully from them.  None of them lied to
25  them when they said we want to build this school, so give us
```

1 the money for it.

2 In an effort to find some basis for the allegation
3 that there is a constructive trust, in the absence of
4 Diocese's misconduct, the committee discussed a constructive
5 trust concept based on an implied contract, because we
6 recognize, Your Honor, that this is an area of law that's a
7 little loosy-goosy.

8 Now, if there's something that hits you that's wrong
9 about this, a court can make some argument that some kind of
10 implied trust should apply. We recognize that. That's why
11 we went the step further, to see if there was some theory
12 beyond the fraud, or the deception, or the misrepresentation
13 that might justify this argument. And we couldn't find it.

14 If you're going to use a quasi-contractual theory for
15 imposing a constructive trust, there are at least two
16 requirements. One, is that the wrongdoer must have been
17 enriched by some unjust action. That theme continues
18 throughout the analysis no matter how egregious the conduct
19 is from one end of the spectrum to the other. But the
20 second, is the plaintiff cannot be a mere volunteer.

21 Well, do we even have to get there? I mean, is there
22 a single parishioner who made a contribution of money who
23 did it because they were compelled to do it? No. Each and
24 every one of them was a mere volunteer and thus, taken out
25 of the context of any theory for a constructive trust.

44

```
 1          Finally, Your Honor, the Diocese contends that we have
 2   not dealt with the issue of restricted gifts, the gifts with
 3   strings.  But that theory that somehow keeps the property
 4   from being property of the estate to be used to pay
 5   creditors, really flies in the face of common sense that we
 6   all have that charities, no matter how organized or
 7   disorganized they are, has to pay its bills.  I don't think
 8   anyone--  well, at least with very rare exception, gives
 9   their money to the charity and says, here, use this to pay
10   for the car accident that one of your workers had yesterday.
11   We want to make sure that the tort victim is well taken care
12   of.

13          They give the money generally, for whatever specified
14   charitable objective or religious objective that entity has.
15   And under no theory, and I don't care if you use the
16   institution of funds management law, the nonprofit
17   corporation dissolution statute, the administrative
18   corporation--  the administrative dissolution corporation
19   statute that specifically is in the Washington corporation
20   sole statute scheme, none of them say charities and
21   religious institutions do not have to pay their bills.

22          If the charitable immunity dock--  if abrogation of
23   the charitable immunity doctrine means anything, it means
24   that religious institutions must pay their bills.  And
25   that's what this case is about, Your Honor.  It's about the
```

45

1  Diocese paying its bills.

2       Thank you, Your Honor.

3       THE COURT:  All right.  I have 10:45, and I know the

4  benches, in particular get a little hard, so I guess, Mr.

5  Cross, you're the next one up.  Would you like a break?

6       All right.  Just because of the number in the

7  courtroom, I think we should plan on being back at 11:00.

8  And I expect the audience to be in their seats at 11:00, not

9  11:05.

10      Okay.  We'll recess.

11                                              (Recess)

12      THE COURT:  Hold on, Mr. Cross.  All right.  Mr.

13  Cross, you're next.

14      MR. CROSS:  Thank you, Your Honor.  For the record my

15  name is Shaun Cross, with the firm of Paine Hamblen, and we

16  are acting as reorganization counsel to the debtor in this

17  case, the Catholic Bishop of Spokane.

18      THE COURT:  Okay.  Just a moment.  I'm sorry.  I

19  forgot something.

20      In this courtroom, which is a historical courtroom, we

21  don't have all the modern conveniences we do in our new

22  courtroom.  We do, however, have an air-conditioning system.

23  The problem is if we turn the air-conditions system on, we

24  can't hear through the recording equipment.  So we have a

25  choice to be either hot and hear, or to be comfortable and

46