```
 1          MR. STANG:  Okay.

 2          THE COURT:  And it was 40 minutes, is that right?

 3          MR. STANG:  All together 40 minutes, Your Honor.

 4          THE COURT:  All right.

 5          MR. O'ROURKE:  Your Honor, while I'd love to partake

 6     in the balance of this party and hear well versed counsel on

 7     the summary judgment motion, since it does not apply to the

 8     Immaculate Heart Center, does the court mind if I excuse

 9     myself?

10          THE COURT:  Please do, Mr. O'Rourke.

11          MR. O'ROURKE:  Thank you, Your Honor.

12          THE COURT:  All right.

13          UNIDENTIFIED SPEAKER:  Also, Your Honor, Mr. Conklin

14     said that he would like a few minutes after we're done, he

15     said about five minutes.  So if that's all right.

16          THE COURT:  Just--  I'll have to rely--  Mr. Conklin,

17     don't let me forget.  All right.  Ms. Hamilton, it's a

18     pleasure to have you here.

19          MS. HAMILTON:  Nice to see you, Judge.

20          THE COURT:  All right.  Give me the benefit of your

21     words of wisdom.

22          MS. HAMILTON:  Here I am.  The reason I thought that

23     it would be worthwhile for me to speak is that I am

24     concerned that the Diocese has rather severely

25     mischaracterized the law through lack of precision.  And so
```

146

what I'd like to do is go briefly through the arenas where I think that correction needs to be taken.

Mr. Cross argues that there is a difference, that there are different types of jurisdictions. Some of them follow the Watson case at the Supreme Court, and use compulsory deference, and some of them use Wolf mutual principles of law. The truth is, is that's a false dichotomy. Those are not mutually exclusive choices Wolf, at the United States Supreme Court does not overrule Watson. They are different cases.

The Watson case where this state would use compulsory deference, that case involved litigants who came into the Federal Courts and said we have a dispute over what we believe, please determine what we believe.

And the United States Supreme Court has said over and over again no court may determine the beliefs of any religious group. That's a compulsory deference scenario.

If there is a request for the court to determine the belief, then the courts are forbidden to do that. But the Wolf case does not involve a request that the court determine their beliefs. Rather, they were all in agreement that there was a schism, that they weren't getting along, and that they wanted the court to determine who legally owned the property. That is a mutual principle of law question.

147

```
 1          The courts can always address mutual principles of
 2     law, even if a religious group is in front of it.  So what
 3     we have here is the Diocese saying--
 4          THE COURT:  Just--  just hold on.
 5          MS. HAMILTON:  Yes, no problem.
 6          THE COURT:  I think I typed the wrong thing.  I did.
 7     I'm sorry.
 8          MS. HAMILTON:  That's okay.
 9          THE COURT:  I typed the wrong thing.  The Wolf case--
10          MS. HAMILTON:  The Wolf case stands for the
11     proposition--
12          THE COURT:  Right.  But what was the other case?
13          MS. HAMILTON:  Watson.
14          THE COURT:  Watson.
15          MS. HAMILTON:  Watson is the original case in which
16     the Supreme Court--
17          THE COURT:  Right, right.
18          MS. HAMILTON:  --  said no court may determine--
19          THE COURT:  Okay.
20          MS. HAMILTON:  --  belief --
21          THE COURT:  Thank you.
22          MS. HAMILTON:  --  of course.
23          THE COURT:  I typed the wrong name.
24          MS. HAMILTON:  It's easy to get them confused because
25     they're both Jones' cases.  But, anyway, I tried to leave
```
148

```
 1 │ that out.

 2 │        THE COURT:  Okay.  I'm sorry.  Go ahead.

 3 │        MS. HAMILTON:  That's okay.  What we have here is the

 4 │ Diocese arguing that this is a case that implicates a

 5 │ dispute over canon law.  There is no dispute from the Tort

 6 │ Litigants Committee that there's any dispute over canon law.

 7 │ We respect their right to believe whatever they want.

 8 │        The First Amendment absolutely protects that.  But the

 9 │ question here is how does state law apply to this issue?

10 │ Who owns the parishes?

11 │        That is a legal question.  It does not require this

12 │ court to determine canon law, and in the State of Washington

13 │ the Wolf reasoning would apply.  So to treat those as

14 │ independent approaches is not accurate.

15 │        Now, the Diocese has, in my view, led the court astray

16 │ rather seriously on the Religious Freedom Restoration Act.

17 │ The Religious Freedom Restoration Act may not apply to state

18 │ law.  That's clear.  Bernie v Florez (phonetic), at the

19 │ United States Supreme Court in 1997, held that Congress

20 │ could not use RIFRA as applied to state law.

21 │        Now, the question for the court today is a question of

22 │ state law.  Is this a trust of whatever variety?  Who owns

23 │ this property?  Those are questions of state law.  RIFRA may

24 │ not be used to alter or amend state law on those issues.

25 │ RIFRA only applies, if it applies at all, it's my view that
```

149

1   it's unconstitutional, but if it applies at all, it applies
2   to federal law, but that's not the question before the court
3   today.

4        The question is to the state law issue of who owns the
5   property-- who owns the parishes? So RIFRA is beside the
6   point. Even if this court, though, were to take into
7   account RIFRA and say that somehow it applies just because
8   this is a federal bankruptcy proceeding, I think it's
9   important to understand there is heavy reliance on the Young
10  decision, and there's an argument that somehow the Eighth
11  Circuit's decision in Young is going to determine what would
12  happen in this case.

13       And the theory has been set forth that if it's just
14  $13,000 being tithed there, whatever thousands of dollars
15  here would be so much larger, then that must be a
16  substantial burden.

17       The two cases are completely distinctive. The Young
18  case involved a couple, two individuals, who claimed that
19  their money should go and stay with the church. That's not
20  this situation. We're with an institution here. Dollar
21  amounts do not determine substantial burden. Courts have
22  said that over and over again. It's not dollar amounts.

23       The question is, and this is the Ninth Circuit's test,
24  is has the law made it impracticable for a religious entity
25  to practice its religion? And that test cannot be satisfied

150

1  in this circumstance. This does not create the application
2  of-- state property law does not create the kind of
3  substantial burden that RIFRA is designed to redress. But
4  even if this court were to say well, somehow RIFRA applies
5  in the context of state law, and somehow there is a
6  substantial burden showing, there can be no question that
7  there is a compelling interest in the stability and the
8  predictability of property law in the context of bankruptcy
9  law.

10  Young dealt solely with the question of bankruptcy
11  law. We're dealing here with the question of how are
12  parties going to organize their affairs if the local and
13  state property law is altered in the context of federal
14  bankruptcy law for the purpose-- because there's a
15  religious debtor? There's a compelling interest in
16  predictability and in stability in this particular situation
17  that simply wasn't addressed in Young. This is an unusual
18  confluence of situations.

19  Now, with respect to the canon law that has been
20  referred to more than once, I want to emphasize that they
21  have the right to believe anything they want. The First
22  Amendment absolutely protects them. This court may not tell
23  them what to believe. But that does not begin to give them
24  a right to avoid mutual and generally applicable laws.
25  That's a very different issue.

1    Their conduct can be regulated if they are in the
2  market, in the property market.  Their conduct in the
3  property market can be regulated even though they are
4  religious.  So in my view raising canon law is, in fact, a
5  red herring.  But that's not the issue in this case.

6       The issue in this case is the Jones v Wolf issue of
7  what actions have been taken?  Have they, in fact, created
8  trusts?

