ENTERED AUG 2 6 2005

FILED

AUG 2 6 2005

T.S. McGREGOR, CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WASHINGTON

In re:

THE CATHOLIC BISHOP OF SPOKANE
a/k/a THE CATHOLIC DIOCESE OF
SPOKANE, a Washington
corporation sole,

            Debtor.

_____

COMMITTEE OF TORT LITIGANTS,

            Plaintiff,

vs.

THE CATHOLIC DIOCESE OF
SPOKANE, et al.,

            Defendants.

_____

No. 04-08822-PCW11
    Chapter 11

Adversary No. 05-80038-PCW

MEMORANDUM DECISION RE:

1) PLAINTIFF'S MOTION FOR
   PARTIAL SUMMARY JUDGMENT;
2) VARIOUS MOTIONS TO DISMISS;
   AND
3) THE CATHOLIC DIOCESE OF
   SPOKANE'S CROSS-MOTION FOR
   SUMMARY JUDGMENT

## INTRODUCTION

This controversy arises under 11 U.S.C. § 541 which is the section of the Bankruptcy Code which defines property of the bankruptcy estate. The Catholic Diocese of Spokane voluntarily commenced a Chapter 11 reorganization listing numerous parcels and items of real and personal property on its schedules as "property held for another" which property is in the possession of other members of the diocesan family. The debtor contends that, with certain exceptions, the individual parishes, schools, cemeteries

MEMORANDUM DECISION RE: . . . - 1

and other members of the diocesan family own the real and personal property. It argues those assets do not constitute property of the estate and are not available for repayment of creditors. The bankruptcy reorganization was caused by numerous tort claims brought by victims of clergy sex abuse. Those claimants allege that the parishes, schools, cemeteries and other members of the diocesan family have no ownership interest in such property, all of which constitutes property of the estate.

## I.

## FACTS

On December 6, 2004, William S. Skylstad, as Bishop of the Catholic Church of the Spokane Diocese (hereinafter "Diocese") and as successor-in-interest to the incorporator of the "Catholic Bishop of Spokane, Washington," a corporation sole, placed the corporation sole in a Chapter 11 bankruptcy proceeding. (Voluntary Petition, Main Case Docket No. 1).

The Diocese has listed a number of the parishes as unsecured creditors in its Amended Schedule F based on funds previously deposited by each parish with the Diocesan Deposit and Loan Fund (hereinafter "D & L Fund"). Parish real property is listed as property held for another person at Item No. 14 of the Diocese Statement of Financial Affairs which includes the following description:

> The Diocese has no equitable beneficial or proprietary interest in this property but, in some cases, holds mere legal title. In addition, certain of the property is subject to a restriction imposed by the donor or grantor.

(Schedules, Main Case Docket Nos. 1 and 130 and Statement of Financial Affairs, Main Case Docket Nos. 1 and 131.) There is no

1   dispute that the value of the "property held by another" far
2   exceeds the value of the undisputed property of the estate.

3       On February 2, 2005, the Tort Litigants' Committee
4   (hereinafter "Committee") was appointed by the Office of the United
5   States Trustee pursuant to 11 U.S.C. § 1102. (Appointment of
6   Committee of Tort Litigants in a Chapter 11 Reorganization Case,
7   Main Case Docket No. 206). The Committee represents tort claimants
8   who had, pre-bankruptcy, initiated litigation against the debtor.
9   On February 4, 2005, the Committee initiated this adversary
10   proceeding seeking equitable relief in the form of declaratory
11   orders against the debtor and various non-debtor members of the
12   diocesan family such as parishes, schools, retreat centers, etc.,
13   each of which was named as a separate defendant. (Complaint,
14   Adversary Docket No. 1). The separate legal nature of the various
15   members of the diocesan family, particularly the parishes, is in
16   dispute.

17       Another committee, the Tort Claimants' Committee (hereinafter
18   "TCC"), was formed by the U.S. Trustee to represent the interests
19   of claimants who had not filed suit pre-bankruptcy but had made
20   known that they were also victims of sex abuse by clergy and hold
21   claims. (Reconstitution of and Appointment of Committee of Tort
22   Claimants in a Chapter 11 Reorganization Case, Main Case Docket No.
23   205). A representative has also been appointed to represent the
24   interests of those victims, if any, who have not yet made their
25   claims known (hereinafter "FCR"). (Final Order Appointing a Legal
26   Representative for Unknown Tort Claimants and Minors, Main Case
27   Docket No. 550). Although neither the TCC or FCR are parties to
28   this adversary proceeding, their interests are aligned with the

MEMORANDUM DECISION RE: . . . - 3

1  plaintiff.

2      There are 155 named defendants in this adversary.   Relying
3  solely upon the caption, it appears roughly 98 of those defendants
4  are parishes.   An informal group of approximately 80 of the
5  defendant parishes was formed and is referred to as the
6  "Association of Parishes."   It has been actively involved in this
7  proceeding.   The parishes are not debtors in any bankruptcy
8  proceeding nor defendants in any state court lawsuits filed by
9  Committee members.   The Association of Parishes argues that the
10  parishes have no legal relationship to the Committee.   The
11  Association of Parishes maintains that the Committee, or more
12  accurately, the members of the Committee, have no claim to the
13  property of any parish. (Complaint, Adversary Docket No. 1, and
14  Answer, Adversary Docket No. 88).

15      The real property in dispute consists of churches, schools,
16  cemeteries and other parcels.   The personal property in dispute
17  consists of bank accounts, investments, furniture, vehicles, etc.
18  Both the real and personal property allegedly is "in fact under the
19  Diocese's complete control and domination."   The Complaint further
20  alleges that the affairs of the Diocese and the other defendants
21  which are members of the diocesan family are so entangled that no
22  allocation of assets is possible, that collectively they are a
23  single economic unit, and that substantive consolidation of the
24  Diocese and the defendants would benefit all creditors.   There are
25  three requests for relief in the Complaint:  (1) declaring that all
26  disputed property constitutes property of the estate;
27  (2) substantive consolidation; and (3) ordering the debtor to amend
28  its schedules to list the disputed property.

MEMORANDUM DECISION RE: . . . - 4

## THE MOTIONS TO DISMISS

The Association of Parishes filed a Motion to Dismiss. (Defendant Parishes' Motion to Dismiss, Adversary Docket No. 99). The Diocese joined in the Motion to Dismiss. (Joinder of Defendant The Catholic Diocese of Spokane, Adversary Docket No. 213). The Association of Parishes' Motion to Dismiss and joinder by the Diocese are supported by legal arguments as well as extrinsic evidence filed in support of the debtor's Cross-Motion for Summary Judgment and the Association of Parishes' opposition to the Committee's Motion for Partial Summary Judgment. Named non-parish defendants Catholic Charities, Inc., Morning Star Boys Ranch, Inc., Catholic Cemeteries, Inc. d/b/a Holy Cross Cemetery, St. Joseph Cemetery and Immaculate Heart Retreat House, Inc. joined in the Association of Parishes' Motion to Dismiss but filed no legal argument or extrinsic evidence (hereinafter "joining defendants"). (Joinder of Defendants Catholic Charities, Inc., et. al., Adversary Docket No. 102). Defendant Saint Philip's Villa, Inc. separately joined in the Association of Parishes' Motion to Dismiss and filed extrinsic evidence. (Defendant Saint Philip's Villa, Inc.'s Joinder in Motion to Dismiss, Adversary Docket No. 125). In connection with the Motion to Dismiss, the Association of Parishes, Diocese, joining defendants and Saint Philip's Villa, Inc. will be referred to as the "moving parties."

The moving parties cite to Fed. R. Bank. P. 7012(b), which incorporates Fed. R. Civ. P. 12(b)(1) and (6), as the basis of the motions. The Association of Parishes makes two specific arguments. Pursuant to Fed. R. Civ. P. 12(b)(6), they argue that the case

MEMORANDUM DECISION RE: . . . - 5

should be dismissed because the Committee does not have standing to seek derivative relief under 11 U.S.C. §§ 521 or 541 and thus they fail to state a claim upon which relief can be granted. The second basis for dismissal is that the Court lacks subject matter jurisdiction because there is no case or controversy between the parishes and the Committee. As a result, the case should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1). These issues are addressed in more detail below.

## 1. **Failure to State a Claim Other than Lack of Standing**.

The 12(b)(6) motion, apart from the lack of standing argument, presents in a tangential way the argument that the parishes are not debtors in this proceeding, are not defendants in the state court actions brought by Committee members, and have no legal relationship with the Committee. The conclusion is that the Committee fails to state a claim upon which relief can be granted.

The briefs filed by the debtor and Association of Parishes in response to the plaintiff's Motion for Partial Summary Judgment and in support of debtor's Cross-Motion for Summary Judgment address the merits of the causes of actions in the Complaint, seek substantive relief and are based upon extensive extrinsic evidence rather than just the Complaint and answers. With the exception of the standing issue analyzed below, any analysis of 12(b)(6) as to the debtor's and the Association of Parishes' Motions to Dismiss would be redundant with the various motions seeking judgment as a matter of law and will not be separately addressed.