9       Now, other Dioceses and Archdioceses have taken the
10  legal actions that are necessary to make this issue clear.
11  This Diocese never did that.  They have never taken those
12  legal actions to make them clear.  And what Jones v Wolf
13  says at the end of the opinion, it gives a warning to
14  churches.

15       It says if you expect the courts to follow your
16  intentions, you're going to need to abide by the laws of
17  property.  And that is precisely what needed to happen here
18  if this is the result the Diocese wanted.  But they did not
19  do it, and the result is that the state principles of laws
20  must apply, and they cannot use canon law now to fill in
21  their failure to follow legal procedures.

22       It's just not adequate.  And if this court were to use
23  canon law to fill in the meaning of civil law, especially
24  the meaning of State of Washington law, it would be a clear
25  violation of the establishment clause.

152

1    Let me just close by saying, it is black letter law.
2    In the United States the law can burden religious entities.
3    If an order of this court were to burden the canon law of
4    the Diocese, that does not make it unconstitutional.

5    Now, the argument in the briefing that I've read is
6    that any order by this court that would be at odds, in any
7    way with the canon law as they presented it, would be
8    unconstitutional is indefensible.  It is black letter law,
9    the law applies to religious entities and their conduct.
10   This court would not be in the business for these purposes
11   of determining their belief.

12   Now, Washington State we are told, uses strict
13   scrutiny.  And, therefore, because they use strict scrutiny,
14   the church must win on this issue.  The fundamental problem
15   for that characterization is that the Washington State
16   Supreme Court did not say that it would now apply strict
17   scrutiny with respect to every case conceivable.  What it
18   said is that it would apply the law before Employment
19   Division v Smith, in 1990.

20   Now, the law before 1990 was not strict scrutiny in
21   every circumstance.  It was strict scrutiny in a small
22   handful of circumstances.  The free exercise clause, as
23   interpreted by the Supreme Court between 1963 to 1990, and
24   in those state courts that followed that era is context
25   dependent.

153

1     It depends on the context of what the level of
2  scrutiny is. And in the vast majority of the states, if the
3  issue was land use, strict scrutiny is not applied. So the
4  argument that somehow there is an overarching strict
5  scrutiny standard that means automatically the Diocese wins
6  or the Diocese canon law determines the result, is just not
7  an accurate reading of the Washington State cases.

8        Thank you.

9        THE COURT: All right. Thank you.

10       MR. CONKLIN: Frank Conklin, Your Honor, representing
11  Mr. Shea. Very briefly, the-- on page 14 of our original
12  memorandum, we cited Zoalman's Work on American Church Law,
13  wherein he points out that a religious corporation is just
14  like Standard Oil. It's the same as in the other
15  corporation.

16       The argument was made on behalf of the Diocese that
17  since this is religious property and a religious leader,
18  therefore, it's a different type of corporation. It isn't.
19  It's just another corporation. It's governed by the same
20  rules.

21       The second point that was made was that if the court
22  rules against the Diocese on the parish issue, the Bishop
23  will be ordered to violate canon law, which isn't true. The
24  court can appoint a receiver if it comes to that to do any
25  transferring of property. So the argument is without merit.

154

1    But, the real issue that the Diocese has failed to address
2    the non-establishment clause, which we keep insisting is the
3    governing issue here.  It wasn't even mentioned by the
4    Diocese in opposition.

5        And, again, if go back to page 17 of our reply
6    memorandum where we're quoting from Reynolds v United States
7    and point out that in Reynolds, which is the landmark case
8    on freedom of religion, the major concern that they had or
9    one of the major concerns was the patriarchal nature of the
10   Mormon Church and the fact that it was theocratic.  And,
11   therefore, it could not be brought into American traditional
12   life.  And that's exactly what the Diocese is arguing in
13   this case, that the theocratic structure of canon law is to
14   govern Washington citizens.

15       Let me complete by saying a simple example, I think
16   should illustrate it.  If someone is seriously injured by a
17   drunk driver, there is no defense that the drunkenness
18   occurred because the individual was over served the
19   Sacramento wine.  The religious issue doesn't arise.

20       You don't say let's look to canon law to see whether
21   or not the injured party can recover.  And the reason is the
22   non-establishment clause.  So I think that Mr. Shea is
23   entitled to summary judgment because they haven't responded.

24       Is there any questions?

25       THE COURT:  Not yet.

1       MR. CONKLIN:  Okay.

2       THE COURT:  All right.  Hold on, Mr. Stang.

3       MR. STANG:  Okay.

4       THE COURT:  One minute.  All right, Mr. Stang.

5       MR. STANG:  Thank you, Your Honor.  Your Honor, I

6  think it is important for the progress of this case for a

7  decision to be made to grant the summary judgment of the

8  committee as compared to Mr. Elsaesser's comments that this

9  should somehow be kicked over for trial.

10      This case needs the resolution of this issue.  And as

11 I said at the beginning of my comments, you have the

12 jurisdiction to do it and you can do it without having to

13 get into the factual issues that Mr. Elsaesser contends are

14 posed by the affidavits of the parishioners.

15      We need to go for a moment to the purpose of the

16 corporation sole.  The purpose of the corporation sole was

17 not to somehow establish the Catholic Church hierarchy

18 regarding property in a civil context.

19      The purpose of the statute was, in effect, to protect

20 church property from bishops and other religious figures who

21 were treating religious property as their own property, or

22 who held property in a way that enabled their creditors to

23 have it treated as their personal property.  That

24 distinction between personal property of religious figures

25 and the property that that religious figure uses in the

156

1  context of his or her official position is the distinction
2  that underlines the term "trust" in the statute and that it
3  underlines the word "trust" in the articles of
4  incorporation.

5      These are not formal trusts that we learned about in
6  law school with a trustee, a trustor, and beneficiary.  The
7  statutes and the articles underscore, this is not your
8  property, Mr. So-and-so, or Mrs. So-and-so.  This is the
9  property of the church.  And we are trying to hold the
10  church responsible in this case for its action so its
11  property should be subject to creditors' claims.

12      I think it might have been, I can't remember if it was
13  Mr. Elsaesser or Mr. Cross who said that an adverse ruling
14  here would have an effect upon the Bishop's religious
15  beliefs because he would be compelled to violate canon law.
16  And you can't order him to do that.

17      Well, if you decide even one piece of property is
18  property of the Diocese, at some further point in time, be
19  it under a plan, or a motion, or whatever circumstance, that
20  property has to be sold or mortgaged.  And the Bishop says,
21  you know, I can't do that.  I don't have the permission from
22  the Holy See or the appropriate authorities in Rome to do
23  that.  You can't make me do it.

24      He doesn't get a walk.  He doesn't get to leave
25  creditors hanging.  The answer is you are no longer going to

157

1 | be the representative of this bankruptcy estate for that
2 | purpose.

3 | Now, that means the appointment of a trustee for a
4 | limited purpose to convey title to property or properties,
5 | then that should happen.  What shouldn't happen is that he
6 | is excused from his responsibilities as a debtor-in-
7 | possession; responsibilities that he voluntarily undertook,
8 | because he falls back on his religious beliefs.

9 | I don't think I'm out of turn discussing this, but I'm
10 | sure you'll stop me if I am.  Mr. Elsaesser described this
11 | as a §542 action.  And I think maybe what he was trying to
12 | do was, without arguing the motion to dismiss, try to make
13 | this into one of these "the trustee shall" or "the trustee
14 | may" statutes.  But this is not a §542 action.  The Diocese
15 | has title to the property.