The joining defendants and Saint Philip's Villa, Inc. have, in addition to standing, raised independent issues relating to Fed. R. Civ. P. 12(b)(6). In essence, they argue that because they are

MEMORANDUM DECISION RE: . . . - 6

1  separate legal entities under state law, they have no legal
2  relationship with claimants in the bankruptcy proceeding and the
3  plaintiff has failed to state a claim against them.  Only Saint
4  Philip's Villa, Inc. has provided any evidence in addition to the
5  Complaint and Answer.  That evidence consists of a copy of its
6  Certificate of Incorporation, its Articles of Incorporation,
7  certain correspondence between counsel, and a copy of the deed
8  evidencing title to certain real estate is held in the name of
9  Saint Philip's Villa, Inc.  (Affidavit of John Munding, Adversary
10 Docket No. 126).

11     The joining defendants and Saint Philip's Villa, Inc. seek
12 dismissal at the pleading stage of the proceeding.  In evaluating
13 such motions, the Court is required to accept all facts alleged in
14 the Complaint as true and construct them in the light most
15 favorable to the plaintiff, the non-moving party.  *Warren v. Fox*
16 *Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).
17 Although motions to dismiss under Fed. R. Civ. P. 12(b)(6) may be
18 supported by extrinsic evidence, with the exception of Saint
19 Philip's Villa, Inc., no extrinsic evidence has been offered.
20 Unless it appears beyond doubt that the plaintiff could not prove
21 any set of facts in support of its claims which would entitle
22 plaintiff to relief, the motions must be denied.  *No. 84 Employer-*
23 *Teamster Joint Council Pension Trust Fund v. America West Holding*
24 *Corp.*, 320 F.3d 920, 931 (9th Cir. 2003), *cert. den.* 540 U.S. 966,
25 124 S.Ct. 433, 157 L.Ed.2d 311 (2003).

26     A separate corporate existence would not prevent the plaintiff
27 from establishing facts sufficient to prevail on the alleged causes
28 of action.  Even though a non-debtor entity may have a legal

MEMORANDUM DECISION RE: . . .  - 7

existence separate from the debtor, that does not necessarily defeat substantive consolidation. *In re Bonham,* 229 F.3d 750, 763-765 (9th Cir. 2000). Nor does the fact that title to real estate is held in the name of a non-debtor preclude a determination that the debtor has an interest in that real estate. It cannot be concluded that the plaintiff could not introduce any evidence which would establish any of its causes of action. This aspect of the 12(b)(6) motion by the joining defendants is **DENIED**.

If this were strictly a 12(b)(6) motion without extrinsic evidence, Saint Philip's Villa, Inc. would not prevail. Fed. R. Civ. P. 12(b)(6) provides that if extrinsic evidence is submitted with a motion to dismiss, the motion is to be treated as a motion for summary judgment under Fed. R. Civ. P. 56. The analysis then becomes whether the extrinsic evidence changes the situation.

If viewed as a summary judgment motion, the result is the same. Fed. R. Bank. P. 7056 incorporates Fed. R. Civ. P. 56. Subpart (c) provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment standards preclude granting of the motion if disputed material facts are present, and facts must be considered in the light most favorable to the non-moving party. *Rivera v. Philip Morris, Inc.,* 395 F.3d 1142, 1146 (9th Cir. 2005).

The extrinsic evidence, although uncontroverted, is not sufficient to defeat the claims in the Complaint. The extrinsic evidence reveals Saint Philip's Villa, Inc. had funds on deposit in

the D & L Fund. Counsel for Saint Philip's Villa, Inc. characterized the deposit as one for safekeeping. (Affidavit of John Munding, Exhibit "E", Adversary Docket No. 126). The nature of the debtor's interest in that account and the understanding or agreement between the debtor and other defendants regarding the depositing and withdrawal of funds originating with the defendants is the subject of vigorous debate. That situation alone would defeat Saint Philip's Villa, Inc.'s motion if summary judgment standards were applied.

The 12(b)(6) motion by Saint Philip's Villa, Inc. on issues other than lack of standing is **DENIED**.

## 2. **Standing Argument**.

Lack of standing is a "subspecies of a Fed. R. Civ. P. 12(b)(6) request to dismiss for failure to state a claim." *In re Stoll*, 252 B.R. 492, 495 (B.A.P. 9th Cir. 2000). The most ardent argument advanced by the moving parties in support of the Motion to Dismiss is that this Court lacks jurisdiction as the plaintiff has no standing. To some extent, the analysis of standing under Fed. R. Civ. P. 12(b)(6) is intertwined with the analysis of whether a case or controversy exists under constitutional standards. The constitutional standards applicable to standing are addressed in a later portion of this opinion.

The moving parties contend that standing does not exist under the Bankruptcy Code. They rely on *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) for their conclusion that the plaintiff Committee lacks standing to commence this adversary proceeding. In *Hartford*, an administrative claimant sought to recover its administrative

1 claim from a secured creditor of the debtor under 11 U.S.C.
2 § 506(c). That section states "The trustee may recover from
3 property securing an allowed secured claim . . . ." The issue was
4 whether the administrative claimant had standing to bring the claim
5 or whether only the trustee had standing. Following the "plain
6 meaning" trend of statutory construction, the Supreme Court held
7 that Congress generally "says what it means and means what it says"
8 in statutory language. Absent an absurd result, the sole function
9 of the Court is to enforce the statute's plain meaning. When a
10 statute authorizes a specific action and designates a particular
11 party to take that action, the common sense meaning is that only
12 the named party is authorized to take the action. As 11 U.S.C.
13 § 506(c) only designates a trustee as having authority, it was not
14 necessary for Congress to state "only the trustee" as the exclusion
15 of others is inferred.

16  Unfortunately for the moving parties, the Code provisions most
17 directly applicable to this adversary are silent as to who has
18 authority to raise issues under those Code provisions. Since this
19 adversary proceeding is essentially a dispute regarding whether
20 certain property constitutes property of the estate, 11 U.S.C.
21 § 541 is of great importance. That statute, however, is merely
22 definitional. It makes no provision as to the appropriate
23 procedure by which such disputes are to be resolved nor does it
24 authorize any particular party or parties to participate in such
25 disputes. *Hartford* is not instructive in that it analyzed
26 statutory language specifically designating a particular party to
27 engage in particular activity.

28  This adversary is analogous to a "turnover proceeding." The

MEMORANDUM DECISION RE: . . . - 10

1 Code provides that a custodian of property of an estate, in this
2 situation the non-debtor defendants, shall "turnover" that property
3 of the estate. 11 U.S.C. §§ 542 and 543. If a dispute arises
4 regarding the turnover of the property of the estate, "notice and
5 hearing" is required, but the statutes are silent as to who is
6 authorized to request that notice and hearing.

7 The debtor, when filing its schedules, clearly articulated its
8 position that it did not have an interest in the disputed property
9 and that such property was owned by other members of the diocesan
10 family. Ordinarily, there is no trustee in a Chapter 11 case. Who
11 then has authority to challenge the debtor's designation? If only
12 the debtor had authority to identify and raise disputes as to
13 property of the estate, the Chapter 11 debtor's unilateral
14 designation could not be challenged. Such a result is unwise.
15 Some debtors have motives other than the repayment of creditors to
16 the greatest extent possible. Some debtors have historical
17 patterns of possession of real estate and personal property titled
18 in the name of family members or affiliated corporations.
19 Precluding creditors from disputing a Chapter 11 debtor's
20 identification of property of the estate could easily result in
21 rewarding dishonest or improperly motivated debtors and, at best,
22 leave creditors and the court wondering at the conclusion of the
23 reorganization whether in fact all property of the estate had been
24 administered.

25 Perhaps due to these concerns, reading various Code sections
26 leads to the conclusion that a creditors' committee has standing to
27 raise such issues. Creditors' committees are specifically
28 authorized to investigate the assets of debtors and any other

MEMORANDUM DECISION RE: . . . - 11

matters relevant to the reorganization case. 11 U.S.C. § 1103(c)(2). They are empowered to perform "services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5). They have the right to be heard "on any issue" in a reorganization case. 11 U.S.C. § 1109(b). The right to investigate the financial affairs of the debtor, including the assets of the estate, would have limited usefulness if a committee were not empowered to disagree with the debtor's characterization of its assets and bring that disagreement to the Bankruptcy Court for resolution.

Plaintiff has standing under the Bankruptcy Code. The 12(b)(6) motion to dismiss as it relates to standing is **DENIED** as to each of the moving parties.

### 3. Lack of Subject Matter Jurisdiction.

The Motions to Dismiss also raise jurisdictional issues under Fed. R. Civ. P. 12(b)(1). The moving defendants seek dismissal as (a) this is a non-core proceeding, and (b) the Court lacks subject matter jurisdiction because there is no case or controversy; and (c) because the constitutional requirements for standing have not been met.

### (a) Core v. Non-Core

Even if this were a non-core proceeding, that conclusion would not deprive the Bankruptcy Court of jurisdiction. Pursuant to 28 U.S.C. § 157(c)(1), non-core proceedings result in a submission to the District Court of the Bankruptcy Court's proposed findings of fact, conclusions of law and decree, but do not deprive the Bankruptcy Court of jurisdiction to hear the matter and enter proposed findings of fact, conclusions of law and decree. More importantly, this adversary proceeding is a core proceeding in

MEMORANDUM DECISION RE: . . . . - 12

which the Bankruptcy Court is empowered to fully hear and determine the merits and enter a final decree.

28 U.S.C. § 1334(b) states that the Bankruptcy Court[1] has exclusive jurisdiction of cases "arising under title 11" which would be the debtor's reorganization case. The Complaint requests that the financial affairs of the debtor be substantively consolidated with other members of the diocesan family. Such request certainly arises under Title 11 as does the request to require the debtor to amend its schedules.