16 | Under the Miller decision, the one where that
17 | childcare worker seemed to want to climb up onto the roof of
18 | the parish hall and then fell through.  It was with the
19 | Munse case.  We talked about the judicial estoppel context.
20 | The court held that not only was the Diocese the owner of
21 | the property, it was also the possessor of the property.

22 | Well, I don't know how you can have a §542 turnover
23 | action when you already are in possession of the property.
24 | A position, by the way, advocated by the Diocese in this
25 | case.  And so this is a, not to go over Mr. Campbell's

158

1   argument, but this is not one of derivative actions that the
2   Diocese and the parishes didn't want to drive us into.

3      Mr. Elsaesser says keep your eye on the money. Where
4   did the money come from? Well, we all know where the money
5   came from. It came from parishioners and other people who
6   made donations, who made donation of funds. But then he
7   says, but that lady in 1958 who wrote the check doesn't have
8   a property interest when she wrote that check. Well, I
9   don't get it.

10      If the applied trust theories are to follow the money,
11   I'm following the money. The money came from the
12   parishioners. And then he tells, in almost the same breath
13   that they are not the parties who should be the
14   beneficiaries of the implied trust.

15      I don't know how he can have it both ways. And he
16   does not address, and Mr. Cross does not address, the fact
17   that if you were to have an adversary proceeding before you
18   to enforce or impose a constructive trust or a resulting
19   trust, and you were to order that the Diocese deed the
20   property over to the parishes, how could they hold that
21   property if they are unincorporated associations?

22      The State of Washington's real property desk book says
23   it has been generally-- it has been held that
24   unincorporated associations such as fraternal lodges,
25   churches, and then other religious organizations cannot hold

1    title to real property because they are not legal entities.
2    And I don't have to go much further than the Diocese's own
3    policy manual at §5.02.05, where the Diocese itself says,
4    "Under the laws of the State of Washington all property in
5    the Diocese is owned by the Catholic Bishop of Spokane, a
6    corporation sole."

7    This means that parishes, institutions, et cetera,
8    cannot legally own property in their own name. And the
9    clincher is the next sentence, "There is no legal entity of
10    the parish to hold such ownership."

11    Now, we'll tell you they meant automobiles when they
12    said that, because the next paragraphs deal with title to
13    automobiles. But I didn't read-- I didn't find the word
14    "automobile" in what I just read to you.

15    I'd like to just point out the things that they didn't
16    talk about. They didn't talk about how they can reconcile
17    what would happen in the state court judgment enforcement
18    proceeding where the interests are clearly those of a
19    judgment creditor against the Diocese or the parish, and how
20    that isn't really what is going on here. There's no
21    question that this is a case of creditor interests versus
22    the Diocese.

23    And as a real footnote for a moment, Your Honor, it's
24    not just the litigants, as I pointed out in our last
25    telephonic conference call, the cooperation of the Tort

1    Claimants Committee has been added to this proceeding.   And
2    they will address you separately, but they've been very much
3    a part of the briefing here.  So it's not just litigants,
4    it's the claimants in their entirety.

5         They totally fail to address the holding in EEOC, and
6    the other cases which describe the unincorporated division
7    concept in the context of an umbrella of a corporation.
8    They don't want to talk about the fact that each and every
9    one of their unincorporated association cases to the extent
10   they dealt with the standing of such associations at all,
11   and for the most part they did not, simply were not in the
12   context of, what I call the Oldsmobile/GM analogy.  And the
13   fact that they have convinced a bank to let them open a bank
14   account, or convinced the IRS to do that incredible task of
15   getting a tax ID number, simply-- or that they get a roofer
16   to send them an invoice is simply not the legal conclusion
17   that they are separate entities.

18        Did those things happen?  Yeah, they happened.   Does
19   that mean they are unincorporated divisions?  Well-- or
20   even unincorporated associations?  Maybe it does, but it
21   doesn't then give them the legal capacity to hold title to
22   property or to hold even beneficial interests in property.

23        They haven't explained how the phrase "the trust" in
24   the corporation sole statutes applies generally to churches
25   that, for example, don't have trust concepts as part of

161

their theology. What's the meaning of that terminology "the trust" for religions that don't have juridic persons? That is a statute of general applicability to all religions. They want to tell it to the Catholic Church so it creates a statutory trust for these subordinate things that are under the hierarchy.

They suggest-- Mr. Cross suggested that you could find the corporation sole as part of the canon law. Then he quickly added well, the Catholic Church propounded the corporation sole statutes.

Well, maybe Catholic organizations and bishops did go to the legislature at the turn of the century and say we think this could work to solve some of the issues that we're encountering with successorship of property, and the ability to convey property or the ability to acquire property. But that doesn't make the corporation sole statute part of the canon law.

What it means is that they could then in conformity with their canons, because the Holy See had now permitted them to use a corporation sole, and that's what that first statute in the corporation sole statute meant. Not that big sucking sound of all canon law becoming a volume of the Washington code. What it meant was that the appropriate authorities in Rome had said you can use this vehicle.

Mr. Cross talks about the importance of different

162

1 state interests, and Ms. Hamilton talked about the
2 importance of stability and predictability of property
3 interests. Well, Mr. Cross said something that I just can't
4 let go of, Your Honor. He basically said we don't have a
5 problem with childhood sex abuse any more. That's behind
6 us.

7 You know, I got a chill through me when he said it,
8 because I'll bet someone would have said something like that
9 in the '70s when Patrick O'Donnell was in this Diocese, a
10 priest who is the-- who was the subject of credible
11 allegations of abuse. I just have to turn to this Diocese
12 website. The first page, and it's about how to safeguard
13 and protect children. I don't know if there is abuse going
14 on in this Diocese, but the suggestion that it is not a
15 compelling concern to prevent it, is way beyond the pall.

16 And the final insult really was to suggest that these
17 gentlemen and women who have been survivors of sexual abuse
18 are somehow victimizing the children of this Diocese by
19 threatening to shut down their schools, was just a bit too
20 much.

21 In the context of resulting trusts, they don't talk
22 about how it would be-- what unjustness was caused by the
23 Diocese, and they certainly don't address the issue that the
24 parishioners were volunteers, which are-- which is, you
25 know, the exact opposite of what resulting trust

163

1 requirements are. Mr. Elsaesser says well, on the
2 constructive trust it wasn't when they got the deed, and it
3 wasn't even when they retained the property, the
4 constructive trust comes into existence when the Diocese
5 tries to enforce its rights under the warranty deeds and the
6 bargain and sale deeds.

7 And let's not forget it doesn't get mentioned enough,
8 almost every single deed that befalls under dispute of real
9 property says, "Bishop of Spokane, a corporation sole." I
10 defy anyone to find the word "trust" in there. And so what
11 is the meaning of the statute of frauds?

12 When you've got an enforceable deed and the triggering
13 event, the bad thing you're doing is the enforcement of that
14 valid deed, you've gutted the whole concept of statute of
15 frauds if that's when the constructive trust arises.

16 The parishes need to respond to the core versus non-
17 core jurisdictional argument, in light of the three Ninth
18 Circuit cases we cited. They don't challenge the notion
19 that is real right, or maybe they disconcede that it's true,
20 that if we are right, this is a self-settled trust and it
21 would be unenforceable against third parties, and maybe
22 that's just the whole crux of it.

23 And finally, Your Honor, they cannot come up with a
24 case, not one, where a parish or a parishioner has prevailed
25 against a Diocese on an implied trust theory. Those cases

164

1 | don't exist because the parishes and the parishioners do not
 2 | have implied trust interests in the property.

 3 | That's all I have, Your Honor, and I came in well
 4 | under my time.

 5 | THE COURT: I'm impressed.