The statute further states in subsection (e) that Bankruptcy Courts ". . . shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334(e). The statute gives the Bankruptcy Court the exclusive jurisdiction to determine the parameters of the property of the estate. Identifying, administering and resolving competing claims to property of the estate is an essential function of a Bankruptcy Court. Even though the Bankruptcy Court must utilize state law in determining the nature and extent of the debtor's interest in property, the ultimate identification of property of the estate is exclusively within the jurisdiction of the Bankruptcy Court. *In re Golden Plan of California, Inc.*, 37 B.R. 167 (Bankr. E.D. Cal. 1984); *In re Prudential Lines, Inc.*, 928 F.2d 565 (2nd Cir. 1991). This adversary proceeding requires interpretation and application of 11 U.S.C. § 541 and is thus a civil proceeding arising under

---

[1]The statute refers to the federal District Courts, but in this District, as is typical, the federal District Court has, by General Order, referred all such matters to the Bankruptcy Court.

MEMORANDUM DECISION RE: . . . - 13

1  Title 11.  The Bankruptcy Court has exclusive jurisdiction to make
2  such determinations.

3      Commencement of a bankruptcy proceeding creates a bankruptcy
4  estate.  The composition of that estate is governed by §§ 541, 551,
5  522, 1306, 1207 and other provisions of Title 11.  Without a case
6  under Title 11, no controversy or issue regarding property of the
7  estate would exist.  On occasion, such issues must be determined in
8  the context of an adversary proceeding rather than in the
9  underlying bankruptcy case.  That does not render the issue or
10  controversy a non-core proceeding.

11      28 U.S.C. § 157 also includes adversary proceedings, such as
12  this, in its description of core proceedings.  This adversary has
13  been repeatedly likened to a "turnover action," as much of the
14  disputed property is in the possession of the non-debtor
15  defendants.  Requests to "turnover" property of the estate are core
16  proceedings under § 157(2)(E).  Proceedings relating to the
17  liquidation of estate assets are specifically identified as core
18  proceedings under § 157(2)(O).  It is difficult to conceive how a
19  Bankruptcy Court could fulfill its duties regarding administration
20  of the estate, which may include liquidation of assets, unless it
21  had core jurisdiction to determine if particular assets constitute
22  assets of the estate.

23      Indeed, the moving parties concede that if the debtor had
24  articulated and alleged that the disputed assets were property of
25  the bankruptcy estate, the other members of the diocesan family
26  would have disputed that contention and that dispute would have
27  constituted a core proceeding.  The argument of the moving parties
28  is essentially that because creditors, rather than the debtor,

MEMORANDUM DECISION RE:  .  .  .  - 14

1 allege these assets constitute property of the estate, the
2 controversy becomes a non-core proceeding. The identity of the
3 person raising the issue does not affect the character of the issue
4 or the conclusion that the issue arises under Title 11.

5 Application of the language of 28 U.S.C. §§ 157 and 1334
6 results in the conclusion that this is a core proceeding.

7 **(b)  Case or Controversy**

8 The moving defendants argue that the adversary complaint is in
9 many respects a request for declaratory relief as it seeks a
10 declaration that the property constitutes property of the
11 bankruptcy estate. More frequently than other types of civil
12 litigation, declaratory judgment actions may be found not to
13 constitute a "case or controversy" under Article III of the federal
14 Constitution. One component of constitutional requirements is that
15 the particular plaintiff bringing the case or controversy to the
16 court must have standing. The determination of standing is a two
17 part analysis. Firstly, does the subject matter of the Complaint
18 present a justiciable controversy. Secondly, does the person
19 seeking the relief have a direct interest in the resolution of the
20 controversy.

21 The analysis begins with the question of whether the Complaint
22 sets forth a justiciable controversy. The defendants argue that,
23 as there is no legal relationship between the plaintiff and the
24 defendant non-debtors, there is no controversy which could affect
25 the legal rights between them and the plaintiff. The adversary
26 Complaint, the Answers filed by the defendants, and the debtor's
27 Schedules clearly indicate that a controversy exists regarding the
28 nature and extent of the various parties' interest in real and

MEMORANDUM DECISION RE: . . . - 15

personal property. The Bankruptcy Court has exclusive jurisdiction over property of the estate. As the identification of property of the estate constitutes a core proceeding arising under Title 11 and is an issue necessarily addressed in every case arising under Title 11, there can be no doubt that this is the type of controversy which is to be addressed in a judicial proceeding. The question which then must be addressed is whether this particular plaintiff has a sufficient stake in the resolution of that justiciable controversy to seek relief from a judicial tribunal.

The Complaint alleges that the non-debtor defendants ". . . are not legal entities separate from or independent of the Diocese, but rather are merely operating divisions . . ." and that they are "mere instrumentalities" of the debtor. The Association of Parishes and the debtor contend that the parishes, as unincorporated associations under Washington law, have separate independent legal existence with all attendant rights such as the right to sue and be sued. They concede that if they are correct in that contention, the members of the plaintiff and other similar claimants would hold tort claims which could be pursued against some of the parishes: to wit; those parishes associated with a particular priest who sexually abused a claimant. In other words, the adversary proceeding will determine whether it is possible for a legal relationship and a direct claim to exist between the members of the plaintiff and certain parishes. The Association of Parishes argues that no case or controversy exists as there is no legal relationship between members of the plaintiff and the parishes. The Association of Parishes simultaneously concedes that if the parishes prevail on their contention that they have a

1  separate legal existence, a legal relationship and direct claims
2  would exist. This is not persuasive.

3     The plaintiff is a creditors' committee appointed pursuant to
4  11 U.S.C. § 1102. It commenced this action on behalf of its
5  members who had, pre-bankruptcy, commenced litigation against the
6  debtor alleging claims of sex abuse by clergy members of the
7  debtor. The members of the plaintiff Committee hold claims in the
8  bankruptcy proceeding as defined in 11 U.S.C. § 101(5)(A). A claim
9  is a ". . . right to payment, whether or not such right is reduced
10 to judgment, liquidated, . . . disputed, . . . legal, equitable,
11 . . . ."

12    The constitutional requirements for standing were enumerated
13 in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561, 112 S.Ct.
14 2130, 119 L.Ed.2d 351 (1992):

> Over the years, our cases have established that the
> irreducible constitutional minimum of standing contains
> three elements. First, the plaintiff must have suffered
> an 'injury in fact' -- an invasion of a legally protected
> interest which is (a) concrete and particularized,
> (citations omitted) and (b) 'actual or imminent, not
> 'conjectural' or 'hypothetical,' (citations omitted).
> Second, there must be a causal connection between the
> injury and the conduct complained of -- the injury has to
> be 'fairly . . . trace[able] to the challenged action of
> the defendant, and not . . . th[e] result [of] the
> independent action of some third party not before the
> court.' (Citations omitted). Third, it must be 'likely,'
> as opposed to merely 'speculative,' that the injury will
> be 'redressed by a favorable decision.'

23    The Ninth Circuit stated it more succinctly in *Partington v.
24 Gedan,* 961 F.2d 852, 862 (9th Cir. 1992) as:

> Article III of the Constitution requires that a would-be
> federal litigant allege some actual or threatened injury
> before a court can gain jurisdiction over the purported
> suit -- the injury cannot exist in the abstract.

28

MEMORANDUM DECISION RE: . . . - 17

The injury which is threatened in this situation is pecuniary in nature. The members of the plaintiff have claims for money damages against the debtor which the debtor is unable to pay. In the foreseeable future, the debtor will be required to file a plan proposing to utilize its assets and future income to pay these claims. Absent this adversary proceeding, that plan would not include the disputed property as assets. Resolution of this adversary proceeding in favor of the plaintiff would result in the debtor having more assets with which to pay the claims held by the members of the plaintiff. They would receive more money from a plan which includes the disputed property than from a plan which does not. Absent the existence of this adversary proceeding, the members of the plaintiff are faced with direct injury in the foreseeable future, i.e., less money available to pay their claims.

The plaintiff has demonstrated that a case or controversy exists and it has standing under the federal Constitution. The Fed. R. Civ. P. 12(b)(1) motions by moving parties are **DENIED**.

### III.

### SUMMARY JUDGMENT/CROSS SUMMARY JUDGMENT MOTIONS

The plaintiff filed its Motion for Partial Summary Judgment on April 7, 2005. That motion seeks a determination that 22 specifically identified parcels of real estate, title to which is held in the name of the debtor, are property of the estate (hereinafter "Disputed Real Property.") The debtor's Cross-Motion seeks a determination that "the property" of the various members of the diocesan family is not property of the estate. Presumptively, this means all real or personal property or equitable interest not just the Disputed Real Property. No other defendant filed a cross-

MEMORANDUM DECISION RE: . . . - 18

motion for summary judgment. As the issues and arguments of all parties are intertwined, the Motion for Partial Summary Judgment and Cross-Motion will not be addressed separately.

### 1. Does the Doctrine of Judicial Estoppel Preclude the Diocese From Maintaining It Does Not Own The Property?

#### (a) Requirements of Judicial Estoppel

The purpose of the doctrine of judicial estoppel is to prevent a party from successfully maintaining a particular position in litigation and then assuming a contrary position in later litigation as it best suits the party to do so. It bars a party from making a factual assertion that is inconsistent with a factual assertion sworn to in a previous proceeding, which proceeding resulted in a benefit to the party. *Rissetto v. Plumbers and Steamfitters Local 343,* 94 F.3d 597, 600-601 (9th Cir. 1996). The doctrine also precludes inconsistent legal positions. *Russell v. Rolfs,* 893 F.2d 1033, 1037-1039 (9th Cir. 1990); *Yniguez v. State of Ariz.,* 939 F.2d 727, 738 (9th Cir. 1991). To put the concept in the vernacular, a party "cannot argue out of both sides of its mouth."