 6 | UNIDENTIFIED SPEAKER: Do I get yours?

 7 | MR. STANG: No, you do not get it.

 8 | THE COURT: Now, let's see.

 9 | MR. STANG: Do you want me stay up here, or do you
10 | want me to go back to my seat?

11 | THE COURT: All right. You're finished for now, Mr.
12 | Stang.

13 | MR. STANG: Okay.

14 | THE COURT: Now, I don't know what order counsel
15 | wanted to go in for the response.

16 | MR. CROSS: I think I was going to go first and then
17 | Mr. Chopko is going to have a few remarks, and then Ford
18 | Elsaesser, also. And I believe the idea was, Your Honor,
19 | was that we'd have roughly, give or take, 40 minutes--

20 | THE COURT: Yeah.

21 | MR. CROSS: -- rebuttal on each side, sort of divide
22 | it up loosely amongst the Diocese and the parishes.

23 | Well, I have-- I'm going to try to quickly respond to
24 | the comments of Ms. Hamilton, Mr. Conklin, Mr. Stang, and
25 | even Mr. Elsaesser. I have a couple things I'd like to say.

165

```
 1         Let me just start off by, I guess I'll go in that
 2   order.  In regard to the brief comments of-- of Ms.
 3   Hamilton, the Supreme Court in the cases that we've cited,
 4   doesn't just talk about a church's beliefs and the impact of
 5   infringement or religious freedom on belief.  It talks a lot
 6   about civil courts walking through the polity of a church,
 7   which is its organizational structure and the relationship
 8   between its component parts.

 9         And-- and in the briefing that you'll see on the tort
10   litigants' side it's belief, belief, belief, belief.
11   There's no argument that the tort litigants are trying to
12   tell the Catholic Church what to believe or that there's a
13   relief that's being requested in the complaint that would
14   have that effect.  But the nature of that complaint is a
15   walk through the polity of the Catholic Church.  There's no
16   getting around it.

17         We could not raise that issue if it was in state court
18   and it was in the sex abuse litigation, and it was in
19   determination of what liability there might be and what
20   damages there might be.  This is not what this is about.
21   This property of the estate litigation does not have
22   anything to do with the nature of the claims that are being
23   asserted in state court.  It's just a fact.

24         A second point that she made was that-- I mean, she
25   loves to talk about the fact that RIFRA's unconstitutional
```

166

1    as to state law.  We haven't argued that the Religious
2    Freedom Restoration Act is implicated in regard to state
3    law.  §541, which is the lynchpin of this case, which says
4    as a matter of public policy, that trusts in the United
5    States as a matter of federal law, civil law have priority
6    over the claims of third party claimants against the
7    trustee, that's a federal statute.

8        The Young case, which is an Eighth Circuit case has
9    been cited favorably and frequently by the Ninth Circuit.
10   And it, basically the bottom line is, if the bankruptcy code
11   or the utilization of the bankruptcy code in any way
12   inflicts on religious freedom, then-- then you get into
13   strict scrutiny.

14       And in regard to her arguments on the Washington
15   strict scrutiny standard, she talked about something that
16   happened between '63, which I think was when the Sherbert
17   case came down, and 1990 when the Smith case came down as if
18   somehow what happened in that time period is really
19   relevant.

20       The two cases that we're relying on for showing strict
21   scrutiny in the State of Washington are Munse, which is a
22   '97 case, seven years after Smith, and First Covenant, which
23   came down in 1992, two years after Smith.  So I'm not sure
24   where she was really headed with that argument.

25       She said well, you know, in some states they've--

167

1  some places have done more. I don't know that she pointed
 2  out in the 17 states where there's corporation soles that
 3  there's anything more that they did or could have done.

 4       This Diocese did what it had to do under the law of
 5  the State of Washington. Within three months of the time
 6  that the corporation sole statute was enacted by the
 7  legislature in March of 1915, this Diocese incorporated in
 8  accordance with that and in conformity with canon law.
 9  There's nothing more that it could have done.

10       In regard to Mr. Conklin's comment that the Diocese
11  hasn't said anything about the establishment clause, he may
12  want to read our briefs, because we have a section in each
13  one that covers the establishment clause. I also, would
14  like to just mention that since our briefing started, the
15  United States Supreme Court in a unanimous decision called
16  Cutter v Wilkinson, which we cite at page 16 to our reply to
17  the tort litigants' opposition, has held as follows:

18       This court has long recognized that the government may
19  accommodate religious practices without violating the
20  establishment clause. Just last term in a case involving
21  Washington State, Locke v Davy (phonetic), the court
22  reaffirmed that there is room for play in the joints between
23  the free exercise and the establishment clauses, allowing
24  the government to accommodate religion beyond free exercise
25  requirements without offense to the establishment clause.

168

1         The Catholic Church is not asking for any special

2 privileges, Your Honor. It's asking that it be treated in

3 accordance with its structure as of the date of filing.

4         The second public policy that I talked about in §541

5 was that the creditors take the debtor as they find it. The

6 debtor, as of 12:30, on December 6, 2004, was a corporation

7 sole, a religious corporation. There's press language

8 throughout that statute. There's in conformity with canon

9 law language throughout that statute, and it applies to any

10 religion.

11         Where there would be a problem is if this statute was

12 just for the benefit of the Catholic Church, which was

13 something that the New York State legislature tried to do in

14 the 19th Century, and that was found to be against the

15 establishment clause. That's not what we have here. It's

16 neutral as to it's application across the board to different

17 religious groups.

18         Now, to Mr. Stang's-- well, let me mention something

19 that Mr. Elsaesser said, because I think it's important. In

20 a different context, there have been discussions that have

21 been brought up by different parties, Mr. Jackson brought it

22 up just before our hearing on the remand of the sex abuse

23 lawsuits. It's come up in different capacities. You know

24 that we have Judge Zive that is standing by, I guess you'd

25 say to mediate any possible settlement.

1    And Mr. Elsaesser mentioned that there is a lot of, I
2  think you said something about real estate between the Tort
3  Litigants Committee's summary judgment motion and the
4  Diocese motion for summary judgment, and that perhaps
5  there's a middle ground, which I assume would be denial by
6  Your Honor of both of the motions for summary judgment.

7    Well, first, I'd like to introduce Mr. Elsaesser's
8  comment as evidence of the autonomy of the parishes, but
9  beyond that, I would like to say that I don't think that
10  that is going to help.  Some people would say that the more
11  uncertainty that you have legally in a situation, the
12  greater the momentum or impetus towards settlement and in
13  some situations that does seem to be the case.  But the
14  Diocese's experience over the past three years is just the
15  opposite.  That the level and extent of uncertainty on the
16  question of the property of the estate, the parish ownership
17  question has pulled the parties apart from settlement
18  discussions.

19    I believe that all the parties involved here, the tort
20  litigants, the tort claimants, and Mr. Shea, the Association
21  of Parishes, of the insurance carriers even, and I can tell
22  you for sure, the Catholic Bishop of Spokane would love to
23  get this matter resolved.  It's probably going to be
24  necessary to have a consensual plan, if we're going to have
25  any plan, but the Diocese strongly believes that settlement

170

1  discussions will be promoted if we have gotten more clarity
2  on the property of the estate issue.  And I might add that
3  of secondary benefit will be additional clarity far beyond
4  this Diocese.

5      Some court is going to have to decide the issues that
6  are before you today.  They have been well briefed, I think,
7  by both sides.  The parties unfortunately have spent
8  probably four to $500,000 in presenting dispositive legal
9  motions before you today.  No one on either side, the
10  Diocese, the parishes, can imagine what the cost would be if
11  this were to go to trial.  It does not have to go to trial.