Because legal disputes may take many forms, there is no precise definition of the doctrine nor checklist of factors to be met for its application. For the doctrine to apply, the party must have been successful in the prior litigation in persuading the court of the correctness of its position. The requirement of "success" includes negotiating a settlement with the opposing party. The *Rissetto* decision, *supra,* involved a person who successfully asserted that they were unable to work in a workers' compensation proceeding but later brought a claim against the

MEMORANDUM DECISION RE: . . . . - 19

employer alleging wrongful termination of employment due to age discrimination. A prerequisite to the wrongful termination claim was the ability to perform the work. The doctrine of judicial estoppel was applicable and the employee was precluded from maintaining the wrongful termination of employment claim due to the prior inconsistent position in the workers' compensation proceeding. The doctrine was applied even though the first proceeding was administrative in nature and even though it had been settled rather than adjudicated.

*New Hampshire v. Maine*, 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) involved a dispute regarding the location of the state boundary which boundary had previously been the subject of a case before the Supreme Court. In the previous case, the same parties had agreed to the interpretation of a particular historical document and the court, although there was evidence to the contrary, accepted the parties' agreement. In the later litigation, *New Hampshire* attempted to interpret the same historical document in a different manner. The Supreme Court held that the doctrine of judicial estoppel precluded *New Hampshire* from presenting its new and different interpretation. It had been successful, not in persuading the court of the correctness of a disputed legal argument or fact, but in persuading the court to accept the agreement it had reached with another party. That was sufficient for application of the doctrine.

The doctrine applies not only in succeeding litigation between the same parties, it is applicable to litigation when a party is faced with a different opponent in later litigation. *Lowery v. Stovall,* 92 F.3d 219, 223-226 (4th Cir. 1996), *cert. denied,*

1  519 U.S. 1113, 117 S.Ct. 954, 136 L.Ed.2d 841 (1997). A litigant
2  cannot posit a legal or factual position and convince a court of
3  the correctness of that position and then in a later case posit the
4  contrary legal position even though the later case involves a
5  different opponent. The ultimate test is whether, by arguing
6  opposing positions on the same factual or legal issue, the party
7  may achieve conflicting results in the two proceedings. If so,
8  then the party has necessarily "argued out of both sides of its
9  mouth."

10        (b)  **Is Judicial Estoppel Applicable Here?**

11        The earlier decisions relied on to support the contention that
12  the debtor has previously successfully argued that the parishes do
13  not own the real property are *Munns v. Martin,* 131 Wn.2d 192, 930
14  P.2d 318 (1997) and *Miller v. Catholic Bishop of Spokane,* 123
15  Wn.App. 1020, 2004 WL 2074328 (Wash.App. Div. 3, 2004).

16        The latter is an unpublished opinion. Although unpublished
17  opinions are not normally to be cited to a court as authority, when
18  considering application of judicial estoppel, there is no
19  requirement that the earlier decision be published. Indeed, the
20  doctrine includes administrative proceedings such as in *Rissetto,*
21  *supra.* The *Miller* case states that the plaintiff suffered injury
22  due to a fall in a parish hall and ". . . sued the owner of the
23  property, the Catholic Bishop of Spokane, for damages . . . ."

24        The *Munns* case arose when certain parishioners disagreed with
25  the intention to demolish St. Patrick's School and build a pastoral
26  center at St. Patrick's Parish, which parish is a named defendant
27  in this adversary proceeding. When the debtor applied for the
28  issuance of a demolition permit from the City of Walla Walla, the

MEMORANDUM DECISION RE: . . . - 21

*Munns* group, composed of several parishioners in the parish plus one additional individual, sought delay of the issuance of the permit under the provisions of the City's Historic Preservation Code. Initially, the City delayed issuance but then indicated that it would issue the permit due to First Amendment concerns. The *Munns* group then sought a writ of mandamus requiring the City to impose the delay.

The Bishop then intervened in the mandamus action. The brief filed by the Bishop on appeal argued that this "is not a case where the affected property owner, the BISHOP OF SPOKANE, is challenging . . . ." the City's action. At page 3, the Bishop argued that the *Munns* group had no clearly founded legal rights in the matter.

> The BISHOP OF SPOKANE, not THE MUNNS GROUP, owns the St. Patrick's school building in question. THE MUNNS GROUP have no proprietary interest, and are not in any way owners of the building in question.

It argued that issuance could not be delayed as to do so would burden the free exercise of religion since demolition and construction of the pastoral center were "changes desired by controlling church authority . . . ." In discussing the economic burden at page 15, the Bishop argued

> While Petitioners contend otherwise, the BISHOP OF SPOKANE, as the property owner is the better judge of economic consequence of the project, and, more importantly, is the better judge of what is needed to further the Catholic mission of St. Patrick Parish and how best to further that mission from an economic standpoint.

In a footnote, the opinion recites that "The Bishop owns the property, part of St. Patrick's Roman Catholic Church, as a corporation sole." *Munns, supra,* at 196. The decision held that the delay in issuance of the permit did constitute a burden on the

MEMORANDUM DECISION RE: . . . - 22

1 free exercise of religion of the debtor. Since no compelling state
2 interest was present, the Bishop and the City were correct that the
3 permit had to be issued.

4 The debtor does not directly argue that individual
5 parishioners have an ownership interest in any of the Disputed Real
6 Property, but supports that contention of the Association of
7 Parishes. To the extent that the debtor so contends, that
8 contention would be clearly inconsistent with the factual and legal
9 position argued by the debtor in the *Munns* decision.[2] The Supreme
10 Court relied upon the fact that the individual parishioners did not
11 own the property in reaching its conclusion which was favorable to
12 the debtor. The debtor cannot now maintain that individual
13 parishioners have any ownership interest in the Disputed Real
14 Property.

15 As to the debtor's contention in this adversary proceeding
16 that the individual parishes own the Disputed Real Property, the
17 *Munns* decision certainly implies that the debtor took an earlier
18 inconsistent position. The debtor's brief filed with the Supreme
19 Court stated that by referring to the Bishop it was referring to
20 the corporation sole and to St. Patrick's "pastor and
21 administrator" and council and building committee. It is
22 noteworthy that the debtor did not refer to the parish as though it
23 were a separate legal entity.

24 However, an inference or implication is not sufficient for
25 application of the doctrine of judicial estoppel. It must be clear
26

27 [2]The basis for the contention is the fact parishioners provide
funds to acquire and improve real property. Logically, the
28 contention would apply to every parish.

MEMORANDUM DECISION RE: . . . . - 23

that the party made inconsistent representations of fact or law. As to the debtor's contention that the individual parishes own the Disputed Real Property, the doctrine of judicial estoppel is not applicable.

### 2. Should the Court Apply Civil Law or Ecclesiastical Law to Identify Property of the Estate?

"[A]ll legal or equitable interests of the debtor in property as of the commencement of the case" are property of the bankruptcy estate. 11 U.S.C. § 541(a)(1). Congress intended this definition to be interpreted broadly as it is vital to include all debtor's property in the estate. *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204-205, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

It is not disputed that the legal titleholder named in the deeds for the Disputed Real Property is "Catholic Bishop of Spokane."[3] (Affidavit of James Stang in Support of Motion for Summary Judgment, Adversary Docket No. 67, Exhibits "1" and "2"). Ordinarily this would end the inquiry as to the debtor's interest.

A bankruptcy debtor's estate does not include property in which the debtor holds "bare legal title" but no equitable interest. 11 U.S.C. § 541(d); *Dewsnup v. Timm*, 502 U.S. 410, 432, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

The debtor's position is that the applicable non-bankruptcy

---

[3]Eighteen deeds reveal the record titleholder is the Catholic Bishop of Spokane, one deed refers to the Catholic Bishop of Spokane d/b/a Our Lady of Fatima, two deeds refer to Catholic Bishop of Nisqually, and one refers to Catholic Bishop of Spokane/Nisqually. Nisqually was the predecessor diocese which existed prior to statehood. The Disputed Real Property does not include the parcel held in the name of Saint Philip's Villa, Inc. referenced earlier.

1 law to be applied in the analysis required by 11 U.S.C. § 541 is
2 not state civil law but the internal law of the Roman Catholic
3 Church, i.e., its canon law.  Since canon law considers the
4 disputed property as property of parishes or other members of the
5 diocesan family, third parties who deal with the debtor are bound
6 by that canon law and the debtor's interpretation of it.  In other
7 words, creditor's rights are determined not by ordinary civil law
8 but by internal ecclesiastical  doctrines.  The proposition that
9 the rights of creditors of religious organizations are to be
10 determined in accordance with the ecclesiastical doctrine of the
11 religious organization is perhaps not quite as astounding as it
12 first appears.

13 The debtor and defendants first maintain that should this
14 Court examine the canon law of the Roman Catholic Church, it would
15 discover that under the canon law, the other members of the
16 diocesan family are the equitable owners of the property with the
17 debtor holding only bare legal title.  Most of the members of the
18 diocesan family and even the Diocese itself, are termed "juridic
19 entities" under the canon law.  The debtor cites canon law at great
20 length for the proposition that each juridic entity owns its
21 property and that the Bishop merely has supervisory duties and
22 oversight of all the juridic entities in the Diocese.  The
23 claimants dispute this interpretation of canon law and cite, again
24 at great length, contrary provisions of the canon law.