12      The tort litigants have a remedy.  The Diocese from
13  day one listed unrestricted assets of around 10 million.  It
14  has worked diligently for three years to secure
15  approximately $15 million or more in insurance.

16      And the Diocese recognizes that if the court were to
17  grant its motion for summary judgment, one of the bases for
18  that would be that some of the parishes who housed these
19  individuals in the '60s and '70s would be subjected to state
20  court litigation, that they would be treated as separate
21  entities that could be sued.  We recognize that.

22      And I think whether it's the Association of Parishes
23  or the Diocese, we all recognize that regardless of how you
24  rule, the parishes are going to have to contribute.  The
25  tort litigants have a remedy.  We're not trying to take a

171

1 | remedy away. That was one of the issues in FEL in the
2 | Chicago case, because unincorporated associations are not
3 | recognized there, and if the court had not concluded as it
4 | had, there would have been an issue as far as a remedy. So
5 | the Diocese believes that we'll have a far better chance of
6 | bridging the gap that we have right now if we have a better
7 | idea of what is the property of the estate, by asking for
8 | better clarity on the §541 issue, the Diocese is not seeking
9 | to take away anyone's remedies.

10 | Now, a couple comments on questions of fact. The only
11 | facts, Your Honor, on the Diocese cross-motion for summary
12 | judgment, are facts that have been introduced by the
13 | Diocese. The Tort Litigants Committee and Mr. Shea have not
14 | countered the Diocese's affidavits at all, except to say
15 | that if it talks about canon law, it's irrelevant, and then
16 | to raise every evidentiary objection that they possibly
17 | could raise. And we believe, whether it's through a
18 | separate hearing or through just reviewing the brief that
19 | Mr. Arpin prepared on behalf of the Diocese that he will
20 | quickly dispatch all of their evidentiary objections and
21 | when push comes to shove, the bottom line is this.

22 | On the five routes that I had up on the screen, there
23 | are no issues of fact on the compulsory deference or mutual
24 | principles route. There are no material issues of fact. In
25 | regard to the RIFRA argument, which is route five, and the

172

Washington constitutional argument, which is route four, there are no issues of material fact. There are no issues of material fact at all.

You can rule in favor of the Diocese, grant the Diocese summary judgment, regardless of whether or not there's an intrachurch dispute. And we believe that the unique posture of this case, which by the way, is the first time this has come up, I think in the history of the country in the context of a Chapter 11. I think we were hoping here in Spokane perhaps Portland would be decided by now. Now, it looks like Spokane gets to have that honor, but this hasn't happened before. That has not happened before.

And for the tort litigants and Ms. Hamilton to just brush aside and say this is not an intrachurch dispute, this is a §541 adversary. In order for Mr. Campbell to truly argue that the TLC has standing, they have to step into the shoes of the Diocese. So the substance of the matter is an intrachurch dispute. But regardless, even if there isn't an intrachurch dispute, they haven't shown any issues of fact to give you a basis for denying summary judgment in favor of the Diocese of Spokane.

The only material issues of fact that exist at this time in the record are in regard to some, not all, but some of the trust arguments in what I've called route three. In the statutory trust argument, there's no factual issue. RCW

173

1  24.12 says what it says. There's no contest as to what the
2  words are. There may be a disagreement as to what they
3  mean, but there's no disagreement that creates a factual
4  dispute.

5      On the express trust theory, there's no factual issue
6  on what the Diocese articles of incorporation say. And I
7  didn't hear in Mr. Stang's rebuttal any reference to the
8  Hoffman v Teatonview (phonetic) case, where the Washington
9  State Supreme Court in another church setting held, based on
10  very similar language in the articles of incorporation that
11  as a matter of law it created an express trust.

12      There are a myriad of factual issues on the resulting
13  trust, instructive trust, and the restrictive trust area.
14  What that does is, it precludes the granting of summary
15  judgment in favor of the Tort Litigants Committee, because
16  in the Diocese and parishes worst day there are thousands of
17  material factual issues at that lowest trust level. But on
18  the statutory and express trust level, there are no factual
19  issues, and this court can so find.

20      There's no reason why this court can't find for this
21  Diocese. This case needs some clarity at this time. We can
22  get a consensual plan. It's not going to be easy. The
23  parishes are-- a lot of folks are going to have to
24  contribute to this, but we will get the kind of clarity that
25  we will need to take this case forward and to get this plan

174

1  confirmed.

 2      The creditors must take this debtor as they find it.
 3  There is simply no reason to walk through the structure of
 4  the Catholic church.  They haven't really hit on it hard,
 5  but they've alluded to it as if our filing a Chapter 11
 6  petition was a waiver of our constitutional rights.  That
 7  can't be done in this country.  We did not waive our rights
 8  when this filing took place.  The Diocese is not asking for
 9  special treatment, but it is asking that it not be treated
10  differently than any religious organization would be were it
11  in this position.

12      Thank you, Your Honor.

13      MR. CHOPKO:  This is Mr. Chopko, Mark Chopko, is the
14  general counsel for the United States Conference of Catholic
15  Bishops.

16      THE COURT:  Mr. Chopko, welcome.

17      MR. CHOPKO:  Thank you.

18      THE COURT:  Glad to see you here.

19      MR. CHOPKO:  Thank you.  May it please the court--

20      THE COURT:  Now, you'll have to wait a moment.  I'm a
21  little behind.  All right.  I've caught up.  Go ahead now.

22      MR. CHOPKO:  Thank you very much.  And for the record,
23  I'm Mark Chopko.  I'm general counsel for the United States
24  Conference of Catholic Bishops in the other Washington,
25  where I'm also adjunct professor of law at Georgetown

175

1  University.

2      I'd make three points just for purposes of
3  clarification for the record. The rights that we're talking
4  about in general in constitutional terms is not just the
5  right to believe, but we have an also-- an equally valid
6  right under church autonomy rules to organize ourselves and
7  govern ourselves according to our own polity. This was the
8  holding of a 1952 Supreme Court case, which is cited in the
9  briefing, Kedra (phonetic).

10     The Washington corporation sole statute, like statutes
11  around the country in 48 of the 50 states, although the
12  timeline is not right, are really accommodations of this
13  right to organize and govern ourselves. Without these kinds
14  of statutes religious organizations would be forced into
15  secular governance models, which don't fit neatly with
16  religious character and religious corporations, religious
17  institutions.

18     Virginia, for example, had in its constitution for
19  many years a provision that churches could not incorporate
20  themselves, and therefore, they were forced into secular
21  models that didn't really fit and that was ruled
22  unconstitutional a few years ago.

23     It's application of that principle. So the principle
24  that we're talking about is not just the right to believe
25  what we want, but the right to organize and govern ourselves

176

1  according to our own religious polity. And the Washington
2  statute, in my view, is an expression of that kind of
3  legitimate accommodation on the part of the legislature.

4      The second point, we've heard a lot about mutual
5  principles. And the briefing in this case, I think uses it
6  in two different ways, which have to be kept apart. One
7  way, is the Wolf-- Jones v Wolf rule, which is the 1979
8  Supreme Court decision.

9      Although, the ultimate decision in many of these cases
10 including Watson was who gets the property, the rule at
11 bottom is that some group in the religious community has
12 decided they want a divorce from another part of that
13 religious community. And the reason is they don't believe
14 that that each other is now proclaiming the truth. So
15 they're fighting about who is the church.