25 It is at this point that the debtor and defendants then
26 maintain that the free exercise of religion clauses in both the
27 federal and Washington State Constitutions preclude a court from
28 examining canon law.  Debtor states that not only is its  interest

MEMORANDUM DECISION RE: . . .  - 25

in property determined by ecclesiastical law, which law provides ownership is always in the individual juridic entity, but that a court must accept debtor's interpretation of canon law without further inquiry. Furthermore, the highest church authority of the Roman Catholic Church on canon law has opined that to subject one juridic entity's property to recovery by creditors of another juridic person would be contrary to the separate nature and autonomy of juridic persons as provided by the canon law.[4] Consequently, the debtor and defendants argue that no civil court has authority to even examine the rights of creditors to church property as those rights are determined by internal church doctrine.

No civil court reported decision has been cited for the proposition that those who have monetary claims against a religious organization and are engaged in a dispute with the religious organization regarding those claims are bound by the internal laws of that religious organization. Indeed, there is an oft repeated quote from *Watson v. Jones*, 80 U.S. 679 (13 Wall. 679), 20 L.Ed. 666 (1871), one of the oldest Supreme Court cases to address property disputes in the context of religious organizations, which is instructive.

> In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to

---

[4] This evidence is the subject of an objection as to admissibility. This statement is not considered as a fact by the Court, but included to articulate the debtor's argument.

> organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it.

*Watson v. Jones,* 80 U.S. at 728-729.

The debtor and defendants would finish this quote with the following: ". . . and all who do business with or have monetary claims against the religious body are also bound to submit to its rules."

The debtor's position is that, in reaching its decision under 11 U.S.C. § 541, any application by this Court of state, civil or federal bankruptcy law rather than canon law is a governmental action violating Article I, Section 2, of the Washington State Constitution and the First Amendment of the United States Constitution. Application of civil law would interfere in the free exercise of religion according to the debtor.

A long line of Supreme Court cases have addressed resolution of property disputes among members of religious organizations. In every case, the controversy has not been between the religious organization and an unrelated third party but has been between the religious organization and certain members or prior members. The disputes have resulted from a schism in the religious organization. The questions have arisen in the context of doctrinal disputes, *[Watson v. Jones, supra]* congregations which have split into minority and majority groups with each claiming to be the "true" church *[Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979)]* and in the context of the power to appoint a bishop or

MEMORANDUM DECISION RE: . . . - 27

minister against the wishes of certain members of the church [*Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Dionisije Milivojevich,* 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976)]. Those cases have established certain principles applicable to intra-church disputes.

> . . . the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property.

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). That decision then applied the "neutral principles of law" approach in the consideration of property disputes involving competing factions within the religious organization. It held that a court's jurisdiction to determine ownership of church property in such circumstances was "severely circumscribed" by the First Amendment. The later decision of *Serbian Eastern, supra,* allowed such disputes to be analyzed not only on a neutral principles of law approach but also on a "compulsory deference" approach. In the compulsory deference approach to disputes involving members of or groups within religious organizations, civil courts are bound to accept the decision of the organization's highest authority in matters of ecclesiastical policy including doctrine, organization, discipline or moral standards or rules. The focus is not on the title to the property but on who within the religious organization has control or authority. Once the source of the control is identified, the court is required to defer to that authority's

MEMORANDUM DECISION RE: . . . . - 28

determination of which of the competing factions of the religious organization represents the "true church" and is entitled to the property.

The Roman Catholic Church is a prototypical example of a hierarchical church. A hierarchical church is one in which various bodies in the church have similar faith and doctrines subject to a common governing ecclesiastical head. *Watson v. Jones, supra,* at 722-723; *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America,* 344 U.S. 94, 110, 73 S.Ct. 143, 97 L.Ed. 120 (1952). There is no dispute among the parties that the Roman Catholic Church is hierarchical.

Washington adopted the compulsory deference approach to disputes between members of religious organizations in *Wilkeson v. Rector, etc., of St. Luke's Parish of Tacoma,* 176 Wn. 377, 29 P.2d 748 (1934) and has applied that approach in later cases. *Southside Tabernacle v. Pentacostal Church of God, Pacific Northwest Dist., Inc.,* 32 Wn.App. 814, 650 P.2d 231 (1982). However, all those decisions involve intra-church disputes, that is to say, disputes as to ownership of property between different factions of a religious organization. In such disputes, as was noted in *Watson v. Jones, supra,* the parties to the dispute had historically voluntarily associated together under the umbrella of the religious organization with all its internal doctrines, practices and beliefs. By that association, they subjected themselves to the doctrines, matters of belief, organizational structure, rules and ecclesiastical authority of that organization. This controversy is inherently different. It involves the rights of creditors of the religious organization, not disputes among its members or component

MEMORANDUM DECISION RE: . . . - 29

1  parts.

2      This is not an intra-church dispute. The Association of
3  Parishes, the debtor and various members of the diocesan family all
4  are in agreement. They all advocate for the proposition that canon
5  law controls the issue of property of the estate. They all agree
6  that the disputed property is not property of the estate as it is
7  the parishes or other defendants which hold the equitable interest
8  and that the debtor holds only bare legal title. This is a purely
9  secular dispute between creditors and a bankruptcy debtor, albeit
10 one which is a religious organization.

11     In situations which are not intra-church disputes but which
12 involve governmental action which allegedly violate constitutional
13 principles, the legal analysis differs. As a general proposition,
14 the First Amendment does not prevent application of a law or body
15 of law which is facially neutral and generally applied in the
16 jurisdiction to a religious organization. This is true even though
17 its application would have an incidental burden or effect on the
18 exercise of religion. It is only if application of the law would
19 have an undue or substantial burden on the exercise of religion
20 that further inquiry be made. If an undue or substantial burden
21 does exist, a compelling governmental interest in the application
22 must be present. *Church of the Lukumi Babalu Aye, Inc. v. City of
23 Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993);
24 *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15
25 (1972). The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb,
26 does not change that initial legal analysis. It merely repeats the
27 proposition that laws which are neutral on their face may not, in
28 their application, substantially burden the practice of religion.

MEMORANDUM DECISION RE: . . . - 30

1   If a substantial burden exists, it must arise as a result of
2   compelling governmental interest and be the least restrictive means
3   of furthering that interest.

4       The present question is whether the application of 11 U.S.C.
5   § 541 of the Bankruptcy Code, i.e., defining the debtor's interest
6   in property in accordance with state civil law and federal
7   bankruptcy law, results in a substantial burden on the debtor's
8   free exercise of religion.[5]

9       Religious organizations do not exist on some ethereal plane
10  far removed from society. As institutions, they engage in many
11  secular activities. They hold title to real estate, they own
12  vehicles, and their agents and employees drive those vehicles on
13  public roads. Religious institutions contract for the purchase of
14  goods and services and maintain bank accounts. They mortgage
15  property and hold copyrights and purchase insurance policies. In
16  short, religious institutions engage in many secular activities.
17  Those secular activities often result in conflicts with others. A
18  motor vehicle accident may give rise to a tort claim, a dispute may
19  develop regarding the requirements of a purchase contract for goods
20  or services, or the religious organization may default on a
21  mortgage. Application of state law to the resolution of those
22  disputes, which necessarily requires a determination of the rights

23

24       [5]If application of a particular Code section would constitute
25  a substantial burden on religion, the appropriate remedy would be
    dismissal of the bankruptcy case. The Code is an integrated
26  statutory scheme. Bankruptcy debtors who voluntarily choose to
    participate in that statutory scheme, even those of a religious
27  nature, should not be able to "pick and choose" among Code
    sections. Dismissal would alleviate any undue burden suffered by
28  the debtor in the application of any particular Code section.

MEMORANDUM DECISION RE: . . . - 31

of the parties, does not generally impose an impermissible burden
on the practice of religion.

> The First Amendment does not provide churches with
> absolute immunity to engage in tortuous conduct. So long
> as liability is predicated on secular conduct and does
> not involve the interpretation of church doctrine or
> religious beliefs, it does not offend constitutional
> principles.

*C.J.C. v. Corporation of the Catholic Bishop of Yakima,* 138 Wn.2d
699, 728, 985 P.2d 262, 277 (1999).

One religious organization's use of another religious
organization's materials protected by copyright law was prohibited
in *Worldwide Church of God v. Philadelphia Church of God, Inc.,* 227
F.3d 1110 (9th Cir. 2000). Even though a religious organization,
the defendant was subject to enforcement of the copyright laws.

> Having to ask for permission, and presumably to pay for
> the right to use an owner's copyrighted work may be an
> inconvenience, and perhaps costly, but it cannot be
> assumed to be as a matter of law a substantival burden on
> the exercise of religion.

*Worldwide Church of God, supra,* at 1121.

The existence of a substantial burden on the practice of
religion becomes more difficult to demonstrate when the burden is
alleged to exist in the context of secular activities. Commencing
a bankruptcy proceeding is certainly a secular activity. The
fundamental purpose of a bankruptcy proceeding is to provide
equitable and fair treatment for creditors and to provide the
debtor a financial "fresh start." It is not a burden on a
religious organization which voluntarily seeks the protection of
the bankruptcy laws to require it to treat its creditors in the
same manner as any other debtor. It is not a burden on a religious
organization to assess its rights vis-a-vis creditors on the same

MEMORANDUM DECISION RE: . . . . - 32

1 basis as any other debtor.