16     The way that gets expressed in all of these cases, all
17 of them, is who gets the property. And we are caverning
18 that body of law for-- the Jones against Wolf rule says
19 that states may adopt a mutual principles approach in which
20 they will review, among other things, the statutes and
21 bylaws of the corporation, the corporation statutes, the
22 deeds, mortgages, and the internal operating rules, laws,
23 customs, book of order, discipline of the church community.
24 All of that would have to be reviewed. And as the briefing
25 points out, inevitably that leads the court towards

177

1 | consideration of the internal operation of the Catholic
2 | community.

3 | The second way in which the mutual principles is used
4 | in this case, Your Honor, is that-- is the application that
5 | a church is, and this church in particular, is somehow
6 | trying to avoid the implication of mutual, generally
7 | applicable rules, that would apply in every other context to
8 | every other kind of claimant. And that's not the position
9 | of the Diocese, and the Catholic Bishop of Spokane. That in
10 | fact, they'd like the court to apply a Washington property
11 | incorporation statute.

12 | If you look at the statutes, though, those statutes
13 | lead you back towards the same kind of question. The
14 | Washington corporation statute as has been discussed already
15 | incorporates the office of the Bishop. How does the court
16 | decide what that means? What that is? What its powers are?
17 | What its limitations are? What its restrictions are,
18 | without looking at that internal custom?

19 | It talks about holding property in trust. That
20 | concept of trust may vary from denomination to denomination,
21 | but a case in which a religious entity is involved, I
22 | submit, the court would have to take evidence as to what
23 | that means. As a footnote here on the second point, the
24 | Catholic Bishop of Spokane has put in evidence about what
25 | that means. And it is possible for this court to adjudicate

178

1  this case on several levels without having to violate the
2  constitution.  But one of them is to find that all of the
3  evidence submitted on these motions has been put in by the
4  Diocese about what these terms mean.  And these terms point
5  you in the direction of the relief suggested by the Diocese.

6       Third and last point, it was asked this morning
7  without bankruptcy where would-- where would this debtor
8  be?  Where would the Diocese be?  We'd be in state courts
9  litigating with judgment creditors.  And I think that that's
10  true.

11       It would be litigated with the judgment creditors in
12  state courts.  But I submit the same issues that are
13  confounding this court would confound a state court trying
14  to unpack these various questions of ownership, restriction,
15  and liability.  None of these issues would be waived by
16  continuing the liability fight in reaching judgments and
17  fighting over this.

18       The forum would just be different.  But I submit the
19  law would be the same, that the Diocese would say we're the
20  entity against which the judgment has been obtained.  You
21  don't obtain a judgment which can be enforced against all
22  these restrictive funds, or restricted assets, or properties
23  which are not owned by us, in any equitable sense.

24       So, thank you for the time, Your Honor.  And I submit.
25            THE COURT:  Thank you.

179

1       MR. ELSAESSER:   Thank you, Your Honor.   Ford
2   Elsaesser, for the parishes.   Mr. Chopko, in the interest of
3   time took one of the areas I wanted to address in response
4   to Mr. Stang, which was what would happen outside of
5   bankruptcy.

6       I think that is a very important point.   I think it's
7   a very related point, and I think the point that Mr. Chopko
8   made needs amplification, and that is surely neither the
9   parishes, nor the Diocese would forego any rights.   The
10  legal rights that they may have in contesting an execution,
11  for example, on an item of parish property is to say the
12  Assumption Parish, a judgment against the Diocese, the
13  Diocese cannot satisfy the judgment, and a writ of execution
14  is issued because of the legal title the Bishop holds.   In
15  that circumstance, I agree with Mr. Chopko completely.

16      The same issues come to the fore that we've already
17  argued.   And so there's no answer, there's no answer by
18  saying well, look what would happen there, because you would
19  just have a different court and a different judge wrestling
20  with the same issues, except it might be more precise
21  because it would only be dealing with one parish, for
22  example.   But other than that, it is a similar issue.

23      Now, I want to correct Mr. Stang one other way.   By
24  opposing summary judgment, the motion for summary judgment
25  by the Tort Litigants Committee as against the 22 parishes,

180

1    we are not looking for a trial.  In fact, take your time
2    with this ruling.

3         I know that this court has a reputation, certainly
4    well known to me of ruling relatively speaking compared to
5    most other bankruptcy courts very quickly.  Perhaps the only
6    quicker environment is when Judge Stiener retires to his
7    typewriter, and he leaves counsel at counsel table while he
8    types up the decision and you can hear it being made.  But
9    this court does move very quickly.

10        But the parishes are obviously not looking for a trial
11   where they have to pay for all three sides to litigate this
12   issue at trial.  But that's not a consideration for this
13   court today as to whether a trial will be a pleasant
14   contemplation for any of us to think about, because we all
15   know it wouldn't be.  That doesn't affect the summary
16   judgment standard, and so I again will, I guess, be the sole
17   attorney here making reference to basically rule 56
18   standards.

19        Now, the other point I wanted to make to Mr. Stang's
20   very articulate argument is that you're being repeatedly
21   advised don't look at canon law, put a visor on or a blinder
22   on with regard to canon law.  But the litigants have very
23   cleverly found every single church policy canon law or
24   testimony of the Bishop in response to §541 testimony or
25   other witnesses for the Diocese where they speak about

181

1 | policy or practice, and as-- as they should.

2 | But it's absurd to say that in the context of a rule
3 | 56 summary judgment, to determine whether the parishes exist
4 | and have a beneficial interest that you would look at the
5 | policies of the Diocese canon law only to the extent it
6 | supports the litigant's position and creates something in
7 | the nature of an estoppel effect. But when that-- those
8 | same policies or that same canon law supports the relative
9 | independence of the parishes and supports the idea that they
10 | are unincorporated associations, and not mere divisions, or
11 | pieces of the Bishop, meaning the Bishop's office, not the
12 | Bishop himself, you can't have it both ways.

13 | You have to take the good and the bad from either
14 | side's perspective and use it not necessarily for anything
15 | other than to make your ultimate determination on the
16 | summary judgment motions. And we think that the canon law
17 | provides great value to you, as stated earlier.

18 | I'm struck by Professor Hamilton's remark, and--
19 | because it followed up on Professor Conklin's remark earlier
20 | when she called what's before you today an unusual
21 | confluence of situations. I think that's absolutely
22 | correct, and I think it follows Mr. Conklin's view of gee,
23 | maybe this should be punted to the State Supreme Court.

24 | I think it is an unusual confluence of situations, but
25 | that's assuming that there are no factual disputes, and

182

| 1 | you're wrestling with some very difficult undecided areas of
| 2 | law. At this point, I don't know how you get over the
| 3 | hurdle that there are legitimate issues of material fact
| 4 | that need to be construed most favorably to the Diocese.

| 5 | The other part of Professor Hamilton's argument that
| 6 | struck me is her emphasis, which I certainly have thought
| 7 | about a lot since this case started, is what did the Diocese
| 8 | or the Diocese and the parishes did not do to protect
| 9 | themselves.

| 10 | And I suggest to the court, that's kind of a gotcha
| 11 | theory, and Mr. Stang picked up on that, is you didn't do
| 12 | anything. You didn't put a trust in your deed, you didn't
| 13 | do like other Diocese have, in fact, done around the country
| 14 | in recent years of setting up separate §501(c)(3)s for every
| 15 | parish, or setting separate charitable trusts as have been
| 16 | done in, for example, in Dallas, or even in its Diocese of
| 17 | Baker in Eastern Oregon. That's true.

| 18 | I don't know how that is relevant to whether there is
| 19 | an interest to protect it-- to protect. It seems to me
| 20 | what those areas did or what churches, such as the Mormon
| 21 | Church already do by setting up separate §501(c)(3)s, for
| 22 | example, for every separate, in their world it's not
| 23 | parishes, but say stake, you know, in retrospect, would that
| 24 | have been a good idea to do 30 or 40 years ago? Probably
| 25 | so.