2 The majority of claims in this bankruptcy proceeding are based
3 upon personal injuries suffered as a result of sex abuse by members
4 of the clergy. One is a personal injury claim arising from
5 negligence, not sex abuse. The schedules list outstanding real
6 estate taxes, priority wage claims and several general unsecured
7 creditors who appear to be "ordinary course of business" creditors.
8 Various executory contracts are listed, primarily leases of
9 equipment and farm land. Fair and equitable treatment of all
10 creditors requires application of civil law not only to determine
11 their rights to recover from assets of the debtor, but to first
12 define the interest of the debtor in those assets. That
13 requirement does not impose an undue or substantial burden on the
14 debtor's or the defendants' free exercise of religion.

15 This argument by the debtor and the defendants is in essence
16 a request to impose internal ecclesiastical rules upon third
17 parties who deal with the debtor in secular transactions.
18 Application of commonly understood and commonly applied statutes
19 and common law regulating property interests, rather than
20 application of ecclesiastical law, does not interfere with the free
21 exercise of religion. Application of § 541 to this debtor on the
22 same basis as its application to all other bankruptcy debtors does
23 not interfere with the free exercise of religion.

24 **3. What is the Nature and Extent of Debtor's Interest in the**
**Disputed Real Property Under the Laws of Washington?**
25

26 The debtor is a corporation sole as provided in R.C.W. 24.12,
27 etc. As such, it is a legal entity with powers to sue and be sued,
28 hold and manage property, enter into binding contracts and

MEMORANDUM DECISION RE: . . . - 33

1  generally take other actions and engage in other activities common
2  to legal entities. R.C.W. 24.12.020. The corporation sole statute
3  specifically authorizes the Bishop, who is deemed to be the body
4  corporate, to hold property in trust. R.C.W. 24.12.040. If a
5  bankruptcy debtor is acting as a trustee under a trust, the
6  bankruptcy debtor has no equitable interest in the trust res. The
7  trustee of a trust holds only "bare legal title" and the trust res
8  would not be property of the bankruptcy estate. *Dewsnup v. Timm*,
9  *supra*; *Olympic Federal Sav. & Loan Ass'n v. Regan*, 648 F.2d 1218,
10 1221 (9th Cir. 1981). Under Washington law, trusts may arise by
11 statute, by express writing, or be imposed by a judicial imposition
12 of a constructive or resulting trust.

13              (a) **Does R.C.W. 24.12, etc., Create a Statutory Trust?**

14      R.C.W. 24.12.010 authorizes a religious leader, in this
15 situation the Bishop, to "in conformity with the constitution,
16 canons, laws, regulation or discipline of such church or
17 denomination, to become a corporation sole, . . . and thereupon
18 said bishop . . . together with his successors in office or
19 possession . . . shall be deemed to be a body corporate . . . ."
20 Unlike other not-for-profit corporations, a corporate sole does not
21 have members or officers or a board of directors. A corporation
22 sole is composed of a series of natural persons who, one after
23 another, hold the office of the religious leader of the particular
24 religious organization. The statute provides for perpetual
25 existence of the corporate body although the natural person holding
26 the office has no perpetual existence.

27      A common sense reading of the statute is that, assuming that
28 the internal rules of the religious organization so allow, a duly

MEMORANDUM DECISION RE: . . . . - 34

appointed Bishop or other religious leader may incorporate as a corporation sole under Washington law. Contrary to debtor's contentions, it does not state that by exercising the right to become a corporate sole, the internal rules of the religious organization become part of the laws of the State of Washington and thereafter govern the secular activities in which the corporate sole engages. "We need not leave our common sense at the door step when we interpret a statute . . . ." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), superceded by statute as stated in *Stender v. Lucky Stores, Inc.*, 780 F. Supp. 1302 (N.D. Cal. 1992). *See also, Demko v. U.S.*, 216 F.3d 1049, 1053 (Fed. Cir. 2000).

The statutory scheme regarding corporate soles further provides in R.C.W. 24.12.020 that "[e]very corporate sole shall, for the purpose of the trust, have the power to contract . . . to receive bequests and devises for its own use or upon trust . . . ." Chronologically, this is the first reference to "trust" within the statutory scheme and is followed by R.C.W. 24.12.030. That provision states in part:

> Articles of incorporation shall be filed in like manner as provided by law for corporations aggregate, and therein shall be set forth the facts authorizing such incorporation, and declare the manner in which any vacancy occurring in the incumbency of such bishop . . . is required . . . PROVIDED, All property held in such official capacity by such bishop . . . shall be in trust for the use, purpose, benefit and behoof of his religious denomination, society or church.

R.C.W. 24.12.030. It is this provision which, in the opinion of the debtor and defendants, statutorily establishes a trust for the benefit of the members of the diocesan family, i.e., the parishes, schools, retreat centers, etc. The statute does not so provide.

MEMORANDUM DECISION RE: . . . - 35

1  The statute does not designate any particular beneficiary but
2  merely identifies the nature or character of the possible
3  beneficiaries. The beneficiary must be a religious organization.
4  The statute does not establish a trust for any specific religious
5  organization or for a congregation or a synod or parish or any
6  component or subgroup or member of any religious organization.
7  Religious organizations vary considerably in their structure and
8  organization. The statute is neutral and allows the religious
9  organization itself to determine the nature of any trust
10 established. The statute allows the natural person, the Bishop, to
11 hold property in trust for the religious organization, the
12 corporation sole. This is the plain meaning of the statute.

13     The historical context giving rise to the enactment casts
14 light on the purpose of its enactment. R.C.W. 24.12, etc., was
15 adopted March 15, 1915. The legislative history does not reveal
16 the purpose of the Washington legislature in adopting the statutory
17 scheme. The historical context in which corporate sole statutes
18 developed begins with the new nation of the United States of
19 America in 1789. At that time, there were various devices employed
20 to hold and convey ownership of church property.

21     Difficulties arose when trustees or lay persons held title to
22 church property. Difficulties also arose when a priest or bishop
23 held fee simple title to church property.

24         There was a constant fear that church property held in a
25         private name might be claimed by a relative of the
           holder. Worse yet, the possibility existed that some
26         unworthy claimant with a plausible story could make out
           a case for ownership. In one lawsuit, an unfrocked
27         priest claimed to be heir to land that a deceased
           predecessor had purchased to build a church.

28 James B. O'Hara, The Modern Corporation Sole, 93 Dickinson Law

1 | Review 23, 29 (Fall 1988).

2 These problems continued to exist post-civil war. Following
3 the death of the Roman Catholic Bishop in Michigan in 1868, the
4 Bishop's relatives claimed as his heirs, the real property which he
5 held in fee simple title for the church. Patrick Joseph Dignan,
6 A History of the Legal Incorporation of Catholic Church Property in
7 the United States (1784-1932), 215 (P.J. Kennedy & Sons
8 1935)(1933). Even after the Civil War era, no clear solution to
9 these difficulties had been developed. In 1878, the personal
10 creditors of a Bishop who had been personally involved with a
11 failed bank attempted to claim the real property in which the
12 Bishop held in fee simple title for the church. *Id.* at 219-223.

13 In order to address these types of problems, many states
14 authorized the formation of corporate soles. Washington's 1915
15 statute arose in this context and has not been substantively
16 amended. History confirms that the general purpose of such
17 statutes was to provide a device by which a religious organization
18 could hold and acquire property as a separate perpetual legal
19 entity. The natural person of the Bishop was to constitute the
20 body corporate and the natural person holding that office was to
21 hold the property in trust for the body corporate. Nothing in the
22 language of the statute indicates it was intended to graft
23 ecclesiastical doctrine onto the laws of the state or establish a
24 trust for the benefit of any particular religious group. No
25 statutory trust has been created.

26 **(b)** **Has the Debtor Established an Express Trust?**

27 R.C.W. 24.12 clearly authorizes the corporate sole to exercise

28

civil legal rights, including the right to establish trusts[6]. An
express trust arises when the grantor clearly intends to transfer
property from the grantor to a trustee for the benefit of another.
The grantor can designate itself as the trustee but the grantor
must manifest an intention to create a trust relationship and make
an effective transfer of the property. *Hoffman v. Tieton View
Community Methodist Episcopal Church*, 33 Wn.2d 716, 207 P.2d 699
(1949); *Niemann v. Vaughn Community Church*, 118 Wn.App. 824,
77 P.3d 1208 (2003). The evidence of an express trust in this
particular controversy consists of the Articles of Incorporation of
the Catholic Bishop of Spokane, a corporation sole. The Articles,
signed on July 3, 1915 by Augustine F. Schinner, Roman Catholic
Bishop of the Diocese of Spokane, provide:

> Article III - This corporation is formed for the purpose
> of transacting business and holding property in trust for
> that certain religious denomination or society known as
> the Roman Catholic Church; . . .
>
> Article V - . . . all property held by it (the corporate
> sole) being in trust for the use, purpose and benefit and
> behoof of the Roman Catholic Church of the Diocese of
> Spokane in the State of Washington."