183

1    But I don't see how that takes away from the facts of
2  the case, and Mr. Stang specifically avoided tying it in to
3  any facts of the case, other than to say it's not on the
4  deed.  Well, we've conceded from the start, there's no trust
5  issue on the deed.

6    It's the other analogy I dispute, is this court
7  division theory as opposed-- or unincorporated division of
8  the Diocese as opposed to an unincorporated association.
9  And it ties into Mr. Stang's arguments, and Professor
10  Conklin's arguments with regard to that there was no
11  difference between the Diocese and Standard Oil, or the
12  Catholic church and Standard Oil.

13    Well, I think there is a distinction because those of
14  us who engage regularly in bankruptcy litigation, we're
15  trying to reach out and grab you in other related entities,
16  whether they be divisions, subsidiaries, or other parties.
17  And we're using arguments such as alter ego, or arguments of
18  entanglement, such as set out in the Bondam (phonetic) case,
19  even though we're not talking about substantive
20  consolidation, I see that argument as just bleeding into
21  kind of a quasi-Bondam (phonetic) test.

22    And if you look at that, even though that's not before
23  the court today, the evidence submitted by the parishes is
24  exactly opposite.  The parishes are-- they do govern their
25  affairs according to canon law and certainly under a certain

184

amount of authority by the Bishop. But, as you can see by
the declarations, every parish is different, how it was
founded, how it runs, the size is obviously very greatly--
they're different animals. They're different entities. And
they don't fit within the cookie cutter definition of §81 or
§82 identical pieces that just happen to be in different
geographical locations.

On the self-settled trust issue, the self-settled
trust in state law, and I am familiar with it, I'm very well
familiar with it because I'm trying to break up perhaps the
largest sham trust scam ever in this region. A self-settled
trust is a trust for yourself.

And a trust-- we're not arguing that the Bishop holds
this property in trust for the Bishop. A self-settled
trust, by definition, is I set up a trust for my own benefit
and, therefore, I have both sides of the equation. I'm the
trustee and I'm the beneficiary. And that's not the case
here.

Here, the parishes, the communities that we call the
parishes, we argue are unincorporated associations that have
an indicia of ownership, evidence of ownership, tracing of
all of the funds that created ownership. In fact, the only
thing they don't have is legal title, and some of the
authority they need to make decisions, again, as far as, you
know, if they want to build an addition, if they want to do

185

1 | major capital improvements.

2 | All those are in policies that-- that Mr. Stang has
3 | made as part of the record. But in every other aspect the
4 | evidence before you is that they do have every indicia of
5 | ownership an entity could possibly have.

6 | Now, finally, coming back again to the deeds. And I
7 | agree that a warranty, a warranty deed that's free and
8 | clear, a title policy that is free and clear, certainly is
9 | indicia of full ownership. But in this case, the facts just
10 | simply show otherwise. And the-- the idea that-- because
11 | the policy prevents us, the parishes from holding legal
12 | title today somehow acts as a bar or an estoppel for us to
13 | claim beneficial ownership is itself a legal absurdity.

14 | On that theory, the resulting trust-- the results
15 | from a resulting trust could never occur, because no one
16 | could climb over the hurdle of the deed. And any of us that
17 | have served as bankruptcy trustees have often thought, hey,
18 | we've got a gotcha. Look, you know, we own title to this
19 | property. And then are sometimes faced with a resulting
20 | trust that is enforceable at state law.

21 | So, Your Honor, again well under the time limitations.
22 | We're not looking for a long trial. We're not looking for
23 | endless discovery. Just imagine the burden on all the
24 | parties here, including the victims, including the victims
25 | who are here in the courtroom from a long, protracted legal

186

1 battle. But that you can't-- that doesn't mean that you,
2 the court, or any of the parties can propose shortcut issues
3 this critical. And these are issues that are critical. And
4 from the parish's point of view, they can't be shortcut.
5 They have to be-- they have to be fully and fairly
6 litigated, unless the matter can be resolved.

7 I think we've put again-- we've met the rule 56
8 standard in every-- any conceivable way. And frankly, I
9 don't-- have not heard Mr. Stang, either in his rebuttal or
10 in his original argument, seriously dispute the evidence
11 that's come forth with the-- from the parishes. So with
12 that, Your Honor, I'll conclude. Thank you.

13 THE COURT: Well, I seem to see some squirming out
14 there, so I'll bet there's some people who want a break.
15 Before we do that, have we finished our list of presenters?
16 We have not. All right.

17 MR. SHICKICH: Thank you, Your Honor. Joe Shickich,
18 on behalf of the Tort Claimants Committee. Thank you for
19 allowing these ten minutes to speak to you on these issues.

20 The committee does respectfully want to point out that
21 it continues to disagree with the decision not to allow it
22 to intervene in this case. And by my making these comments,
23 I do not intend to undermine that position.

24 It also continues to surprise the committee that the
25 Diocese opposed our intervention, given the centrality of

187

1    the issue here, and the importance of your decision, one
2    would have thought that the Diocese would have believed that
3    it would be important to have every constituency given a
4    full right to participate in this case.  But with that, I
5    have two points that I want to make.

6         The first one is, I want to test practically what is
7    the outcome of the argument of the Diocese that the
8    corporation sole statute incorporates canon law.  And
9    secondly, I want to talk briefly about the Bishop's
10   fiduciary duty to the claimants in this case.

11        You know, a good way to test a legal argument is to
12   take it to its extremes, or to see what practical effects
13   it's going to have.  And the Diocese's argument simply
14   stated is that the corporation sole statute, by its terms,
15   incorporates canon law.

16        Now, the Washington State corporation sole statute is
17   open to all religions.  In fact, Mr. Cross just said to you
18   that it applies to all religions, and when you look at RCW
19   24.12.010, it's clear that it's for any church or any
20   religious denomination.

21        Now, that doesn't mean just mainstream religions.  It
22   doesn't mean just the Catholic religion, or the Jewish
23   religion.  It can mean religions that to you or me might
24   seem to be sham religions.  It's open to any religion.
25        In fact in this state, there is a religion that is

188

1     called the Popular Assembly of Sovereign Kazans, K-A-Z-A-N-
2     S. And that is a religion that was formed by Mr. and Mrs.
3     Kazans, who then formed a corporation sole. Mr. Kazans
4     became what is the sovereign patriarch of that religion, and
5     it exists.

6     Now, I'm not making this up. This is a religion that
7     the Washington Court of Appeals had to deal with. It's in
8     an unreported case, and I'm not using the case for purposes
9     of the holding, but to point out to you that there can be a
10     variety of corporation soles here. And you can find that at
11     2004 Westlaw 500852.

12     So I want you to imagine that the Popular Assembly of
13     Sovereign Kazans creates its own canon law. Now, what could
14     they do? Well, let's say that they, under their canon law,
15     say that their home is a parish. And their canon law says
16     that that parish is under their canon law, its own juridic
17     person.

18     Now, let's suppose their canon law further says that
19     juridic persons cannot be held liable for the torts of the
20     corporation sole, or maybe they go even further and say that
21     it can't be held liable for any torts whatsoever. Under the
22     analysis of the Diocese, it would be the obligation of a
23     court to follow that canon law.