The Articles could not express more clearly the intent to
create a trust and, clearly, the current Bishop, in his official
capacity, holds title to the trust res. The named beneficiary of
the trust is not, however, any of the defendant members of the
diocesan family. The named beneficiary is the Diocese itself. The
Bishop, in his official capacity, holds the property in trust for

---

[6]The corporation sole Diocese has the authority to formulate,
execute and implement written trust instruments conveying the
Disputed Real Property to a trust established for the benefit of a
particular parish or member of the diocesan family. There is no
contention that it has done so.

MEMORANDUM DECISION RE: . . . - 38

1  the debtor Diocese. The words mean what they say, the beneficiary
2  is "The Roman Catholic Church of the Diocese of Spokane." They do
3  not mean what they don't say, that each individual parish or all
4  parishes or any member of the diocesan family is the beneficiary.[7]

5      An express trust exists. The Bishop, as trustee, holds the
6  property in trust for the Diocese, the legal entity which commenced
7  the underlying bankruptcy proceeding.

8              (c)  **Has a Constructive or Resulting Trust Arisen?**

9                  i.  **Requirements for Imposition of Such Trusts**

10     The Association of Parishes, in its response to the
11  plaintiff's Motion for Partial Summary Judgment, argues that as a
12  matter of law, a constructive or resulting trust exists in all
13  property for the benefit of the parishes or appropriate member of
14  the diocesan family or, alternatively, for the benefit of the
15  individual members of each parish. The property is in the
16  possession of the parishes or other members of the diocesan family.
17  A few parcels of Disputed Real Property were acquired from other
18  Catholic organizations such as the Franciscans or Jesuits. Most
19  property has been acquired, improved, maintained, and insured with
20  voluntary contributions or gifts or bequests made by parishioners
21  and others who both intended and believed that the gifts were for
22  the benefit of the parish or other diocesan family members. In
23  considering whether an asset constitutes property of the estate, a
24  Bankruptcy Court is first required to apply state law to determine

25  _____

26      [7]Parol evidence may be utilized to establish an express trust
    if the beneficiary which is in possession of the property has
27  performed under the trust. There is no authority for the use of
    parol evidence to change the terms of an express trust, in this
28  case the identity of the beneficiary.

MEMORANDUM DECISION RE: . . . - 39

1  whether a constructive or resulting trust exists. *In re B.I.*
2  *Financial Services Group, Inc.*, 854 F.2d 351 (9th Cir. 1988) and
3  *Elliott v. Bumb*, 356 F.2d 749, 753 (1966).

4       A constructive trust is a remedy imposed by a court which
5  arises in one of two scenarios. It is a remedy for fraud, abuse of
6  confidence, gross misrepresentation or other improper or wrongful
7  conduct which results in a person obtaining something to which he
8  would otherwise not be entitled. In this situation, there has been
9  no allegation of any wrongful conduct on the part of the' Diocese
10 relating to the parishes or other members of the diocesan family.
11 The basis of the requested remedy is the second scenario in which
12 the circumstances of the relationship or transaction demonstrates
13 that allowing the titleholder to continue to hold the property
14 would result in unjust enrichment. It is a purely equitable
15 remedy. *Consulting Overseas Management, Ltd. v. Shtikel*, 105
16 Wn.App. 80, 18 P.3d 1144 (2001).

17      A resulting trust is also purely equitable. It is the
18 judicial imposition of a duty upon the person found to act as
19 trustee and that duty typically is the duty to convey title to the
20 intended beneficiary. It is imposed when the facts and
21 circumstances of the relationship or transaction indicate an intent
22 of the parties to create a trust. If the facts and circumstances
23 indicate that some other intention could be inferred, no resulting
24 trust is imposed. *Thor v. McDearmid,* 63 Wn.App. 193, 205, 817 P.2d
25 1380 (1991); *Diel v. Beekman,* 7 Wn.App. 139, 148, 499 P.2d 37
26 (1972), overruled to the extent it is inconsistent with the
27 doctrine of adverse possession in *Chaplin v. Sanders*, 100 Wn.2d
28 853, 676 P.2d 431 (1984).

MEMORANDUM DECISION RE: . . . - 40

Both types of non-express trusts are equitable in nature and the burden of proof is on the party seeking the relief. The entitlement to such relief must be shown by clear, cogent and convincing evidence. *In re Estate of Krappes,* 121 Wn.App. 653, 665, 91 P.3d 96 (2004); *Thor v. McDearmid, supra,* at 206. The evidence must "unmistakably point" to the conclusion the equitable remedy should be imposed. *Diel v. Beekman, supra*, at 148.

The distinction between the two is subtle and, like beauty, is easily recognized in a particular situation but difficult to describe in the abstract. Reported decisions do not always clearly distinguish between the two doctrines. Simplistically, in constructive trust situations, the courts do not create an actual trust but effectuate relief as though a trust had been created at the time of the transaction. Absent allegations of wrongdoing, the basis for the corrective action is that it would be "unfair" or "inequitable" or just "not right" to allow the situation to continue. In a resulting trust situation, the court creates a trust as that was the parties' intention at the time of the transaction. The trust is created to convey the beneficial interest to the person who was intended to receive it. *See Restatement of Restitution* § 160, cmt. b at p. 642.

The essence of both constructive and resulting trust requires that the underlying facts and circumstances regarding the relationship and course of dealing between the parties must demonstrate that it would be inequitable to allow the titleholder to retain the beneficial interest in the property.

## ii. Who are the Beneficiaries of the Constructive or Resulting Trust?

The Association of Parishes, which has not filed a cross-motion for summary judgment, argues that the Disputed Real Property and, by implication, all other property in possession of any parish, is held in constructive or resulting trust for the benefit of either the parishes themselves or the individual parishioners associated with each parish.[8]

### THE PARISHIONERS

In support of the novel contention that those who put money in weekly church contribution envelopes acquire a beneficial interest in the assets of the church, the Association of Parishes relies on two propositions. Firstly, some of the gifts, donations, or contributions were specifically solicited and received for the purpose of acquiring, improving or maintaining a specific parcel of Disputed Real Property. Secondly, all contributions, donations or gifts were made based upon the donor's understanding or belief that the funds would be used exclusively for the parish.

As support for the first proposition, the parishes cite R.C.W. 24.44, the Uniform Management of Institutional Funds Act. That statute establishes certain standards for non-profit corporations receiving restricted gifts. The funds may be placed into a pooled account, may be invested, and must be managed with "ordinary business care." The declarations by individual parishioners

---

[8]Should the parishes not constitute separate legal entities capable of holding beneficial interests in property, the alternative argument is that the debtor itself holds the property in constructive trust for the individual parishioners.

MEMORANDUM DECISION RE: . . . - 42

indicate that many parishes have, over the course of many years, solicited funds from individual parishioners and other persons, specifically to acquire or improve or maintain specific parcels of Disputed Real Property and have received donations for that purpose. Assuming that such constituted restricted gifts governed by this statute, the statute is irrelevant to this controversy. There is no evidence that any parish used any such restricted gifts contrary to the donor's intent. Even if that had occurred, the statute does not purport to provide the donor of a restrictive gift a beneficial or ownership interest in the asset acquired.

No legal authority has been cited in support of the second proposition that those who contribute money to a component part of a larger religious organization intending to benefit only that component part, acquire a beneficial interest in the assets of the religious organization or component part. No reported decision has been cited for the proposition that those who tithe or contribute to a church have a legally enforceable interest in the assets of the church. No law review article or legal treatise supports that contention. Undaunted, the Association of Parishes contends that the general precepts of constructive trust and resulting trust theory mandate that conclusion. The declarations of the parishioners repeatedly refer to "offerings," "donations," "tithes," and "gifts." *Webster's Ninth New Collegiate Dictionary (1985) Edition* defines gift as "something voluntarily transferred by one person to another without compensation". Donation is defined as "the action of making a gift esp. to a charity or public institution." A tithe is defined as "a tenth part of something paid as a voluntary contribution or as a tax esp. for the support

1  of a religious establishment." The term offering has various
2  definitions, the most relevant being "a contribution to the support
3  of a church."

4      Voluntary gifts cannot result in a constructive or resulting
5  trust. *Restatement (Second) of Trusts* § 25, cmt. a at p. 71,
6  § 125, and *see also* § 37, cmt. a. To paraphrase Gertrud Stein, a
7  gift is a gift is a gift and by any other name (donation, offering,
8  tithe) would still not result in a legally enforceable interest in
9  assets of the donee. No constructive or resulting trust exists for
10 the benefit of individual parishioners.

11                            **THE PARISHES**

12     The Committee argues that unincorporated associations, such as
13 the parishes, have no legal existence. One result of that
14 conclusion is that they may not be beneficiaries of a trust. The
15 Complaint alleges that the debtor controls and manages the other
16 members of the diocesan family to such an extent that they lack the
17 authority and independence of action necessary to constitute a
18 separate legal entity. The Committee analogizes the parishes to
19 operating divisions of a large corporation. Like operating
20 divisions, they may exercise day-to-day decision-making authority
21 and engage in transactions with third parties but routinely report
22 to and are responsible to the officers and directors of the
23 corporation who appoint those who manage the division, make policy
24 decisions and must approve all transactions with significant
25 economic consequences. The Association of Parishes denies this
26 description of parish activities. Clearly, issues of fact exist.
27     For purposes of this opinion, it will be assumed that the
28 parishes and other members of the diocesan family are separate

MEMORANDUM DECISION RE: . . . . - 44

1 legal entities and capable of holding title to property and
2 constituting beneficiaries of a trust. If constructive or
3 resulting trusts exist, the beneficiaries would be the parishes or
4 other members of the diocesan family.