24     Now, this is not an academic question, Your Honor. I
25     checked this morning with the Washington State Secretary of

1  State.  There are 3,150 corporation soles active in this
2  state today.

3       In January of this year, in the Western District of
4  Washington, the US attorney began an investigation and a
5  proceeding against a husband and wife, who are operating a
6  program, whereby they essentially sold corporation soles to
7  investors to-- to taxpayers to use it as a tax dodge.  Now,
8  the easiest way to find information about that is to look in
9  the popular press, and there was an article about that in
10 the Seattle Post-Intelligencer, on January 12th of this year.

11      Now, what if the canon law for each of those sham
12 corporation soles said you don't need to pay tax, or you
13 never can be subject to a lawsuit, or you're not responsible
14 for somebody's torts.  The logic of the Diocese's argument
15 here is that that canon law would prevail over the laws of
16 the state and over the laws of the federal government.

17      The position that the Diocese is taking that canon law
18 insulates and can be written in any way that the entity
19 wants, really doesn't work.  It, number one, contradicts the
20 position taken by the Diocese in the cases that have been
21 talked to you today-- talked about today, the Yakima case,
22 and the other cases.  They did not follow that rule there.

23      Second, it finds no support in any case law
24 whatsoever.  Mr. Stang, in his argument, challenged the
25 Diocese to come up here and point out to you a case where

190

1  canon law supersedes civil law.  That was not done.

2      It is belied, number three, by what's going on in the

3  Boston Archdiocese.  There the Archbishop is suppressing

4  parishes, liquidating them and using them to pay claimants.

5      And lastly, and perhaps most importantly, think of all

6  the mischief that sort of policy would cause, especially in

7  this state where we know that there are 3,150 active

8  corporation soles.  That's the end of my first point.

9      My second point, has to do with fiduciary duty.  Mr.

10  Elsaesser and Mr. Chopko talked about what would happen if

11  this were in state court and this were a judgment creditor

12  versus a judgment debtor.  And they said that it was the

13  same issue as what you're presented with today, not quite.

14      What's different is that the Bishop of Spokane, the

15  Catholic Bishop of Spokane, is not an ordinary litigant

16  here.  The Catholic Bishop has voluntarily filed a

17  bankruptcy case.  And in doing so has voluntarily taken on

18  the fiduciary duty of a trustee of loyalty to the claimants

19  in this case.

20      How has that duty of loyalty been expended to date?

21  Well, as Mr. Cross pointed out, four hundred to $500,000 has

22  been expended in litigation.  But to date, the Catholic

23  Bishop of Spokane has made no overture to the Tort Claimants

24  Committee, and to my knowledge, to the Tort Litigants

25  Committee to talk about this case.

191

1     There has been no meeting, no indication by the Bishop
2  of Spokane to either committee.  The committees have not
3  been invited by the Bishop to express their views, or to
4  talk about how the case could be resolved.  The Bishop has
5  not, to date, offered a settlement proposal or groundwork
6  for a discussion to resolve this case.  And sadly, Your
7  Honor, and to the discouragement of the claimants, the
8  Bishop is not even here today.

9     It is the fervent hope of the Tort Claimants Committee
10 that the pendency of your decision will crystallize, will
11 crystallize the urgency of the Bishop, acting as a fiduciary
12 to meet with the constituency here, and to begin the work on
13 a consensual plan, and to stop the race for litigation, and
14 to stop placing roadblocks to the resolution of this case.

15     Thank you.

16     THE COURT:  Thank you.  All right.

17     MR. JACKSON:  I can wait till after the break.

18     THE COURT:  Come on up.

19     MR. JACKSON:  Your Honor, I'll be very brief.  One of
20 the most valuable tools that we have as lawyers and as
21 judges that I've found useful throughout my career, and a
22 trait that's held by the lawyers and judges I admire the
23 most, is good common sense and clinging to that common sense
24 when they're presented with legal and factual issues in life
25 and in the courtroom.  So I think that common sense is the

192

1  best trait that we can have as lawyers, in fact, as human

2  beings.  But unlike non-lawyers, lawyers and judges all too

3  often find themselves pulled into intricacies of factual and

4  legal disputes almost beyond all logic and reason.

5       And I think that when we find ourselves in that

6  position, as we surely do today, we need to look at common

7  sense.  Common sense tells us that when a church files

8  bankruptcy and locks in, you would expect that listed in

9  their schedules would be all the churches that you can see

10 in the area.  But you were told by the people involved

11 they're there.  It's not that simple.  Okay.

12      And there's often where common sense comes into

13 conflict, that's the other side of common sense.  It's not

14 that simple.  There's more to it.  Okay.  I'll put aside my

15 common sense.  Let's check out the deeds.

16      Oh, wait.  The deeds are all in the Bishop--  name of

17 the Bishop.  Common sense tells me it's all over.  That's

18 what we look at in bankruptcy.  We look at documentation, we

19 read the rules, we read the words, and if it's not on the

20 deed, it's all over.  Well, counselor, it's not that simple.

21      Oh, well, tell me what alters the deeds that we rely

22 on day in and day out in bankruptcy court, and stop them in

23 our determination.  You've got to look at canon law.

24 Because canon law says that that deed is really held in

25 trust.  Oh, is there a trust document?

193

1    Well, no.  We'll get you that later, but we need to go
2  talk about canon law.  And so we get the candle on, put on
3  the cassock, go down to the canon law library as a guest of
4  Father so-and-so.

5    We read through the dusty pages, and we find sure
6  enough that canon law and not all accepting is--   is not
7  the issue to adopt, very clearly says--   defines what
8  juridic persons are.  But if I go through those dusty pages,
9  again, and again, and again, myself down there in the canon
10  law library, you'll find law, specific language that says
11  canon law requires that the property of the church-- or
12  sorry, the parish property is held in trust by the Bishop.

13    It has vague language and so forth, and you say, well,
14  golly, you know, when you were talking about juridic
15  persons, it was crisp and clear.  I could see what you were
16  saying.  But when you tell me that there's this trust
17  concept, where is that?

18    Well, I don't see the words.  And the answer is, well,
19  we interpret the words, so you'll just have to take it on
20  faith that our interpretation is correct.  So the ultimate
21  determination is not made on the law, it's not made on the
22  words, it's made on faith and that's not how we govern in a
23  secular society on this type of question.  But, wait, we're
24  not done.

25    There's another thing that common sense tells us, is
                                 194

```
 1   if we get a shotgun group of arguments then maybe none of
 2   the arguments are very strong.  Well, we have another
 3   argument.  What's that?

 4        Well, a corporation sole puts, by state law, all this
 5   property in trust.  Wow, that's pretty strong.  I'll go look
 6   at that.  That's something I can deal with, both my common
 7   sense and my legal training says I can read statutes and
 8   read documents.  So is there a trust document that follows
 9   that to the statute?

10        Well, no, there's no real trust, but there's the
11   articles of incorporation.  Oh, great.  And that sort of has
12   trust aspects to it, does it?  Well, yes, it does.

13        Golly, now if I were going to look at a trust, the
14   first thing I would do, if I were trying to figure out who
15   the beneficiary was, is I would look at the word that
16   followed for the benefit of, because usually that's where
17   you'll find the beneficiary.  And this entire smokescreen is
18   a search for the beneficiary.

19        The claim is the beneficiary is the parishes.  So I
20   would expect that the articles of incorporation of this
21   corporation sole would say held in trust for the parishes of
22   the Diocese.  Then I'd ask you to look at the language.  The
23   language says, and I don't know if I could (inaudible) of
24   the Diocese.  Roman Catholic Church of Spokane Diocese where
25   the Diocese is included as a beneficiary, or at least
```

195