5 The deeds to the property reflect fee simple title in the
6 Diocese. If there is no limiting language, the deed is a fee
7 simple title. *Ray v. King County,* 120 Wn.App. 564, 577, 86 P.3d
8 183 (2004). The Washington Supreme Court has noted that the
9 settled rule in Washington is that a deed which conveys the land to
10 the grantee operates as a grant of fee even though it may have
11 language which attempts to designate or restrict the use of the
12 property. *King County v. Hanson Inv. Co.,* 34 Wn.2d 112, 119, 208
13 P.2d 113 (1949). The Diocese and Association of Parishes have
14 submitted declarations that it was the intention of the Diocese and
15 the parishioners who gave the monetary gifts relating to the
16 property that the Disputed Real Property would be for the benefit
17 of the parishes. They argue that since the titleholder and the
18 alleged beneficiary of the trust agree that the parishes should
19 hold the beneficial interest, the inquiry ends. This ignores the
20 fact that the deeds do not reflect this supposed intention. Under
21 this theory, debtors would be free to hold fee simple title to
22 property but submit a declaration from a family member or related
23 corporation indicating that the family member or related
24 corporation was to have held the beneficial interest in the
25 property thus removing such property from the reach of creditors
26 without further inquiry. Such a result would require the Court to
27 ignore the deed and totally rely upon self-serving statement of the
28 debtor and theoretical beneficiary.

MEMORANDUM DECISION RE: . . . - 45

1   Reliance on the declarations of the priests and parishioners
2 on this point is not sound. At best, these declarations say that
3 contributions or gifts were intended for the benefit of the
4 individual parish. There are no allegations that the parishes did
5 not benefit or that the gifts and contributions were misdirected or
6 misallocated. The property was acquired and the parishes occupied
7 the buildings and had use of the same. The purpose of a gift or
8 donation to any church for property and facilities is to create a
9 place for worship, learning and gathering as a community. The
10 identity of the holder of title or beneficial interest is not a
11 factor. If a Boy Scout camp or a church camp happen to be located
12 on forest land leased from the federal government, those with an
13 interest would still contribute to the physical development of the
14 camp. Those contributions would have no effect on the legal title.
15 There is no evidence to support the creation of a constructive or
16 resulting trust with regard to the Disputed Real Property.

17      As to the personal property, disputed issues of fact exist.
18 Examples of the issues surrounding the handling of money can be
19 found in the Interim Agreed Order on Motion of Debtor for Entry of
20 An Order (A) Authorizing Continued Use of Debtor's Cash Management
21 System; . . . (Main Case Docket No. 270). The Order refers to the
22 D & L Fund which, from time to time, receives deposits from
23 parishes which deposits are held in the parishes' name. As the
24 name implies, the D & L Fund occasionally makes loans to parishes.
25 There are pooled accounts containing parish and other diocesan
26 family member funds which are invested by the debtor which manages
27 and directs the investment activity. Certainly, the Diocese has
28 possession of the funds. Numerous disputed facts exist regarding

MEMORANDUM DECISION RE: . . . - 46

the interest of the Diocese in these funds under state law. This
decision does not attempt to resolve the nature and extent of the
debtor's interest in the various cash and investment accounts nor
questions regarding other personal property.

### 4. Effect of Federal Bankruptcy Law on Alleged Constructive or Resulting Trusts.

Assuming the parishes and other members of the diocesan family
could demonstrate grounds to impose a constructive or resulting
trust under state law, that would not end the inquiry as to whether
such property constituted property of the bankruptcy estate. The
ultimate identification of property of the estate is dependent upon
application of federal bankruptcy law. *In re Cogar*, 210 B.R. 803,
809 (B.A.P. 9th Cir. 1997).

Constructive trust is a remedy and does not exist until
imposed by a court. Any such prospective trust is inchoate.

> While we agree that any constructive trust that is given
> effect must be a creature of (state) law, we cannot
> accept the proposition that the bankruptcy estate is
> automatically deprived of any funds that state law might
> find subject to a constructive trust. . . . . A
> constructive trust is not the same kind of interest in
> property as a joint tenancy or a remainder. It is a
> remedy, flexibly fashioned in equity to provide relief
> where a balancing of interests in the context of a
> particular case seems to call for it. . . . Moreover, in
> the case presented here it is an inchoate remedy; we are
> not dealing with property that a state court decree has
> in the past placed under a constructive trust.

*In re North American Coin & Currency, Ltd*, 767 F.2d 1573, 1575, (9th
Cir. 1985), *cert. denied, Daniel Torres v. Eastlick*, 475 U.S. 1083,
106 S.Ct. 1462, 89 L.Ed.2d 719 (1986).

If the parishes and other defendants could demonstrate unjust
enrichment or other cause for the imposition of a constructive
trust under state law, that remedy is no longer available once a

MEMORANDUM DECISION RE: . . . - 47

1 bankruptcy has been commenced. *In re Tleel*, 876 F.2d 769 (9th Cir.
2 1989).

> Because it is a *remedy*, a constructive trust cannot
> affect rights in the res until it is imposed. A
> constructive trust imposed by state law pre-petition
> would therefore exclude the res from the debtor estate.
> If the remedy remains inchoate post-petition, however, it
> is subordinate to the trustee's strong arm power.

7 *In re Markair, Inc.*, 172 B.R. 638, 642 (B.A.P. 9th Cir. 1994).

8      As to resulting trusts under state law, no such trusts exist
9 until created by judicial act. The rationale of *Markair*, *supra*,
10 would also apply to such inchoate trusts. The Bankruptcy Court has
11 jurisdiction to create a resulting trust as it is a court of equity
12 and such trusts are creatures of equity. However, a Bankruptcy
13 Court must balance not just the equities between the entity which
14 holds legal title to the property against the entity which holds
15 the beneficial interest, but those interests against the equities
16 in favor of the creditors. A resulting trust cannot be used as a
17 weapon to defeat the claims of creditors. *In re Foam Systems Co.*,
18 92 B.R. 406 (B.A.P. 9th Cir. 1988). In this situation, the debtor
19 and entities affiliated with the debtor have agreed between
20 themselves that a resulting trust renders the Disputed Real
21 Property immune from the claims of debtor's creditors. Such
22 contention, however, fails to consider the equities in favor of
23 those holding claims against the debtor.

24      Imposition of a resulting trust is also inconsistent with
25 11 U.S.C. § 544. A Chapter 11 debtor has the rights of a trustee
26 under that section. *In re Kim,* 161 B.R. 831 (B.A.P. 9th Cir. 1993);
27 *In re Probasco,* 839 F.2d 1352 (9th Cir. 1988). The deeds to the
28 Disputed Real Property reflect fee simple title in the debtor.

MEMORANDUM DECISION RE: . . . - 48

1 They provide no notice of any prospective or existing trust. A
2 creditor doing business with the debtor and relying upon its
3 general creditworthiness would have no reason to believe nor any
4 notice that the property was not an asset of the debtor. A bona
5 fide purchaser for value would obtain fee simple title without
6 regard to the existence of any agreement between the debtors and
7 members of the diocesan family that the property was to be held in
8 trust. The debtor has the rights of a bona fide purchaser under
9 § 544(a)(3) and could set aside any beneficial interests claimed by
10 the other members of the diocesan family. Indeed, the power to
11 exercise the rights of a bona fide purchaser under § 544(a)(3) and
12 void those interests could be granted to the plaintiff's
13 Committee. *Official Committee of Unsecured Creditors of*
14 *Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d
15 548 (3rd Cir. 2003).

16     *In re Tleel, supra,* in discussing the effect of § 544(a)(3)
17 upon constructive trusts concluded that a trustee exercising the
18 powers granted in that section would have priority over any
19 interest of the purported beneficiary of such a trust. The same
20 rationale is applicable to resulting trusts.

21     No constructive or resulting trust exists.

22                               **IV.**

23                           **CONCLUSION**

24     There are disputed material facts regarding the nature of the
25 parishes and other members of the diocesan family. For purposes of
26 this decision, it has been assumed that the debtor and other
27 defendants are correct in their contention that the parishes and
28 other members of the diocesan family have the legal capacity to

MEMORANDUM DECISION RE: . . . - 49

1  hold the beneficial interest under a trust.    There are also
2  disputed material facts regarding the nature and extent of the
3  debtor's interest under state law in certain cash and investment
4  accounts as well as other personal property.    This decision does
5  not address that issue.

6      The various Motions to Dismiss for lack of standing and lack
7  of jurisdiction are **DENIED**.    The plaintiff's Motion for Partial
8  Summary Judgment is **GRANTED** and the debtor's Cross-Motion for
9  Summary Judgment is **DENIED**.    It is not a violation of the First
10  Amendment to apply federal bankruptcy law to identify and define
11  property of the bankruptcy estate even though the Chapter 11 debtor
12  is a religious organization.    Nor is it a violation of the First
13  Amendment to determine the nature and extent of the debtor's
14  interest in property by application of state law rather than
15  internal church doctrine. As authorized by R.C.W. 24.12, et seq.,
16  an express trust was created whereby the Bishop, a natural person,
17  holds legal title to the Disputed Real Property in trust for the
18  benefit of the debtor Diocese which holds the beneficial interest.
19  The Disputed Real Property constitutes property of the estate.

20      DATED this _26_ day of August, 2005.

21

22                              PATRICIA C. WILLIAMS
23                              Bankruptcy Judge

24

25

26

27

28

MEMORANDUM DECISION RE: . . . - 50