UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| COMMITTEE OF TORT LITIGANTS, et al., | NO. 05-CV-274-JLQ |
| Plaintiffs, | Bkty. Ct. No. 04-08822-PCW11 |
| vs. | MEMORANDUM OPINION AND ORDER REMANDING TO BANKRUPTCY COURT |
| CATHOLIC DIOCESE OF SPOKANE, et al., | |
| Defendants. | |

This matter came regularly on for hearing by the court on the 15th day of June, 2006, on the appeal of a Memorandum Opinion of the Bankruptcy Court for the Eastern District of Washington granting summary judgment to the Committee of Tort Litigants and claimant Michael Shea, finding that the Parish properties in the Diocese of Spokane are owned outright by the Diocese or Bishop of Spokane and that the Parishes have no legal, beneficial or equitable interest in their individual churches and schools. The Bankruptcy Court Memorandum Opinion also denied the Diocese's Cross-Motion for Summary Judgment and denied the Parishes' Motions to Dismiss.

James Stang, Hamid Rafajjod, and John Campbell appeared on behalf of the Committee of Tort Litigants. Frank Conklin appeared on behalf of Claimant Shea. Shawn Cross, Gerald Kobluk, and Gregory Arpin appeared on behalf of the Diocese of Spokane. John Munding and Ford Elsaesser appeared on behalf of the individual Parishes. James Stang and Frank Conklin argued on behalf of the Plaintiffs. Shawn Cross argued on behalf of the Diocese. Ford Elsaesser argued on behalf of the Parishes.

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 1

## A. PROCEDURAL BACKGROUND

It is important to note at the outset that the issues before the court do not involve the efficacy or validity of the claims by the alleged victims of abuse against the Diocese of Spokane or the Bishop thereof. The June 15, 2006 hearing also did not resolve or involve what other properties are held in fee simple by the Diocese or Bishop that may be subjected to the claims of the alleged victims. The only issue presently before this court is whether the Bankruptcy Court erred in granting summary judgment to the Tort Litigants Committee, finding that the Parish real properties in the Diocese of Spokane are owned outright by the Diocese or Bishop and that the individual Parishes have no legal, beneficial, or equitable interest in their individual churches and schools.

This case began on December 6, 2004, when William S. Skylstad, as Bishop of the Catholic Church of the Spokane Diocese ("Diocese") and as successor-in-interest to the incorporator of the Catholic Bishop of Spokane, a corporation sole, facing a large number of claims by individuals allegedly abused by a priest or priests, placed the corporation sole in a Chapter 11 Bankruptcy. The Diocese listed a number of Catholic Parishes as unsecured creditors in its Amended Schedule F based on funds previously deposited by each Parish in the diocesan Deposit and Loan Fund. The Bankruptcy Court reserved ruling on these personal property accounts and that issue is not before this court. Parish real properties were listed as "property held for another person" in the Diocese Statement of Financial Affairs with the following description:

> The Diocese has no equitable, beneficial, or proprietary interest in this property, but in some cases, holds mere legal title. In addition, certain of the property is subject to a restriction (of some kind) imposed by the donor or grantor.

Between October, 2002, and December, 2004, when the Diocese filed its bankruptcy petition, twenty-one court complaints, involving sixty-four claimants alleging

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 2

sex abuse, had been filed against the Diocese. On February 1, 2005, the Tort Litigants'
Committee was appointed to represent the tort claimants, who had, pre-bankruptcy,
initiated litigation against the debtor Diocese. On February 4, 2005, this Committee
initiated an adversary proceeding in Bankruptcy Court seeking equitable relief against the
debtor Diocese and various non-debtor members of the diocesan family including parishes,
schools, retreat centers, etc., each of which was named as a separate Defendant. The Tort
Litigants Committee sought a declaration from the Bankruptcy Court that the Parishes had
no legal, equitable, or beneficial interest in their real property, including the churches and
schools.

One hundred-fifty-five Defendants were named in the adversary complaint,
approximately ninety eight being Parishes. An informal group of approximately eighty of
these Parishes was formed as the Association of Parishes. The adversary complaint only
dealt with the real property of twenty-two of the Parishes, which are located in Spokane
County, because the title information concerning these twenty-two Parishes was readily
available. None of the Parishes are debtors in any bankruptcy proceeding nor defendants
in any of the state court lawsuits filed by members of the Tort Litigants Committee.

The Tort Litigants Committee, in its summary judgment pleadings, alleged that the
affairs of the Diocese and the Parishes are so entangled that no allocation of assets is
possible, and that collectively they are a single economic unit. The Committee sought
substantive consolidation and a summary judgment Order from the Bankruptcy Court
directing the Diocese to amend its schedule to list disputed Parish real and personal
property as property of the Diocese bankruptcy estate. The Parishes, in their summary
judgment responses, argued that the Tort Litigant Committee members have no claim to
the property of any Parish, because that property is not part of the Diocese's bankruptcy
estate.

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 3

The Adversary Complaint, and summary judgment pleadings, alleged that the Parishes are not legal entities separate from or independent of the Diocese, but rather are merely operating divisions . . . and "mere instrumentalities" of the debtor. The Defendants Parishes and the Diocese claimed that the Parishes, as unincorporated associations under Washington law, have separate independent legal existence with all the attendant rights such as the right to sue and be sued and hold beneficial interests in real and personal property. The Parishes contended that having purchased and erected their individual churches and schools, at a minimum, they own the beneficial interest in those properties.

The Parishes filed Motions to Dismiss, primarily raising Committee "standing" issues which the Bankruptcy Court denied. This court affirmed that ruling. The Committee of Tort Litigants filed a Motion for Summary Judgment, as did claimant Shea, seeking summary determination that the twenty-two specifically identified parcels of real estate, title to which is in the name of the Diocese, belongs to the Diocese's estate without any interest being held by the Parishes. The Diocese filed a cross-motion for Summary Judgment. The Bankruptcy Court granted the Plaintiffs' Motions for Summary Judgment as to the Parish real property, found there were disputed issues of material fact as to the personal property, and denied the Diocese's Cross-Motion for Summary Judgment. Those rulings were then appealed to this court.

## B. FACTUAL SUBMITTALS

The Bankruptcy Court accepted the sole submittal of the Committee of Tort Litigants, being deeds to the 22 properties in the name of the Bishop or Diocese. The Diocese and Parishes complain that the Bankruptcy Court did not consider a majority of the affidavits they submitted concerning the acquisition and improvement of the real properties because of its stated "judicial economy" concerns. The Parishes and Diocese's submittals resisting the Committee's Motion For Summary Judgment consisted of a large

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 4

number of affidavits, including documents, of Priests and Parishioners of each of the 22 Parishes setting forth the factual basis for the claim that each Parish holds a beneficial interest in its parish real and personal property. The Bankruptcy Court explained that it did not consider the voluminous affidavits because to do so would "require the Court to ignore the deeds and totally rely on the self-serving statements of the debtor and theoretical beneficiary." However, this court concludes that the Bankruptcy Court, in ruling on the summary judgment motions, should have considered the deeds and affidavits submitted by all parties.

This court has considered the affidavits and documents submitted to the Bankruptcy Court on behalf of all 22 Parishes in response to the Committee's Motion for Summary Judgment, as well as the deeds showing formal title to the disputed property to be in the name of the Bishop of Spokane. Each response of the Parishes includes the affidavit from the Parish Priest and at least one long-time Parishioner. Most of the affidavits contain similar information, which will be summarized here and will not be repeated.

Each of the Priest's Affidavits sets forth the real property at issue and claims that it all was acquired with Parish funds and belongs to the individual Parish, not to the Diocese. Each affidavit states that although exempt from real property taxes, all property tax exemption forms and fees associated therewith are in the name of and completed by the Parish. Exhibits to the affidavits show that in each case the individual Parish is billed for and pays for insuring the property. The insurance documents show the property owners to be the Catholic Bishop of Spokane and the individual Parish. Each Priest Affidavit sets forth the number of Parishioners making up the Parish and contains the following paragraphs:

> The financial strength or weakness of a parish is dependent almost entirely upon its Christian faithful. Offerings gifts, and tithes are made by Parishioners of the Parish, for the financial being of the parish. (Our Parish)

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 5

since its inception has raised money through weekly collections, tithes, gifts, and capital campaigns. In recognition of the donations by Parishioners (Our Parish) issues quarterly statements to each specific donor) (form statement attached).

All money collected in the regular Sunday collection is for the use, maintenance and improvement of (Our Parish). Occasionally there will be additional collections for specific purposes, such as hurricane or other disaster relief. Such collections and their purposes are announced to the Parishioners (of our Parish) and all money is kept separate from the money donated directly to (our Parish).

(Our Parish) and its ministries bank in the public sector. Bank accounts are currently held at: (Names of Banks) these accounts are in (Our Parish)'s or its ministries' names exclusively and are referenced by (Our Parish, TIN #).

(Our Parish) has its own employees and volunteers. The employees are hired and fired at the sole discretion of (Our Parish). The employees are paid by (Our Parish), from its checking account with (Name of Bank). The withholding is under (TIN #).

(Our Parish) directly contracts with numerous businesses for goods and services . . . (Our Parish) is billed directly by these businesses and pays such invoices from it bank account (copies of invoices billed directly to Parish are attached).

Each Parishioner affidavit states, *inter alia*, that the affiant contributed to his or her Parish and intended that all contributions were to solely benefit that particular Parish.

The affidavits of Parish Priests and Parishioners from each parish and their exhibits establish a long and detailed history regarding the acquisition and ownership of its real property and also that in some cases it was parishioners who gifted or donated the real property to the Parish. Illustrative is the Affidavit of Father Barnufsky of St. Francis Assisi Parish on West Heroy Ave. in Spokane which states that he caused the real property to be transferred as a gift from the Franciscans. The affidavit of Father Shaff of St. John Vianney Parish on North Walnut St. in Spokane has an Agreement to Purchase attached which shows that on March 26, 1951 George F. Struges & Elsa A. Struges agreed to sell the real property to St. John Baptist Vianney Church for $1,600.00.

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 6

1   The affidavit of Father Thomas C. Caswell of St. Rose of Lima Parish in Cheney

2   states that the Parish purchased four lots owned by Parishioners Mr. and Mrs. Robert

3   Wilson and four lots were donated by the Wilsons.

4       The history of St. Thomas More Parish on North Howard Drive in Spokane ,

5   founded in 1957 is also illustrative and instructive. The Affidavit of Martin G. Weber. a

6   long term Parishioner of St. Thomas More, who has also served on numerous boards of the

7   Catholic Diocese of Spokane, states:

> As a Parishioner of St. Thomas More, I have served in various capacities including chairman of the Parish Council, past and present chairman of the Parish Finance Committee, past president of the St. Thomas More Home and School Association and past president of the St. Thomas More School Board.

> I have served on numerous boards of the Catholic Diocese of Spokane including six years on the Bishop's Finance Council, two of which were as Chairman. Because of my extensive service on these boards, I am aware of the ongoing financial relationships between the Catholic Diocese of Spokane and the various Parishes within the Diocese.

> Since its inception in 1957, St. Thomas More has conducted nine separate campaigns for the construction of Parish facilities. I have personally participated in eight of these campaigns and have served as over-all-chairman of two of them and as co-chairman for one other. **The funds collected were used exclusively for the construction of the facilities for the Parish. I am unaware of any grants or gift of funds provided from the Catholic Diocese for these purposes.**

> As a member of the Parish Finance Council, **I know that contributions from the parishioners, gifts, and bequests have all been used exclusively for the benefit of St. Thomas More. Any contributions made to the Catholic Diocese of Spokane are specifically designated as such at the time the collection is made and they are separately and distinctively accounted for from the parish funds.** I am a regular contributor to the regular collections and the capital campaigns conducted by St. Thomas More. **It is my intent that these contributions be used exclusively for the benefit of St. Thomas More.**

> **St. Thomas More sold a residence which originally had been purchased as a convent for the Dominican Sisters teaching in the grade school. In my capacity as an attorney, I personally prepared the closing papers for the sale of the property which I believe occurred in 1988. All funds remaining from the sale were retained by St. Thomas More for its exclusive benefit.**

25      I am a former six year member and two year chairman of the Bishop's Finance

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 7

Council. During my tenure, I was charged with reviewing the real property holding of the Diocese. **Individual Parishes of the Diocese were all required to raise the requisite funds for any building projects which they would undertake. Any loans to Parishes came from funds on deposit with the Deposit and Loan Fund maintained by the Diocese which consisted of monies deposited by the individual Parishes.**

**The Diocese of Spokane did not give financial assistance to parishes in the construction of buildings and improvements other than to approve loans made from the Deposit and Loan Fund**. (Emphasis added.)

The correspondence and documents regarding the negotiations and conveyance of title to the real property of St. Aloysius Parish appear to be the most illuminating evidence on the issue of the parties' actions and intent when Parish property in the Spokane Diocese was acquired and improved. St. Aloysius Church was built between 1909 and 1912 on land originally owned by the Jesuit Order. While located adjacent to Gonzaga University, the Parish operated independent of the University. In 1935, discussions and correspondence took place between the Parish Priest, Father O'Malley, and others as to the Jesuit order issuing a deed to the Parish for the land on which the church had been erected. Attached to the Affidavit of Father Barnett is a letter Bishop Charles A. White of the Spokane Diocese wrote Father Fitzgerald, the Provincial of the Jesuit Order on November 30, 1935, as to the sale of the property to the Parish and the monetary consideration of some $3,000 which the Parish proposed to pay for the land. This letter, written some 70 years before any issue arose as to ownership of Parish properties, clearly and unequivocally sets forth the role of the Bishop and the Diocese of Spokane as it relates to formal title of Parish real properties being placed in the name of the Diocese or the Bishop, that being that the properties are Parish properties and that the Bishop holds title thereto solely as a trustee for the benefit of the individual Parishes. Bishop White's November 30, 1935 letter to Fr. Fitzgerald, stated in part:

MEMORANDUM OPINION AND ORDER REVERSING IN PART AND REMANDING TO BANKRUPTCY COURT 8

> However, if Gonzaga University feels that to expect it to give a deed of the lots to the parish (title, The Catholic Bishop of Spokane) without its receiving something more than a mere nominal fee would be an attempt to exact a gift that it does not consider itself either in any way obligated or in financial position to make, it will be agreeable to me to authorize the parish to make proper consideration.
>
> I would state further that in every case, I hold each parish responsible for its own obligations. Even when the parish properties are held under the title of the diocesan corporation, the Catholic Bishop of Spokane (the title of nearly all our parish properties) this form of tenure does not change the fact that they are parish properties, the diocesan corporation being a mere non-profit holding corporation which holds the various parish properties in trust for the faithful of the respective parishes. (Emphasis supplied).

There was no evidence submitted as to the actual amount of payment by St. Aloysius Parish. While of some non-determinative interest, and with credit to the Jesuit Order, the records that were submitted suggest that the Order accepted only a nominal payment by the Parish for the land on which St. Aloysius Church then and now stands. This letter from Bishop White makes it very clear that from at least 1935, all concerned believed that even though title to Parish properties was and is in the name of the Catholic Bishop it does not change the fact that they are Parish properties and that the Bishop merely holds the title to the properties in trust for the Parishes. No evidence to the contrary was submitted in the summary judgment proceedings by the Tort Claimants Committee or claimant Shea.

On July 10, 1986, Bishop Lawrence H. Welsh of the Spokane Diocese wrote in response to a letter concerning the finances of the parishes and the Bishop which is also illustrative of the parties' intent. This letter is an attachment to one of the affidavits filed by Father Daniel Barnett, the Priest of both St. Francis Xavier Parish on N. Standard St. in Spokane and St. Patrick Parish on N. Nelson St. in Spokane.

> Your letter, however, contains basically an inaccurate picture of how the finances of parishes and diocese function. Your letter seems to imply that the diocese or "Bishop" pays for gymnasiums in different parishes around the diocese that happen to have those facilities. That is certainly not true. The gyms at Sacred Heart Parish or Our Lady of Fatima, St. Charles, etc. have all been built

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 9

by the people of the parish. When you refer to having to pay 50% of the total cost, the implication is that the diocese pays the other 50%. That is not true. The rule in this diocese is that a parish must have raised and have on hand 50% of the money of the total cost of the building project before the diocese will <u>lend</u> the balance of the money. The money that the diocese lends to the different parishes is money which is on deposit from other parishes which have an excess of funds. We have to return that money eventually to those parishes when they need it and in the meantime, we have to pay interest to them, for use of that money just as a bank would have. It really is not our money

Further evidence of an individual Parish's beneficial interest in its real property and recognition by the Bishop and Diocese is reflected by the 1989 sale of a portion of the St. Augustine property to the City of Spokane where the terms and conditions of the sale were negotiated by the Parish priest and council with all of the $77,000 proceeds of sale being applied for the Parish's benefit.

The Committee of Tort Litigants objected in detail to each affidavit of a Priest or Parishioner claiming that the facts stated therein were "irrelevant" or "inadmissible" as a legal conclusion, or lacked foundation. The objections of the Committee of Tort Litigants were both general as to the Clergy Affidavits and the Parishioner Affidavits, as well as specific to each paragraph. However, these "objections" of the Committee of Tort Claimants confirm, rather than deny, the factual submittals of the Parishes. In general the Tort Litigants Committee objections state:

**A. The Clergy Affidavits**

. . . the Clergy Affidavits proffer generic testimony that falls into several clearly identifiable subcategories: (1) **the Parishes have maintained and improved the churches, schools, rectories on property purchased many decades ago, or more recently;** (2) the parishes pay, *inter alia* real property taxes and insurance premiums; (3) the parishes hire and fire employees, contract with vendors, buy cars, and have gaming licenses; (4) the parishes have their own bank and investment accounts in the public sector, maintain their own accounting systems and participate in the Deposit and Loan fund; and (5) the Parishes have parishioners who through tithing and other donations financially support the parishes and their mission. As a result the clergy affidavits conclude that the Parishes have legal and/or equitable title to the disputed real property. **Some of the Clergy Affidavits have lengthy statements detailing**

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 10

the history of the land transactions and building campaigns from the 1920s through the present. Others attach pages of invoices showing repairs and improvements over the past 50 years. One has offered into evidence a 40-page Centennial History . . . . All of this is aimed at keeping the disputed real property out of the Diocese's bankruptcy estate. (Emphasis added).

The Clergy Affidavits and accompanying exhibits are completely irrelevant to establish an ownership interest by the Parishes in the Disputed Real Property . . . title to every piece of real property is held in fee simple in the name of the Catholic Bishop of Spokane, a corporation sole. A fee simple includes all possible rights and privileges with respect to land. By virtue thereof, the Debtor can exercise 'absolute and exclusive control over the real property. . . In addition, none of the deeds restrict the fee simple estate acquired by the Diocese. Neither the Debtor nor the parishes have introduced any admissible evidence which would suggest the record title of the subject property is vested in the Debtor in anything other than fee simple. In addition, none of the deeds contain a restrictive use provision which would prevent the real property from being sold or used for any purpose whatsoever.

The Clergy Affidavits are also irrelevant to the extent that they rely on ecclesiastical legal principles to establish that the use of funds to maintain the disputed real property created an ownership interest in the disputed real property. Moreover, the affiants improperly rely on inadmissible hearsay, unauthenticated documentary evidence, and testimonial evidence that lacks foundation and draws legal conclusions. Therefore, the Committee generally objects to the Clergy Affidavits in their entirety on these grounds.
Where indicated, **the Committee does not dispute the proffered facts as such no genuine issue of material fact exists concerning the legal and equitable ownership of the disputed real property pursuant to Washington law.** For each of the foregoing reasons and those specifically set forth below, **the Clergy Affidavits must not be considered by the Court to the extent that they contain irrelevant and inadmissible evidence.** (Emphasis added).

**B. The Parishioner Affidavits**
The second category of Parish Affidavits are the Parishioner Affidavits provided by non-clergy members of the parishes to establish the parishes' independence and equitable ownership of the disputed real property. The Parishioner Affidavits also proffer generic testimony that falls into several categories: (1) **that the affiants have participated in capital campaigns for the exclusive use of their respective parishes, which funds were used in many instances to erect buildings, schools, church rectories and other church properties;** (2) that affiants have put money in envelopes and place them in the collection trays with the understanding and belief that their money would finance parish projects; (3) **that property was gifted to the parishes for the "exclusive use : of the parish;** and (40 that any funding of Diocese projects would be collected and accounted for separately from their donations to the parish. (Emphasis added).

As with the Clergy Affidavits, the Parishioner Affidavits are irrelevant to

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 11

determining whether the disputed real property is properly part of the Debtor's estate. The Debtor holds the disputed real property in fee simple, and **it is of no consequence that the parishioners used their "sweet equity" to maintain and improve parish structures or intended that their donations to their chosen parish be used only by the parish for the benefit of the parish.** (Emphasis added).

**Given their overall irrelevance, and inadmissibility . . . , there are no genuine issues of material fact created by the parish affidavits concerning the legal ownership of the disputed real property pursuant to Washington state law.** (Emphasis added).

The Committee of Tort Litigants then set forth pages and pages of objections to each specific paragraph such as "lack of foundation" or "legal conclusion" or "irrelevant".

The Bankruptcy Court entered a Memorandum Decision Re: Evidentiary Objections noting that the chart detailing the Committee's objections to the Diocese's Affidavits ran to 40 pages and those detailing the objections to the Parishes Affidavits ran to 233 pages. The Bankruptcy Court decided at oral argument on the summary judgment motions that "a lengthy hearing to consider each and every objection was not a good use of scarce assets." The parties were told that they would be invited to submit additional materials regarding specific objections to be defined at a later date. The court then stated:

The goal of these objections was clearly to eliminate opposing affidavits for technical rather than substantive reasons. Objections to affidavits in a summary judgment motion have their place. On occasion, a party will file affidavits which in whole or in part should not be allowed to stand unchallenged for evidentiary reasons. However, that is certainly not typical. A judge is normally quite capable of determining what to consider and what to discount. The fact that evidence is being allowed for the purposes of this motion does not mean that it would be automatically admitted in an evidentiary hearing. **Further, since the Court is dealing with a fraction of the objections, absolutely no conclusions should be drawn as to how the objections not addressed might have been handled.** (Emphasis added).

The court admitted the Affidavit of the Bishop and ruled on eight Affidavits submitted by Priests and Parishioners, admitted 2 or 3 paragraphs of each, and occasionally one or two exhibits attached thereto. The court then noted that:

the Court is only ruling on specific paragraphs and exhibits in affidavits. To

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 12

the extent that an affidavit is not mentioned at all or there is not a specific ruling as to a paragraph or exhibit, the objection is neither granted nor denied as the paragraph or exhibit has not been relied upon. In the event the Court failed to mention an affidavit, paragraph or exhibit the foregoing general rule should be applied.

Generally speaking, the Bankruptcy Court admitted and considered statements from the affidavits that the affiant is a resident of Spokane and has personal knowledge of the facts set forth in the Affidavit; that the affiant is the Pastor of a Parish and an ordained Catholic Priest or Parishioner; and that the financial strength or weakness of a Parish is dependent almost entirely upon its Christian faithful. However, the court did not consider any statements regarding the history of any real property, where or from whom the real property came, who paid for it or who paid for the improvements thereon. The exhibits the court admitted and considered were the tax and insurance papers attached to each considered Priest's Affidavit and nothing else. Except for the paragraphs and exhibits admitted by the court, the court did not grant or deny the objections, but simply said the court did not rely on the affidavit or objection thereto on ruling on the motions for summary judgment.

The Bankruptcy court relied almost entirely on binders of Title information on the disputed real property showing title to be in the name of the Bishop of Spokane. That the titles are all or nearly all in the name of the Diocese is not disputed by the Diocese and Parishes who claim that the Diocese holds the titles in trust for the benefit of each individual Parish.

The Bankruptcy Court also relied on a statement from the Diocese's Articles of Incorporation which state in Article III that " the corporation was formed for the purpose of transacting business and holding property in trust for. . . the Roman Catholic Church" and Article V states that "all property is held by it being in trust for the Roman Catholic Church of the Diocese of Spokane." The court noted that there was no reference to "Parishes" as

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 13

1  the beneficiary of Church property and concluded that the Bishop of the Catholic Diocese
2  of Spokane, holds title to the properties in trust for the Catholic Diocese of Spokane, which
3  are one and the same party. However, while not determinative, this court finds that the
4  "Roman Catholic Church of the Diocese of Spokane" consists of the many Parishes,
5  schools, churches, cemeteries, and retreat centers that make up that Church under Canon
6  Law Principles.

7  ### C. STANDARD OF REVIEW

8       This court's review of a decision by the Bankruptcy court is de novo. In granting
9  Summary Judgment as the Bankruptcy Court did, there must be no dispute as to the material
10 facts involved and those facts must dictate the grant of summary judgment as a matter of
11 law. In ruling on a motion for summary judgment, all reasonable inferences from the
12 undisputed facts must be resolved in favor of the party resisting the motion for summary
13 judgment, in this case, the Diocese and Parishes. Fed. R. Civ. P. 56 (c); *Anderson v. Liberty*
14 *Lobby, Inc.,* 477 U.S. 242, 252 (1986). If there are disputed material facts that affect the
15 issue, summary judgment may not be granted. *Id.*

16      Despite all of the evidence submitted by the Parishes and the Diocese, the
17 Bankruptcy Court held that "There is no evidence to support the creation of a constructive
18 or resulting trust with regard to the Disputed Real Property." *Memo. Op.* @ p. 46. The
19 Bankruptcy Court further ruled that since formal title to the property was in the name of the
20 Diocese the Parishes could hold no legal, equitable, or beneficial interest in those Parish
21 properties and, as a matter of law no resultant trust could exist. Therefore, the Bankruptcy
22 Court did not consider the resulting trust claims. This ruling was clearly erroneous as
23 conceded by counsel for the Tort Litigants Committee at argument before this court. If the
24 Bankruptcy Court ruling were the rule of law, there could never be a resulting trust since
25 such a trust arises only when title to property is in the name or a person or entity other than

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 14

the person furnishing the consideration for its acquisition and holding the beneficial interest.

## D. UNINCORPORATED ASSOCIATIONS

The Bankruptcy Court assumed that the individual Parishes were unincorporated associations which are legal entities which can sue, and be sued, as well as be beneficiaries of a trust. The court was correct in that assumption. It is the rule of law in the state of Washington that unincorporated organizations or associations such as the individual Parishes are regarded as legal entities capable of being a beneficiary of a trust, conveying real and personal property, and also capable of bringing suit or bring sued. *See Leslie v. Medical Center, Inc.*, 72 Wash. 2d 977, 436 P.2d 201 (1967) holding that an unincorporated association can be the beneficiary of a trust.[1]  Here, the Parishes are unincorporated associations.

Treatise trust law is also clear that an unincorporated association is capable of being a beneficiary of a trust. *See Bogert–Trusts & Trustees (Second Ed. Rev. 1979)* § 167, page 171 ". . . the modern attitude is generally that the unincorporated association is capable of being a beneficiary of a private trust, either because it is considered a *de facto* legal entity . . ."; *Scott on Trusts, Volume II*, § 119- "Property may be held in trust for a non-charitable unincorporated association." § 119, page 896 –"If the unincorporated association is one whose purposes are charitable, there is no doubt as to the validity of the trust."; *Restatement*

---

[1]  The court notes that there are approximately 80 Washington cases where an unincorporated association was either a Plaintiff or a Defendant. Only one, however addressed the issue of standing. *SAVE v. City of Bothel*, 89 Wash.2d 862, 576 P.2d 401 (1978). The Washington Supreme Court adopted the federal courts practice of not distinguishing between non profit corporations and unincorporated associations, who must allege a specific and perceptible injury to a member of the organization to have standing.

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 15

of the Law of Trusts (Second Edition) § 119, Comment a – "An unincorporated association has capacity to be the beneficiary of a trust," and Restatement of the Law of Trusts (Third Edition) § 43 Comment (d) as to unincorporated associations: "Whether or not it has capacity to take or hold legal title to property, an unincorporated association has capacity to be the beneficiary of a trust, the disability being a technical and historical one rather than one based on current substantive policy."

The Parishes claim that, at a minimum they are the beneficiaries of a resulting trust, in earlier times, the *cestui que trust*- he for who title is held. The Parishes, while contending that as a factual matter they are the true owners of the property, argue that each of the parish properties is the res or property of a resulting trust, that being that even though title to the 22 properties denominated by the Tort Litigants Committee is in the formal records in the name of the Catholic Bishop of Spokane, the individual Parish furnished all of the consideration for the purchase and improvement of the real properties with the additions of churches and schools and thus the holders of the beneficial interest in the properties.

## E. RECOGNITION OF RESULTING TRUSTS

The *en banc* Opinion of the State of Washington Supreme Court in 1996 in *Brown v. State of Washington,* 130 Wash.2d 430, cited the many prior cases in this State recognizing resulting trusts where title to property is taken in the name of a party other than the actual purchaser. The Court held that as between the **Grantor and Grantee** of a deed:

> In general, when construing a deed, the intent of the parties is of paramount importance and the court's duty to ascertain and enforce . . . In this case, where the original granting clauses convey definite strips of land, we must find that the grantor's intended to convey fee simple title unless additional language in the deeds clearly and expressly limits or qualifies the interest conveyed.

However, of much greater import to the matter *sub judice* the *Brown* court went on to state "In addition to the language of the deed, we will also look at the circumstances

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 16

surrounding the deed's execution and the subsequent conduct of the parties," citing *Scott v Wallitner,* 49 Wn.2d 161, 162, 299 P.2d 204 (1956) and *Harris v. Ski Park Farms, Inc.* 120 Wn.2d 727, 739, 844 P.2d 1006 (1993), *cert denied,* 114 S. Ct. 697 (1994). The court then stated that **"Washington recognizes a resulting trust".** (Emphasis supplied).

Basic trust law also recognizes resulting trusts. The *Restatement of the Law of Trusts (Second Edition)* provides at § 448: **"Where Transferee Pays Purchase Price as Loan to Another"**

> **Where a transfer of property is made to one person and the purchase price is advanced by him as a loan to another, a resulting trust arises in favor of the latter, but the transferee can hold the property as security for the loan.**

> **Comment:**

> a. Reasons for the rule. In the situation stated in this Section the result is the same as through the transferee first lent the amount of the purchase price to the borrower and the borrower then paid the amount so borrowed to the vendor and the conveyance was then made by the vendor to the lender. Although the purchase price is not paid directly by the borrower to the vendor, it is paid for him by the transferee and the borrower is in substance the person who pays the purchase price.

An inference of a trust arises where the property is paid for by one party, but title is taken in the name of another. *See Bogert–Trusts & Trustees (Third Ed. 2005)* § 454, page 316.

> The inference of an intent to have a trust which the court draws from the acts of the payor in paying the price and taking title in another, is not a conclusive inference. It is an inference or presumption of fact and not of law.
> Once the inference is established, the burden shifts to the contestant to rebut and overcome the inference.

At § 454 of *Bogert*, page 325, it is stated:

> **The conduct of the parties with relation to the possession of the reality and the benefits and burdens thereof, after delivery of the deed, is important as corroborating or contradicting the presumption of a trust.**
> In this case, the unchallenged evidence is that some, if not all, of the individual

Parishes provided the funds for the purchase of the real properties and that the erection thereon of the churches and schools was paid for in each instance by the individual Parish.

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 17

1    The Parishes also assumed all responsibility for the maintenance and operation of each
2    Parish property including all expenses thereof and receipt of any revenue therefrom.

3       The Tort Litigants Committee argues that there can be no resulting trust unless a court
4 so finds. This is not the rule in the State of Washington, or elsewhere. Resulting trusts are
5 universally recognized. Resulting trusts arise when title to property is taken in the name of a
6 person or party such as the Diocese or Bishop who did not furnish the consideration for the
7 purchase or improvement rather than having title in the name of the person or party who in
8 fact furnished the consideration for the acquisition and/or improvements for that property.
9 This **resulting trust** rule is contrary to the rule that a **constructive trust** requires a court
10 finding of fraud. The Committee's reliance on the case of *Yates v. Taylor*, 58 Wash. App.
11 187, 791 P.2d 924 (199) is misplaced. *Yates* dealt with a claim of a constructive trust as
12 opposed to a resulting trust. *See also* page 327 of *Bogert (Third Ed. 2005)* "the resulting trust
13 of the purchase money type arises at the time of the delivery of the deed. **The trust is not**
14 **dependent on a decree of court for its establishment.**" (emphasis added).

15       That resulting trusts are recognized and a part of the bankruptcy law is illustrated by
16 the Ninth Circuit case of *In re Torres*, 827 F.2d 1299, (9th Cir. 1987) affirming the
17 underlying BAP case reported at 63 B.R. 751 which held that the "strong arm" power of
18 section 544 of the Bankruptcy Code could not make the corpus of a valid resulting trust
19 property of the bankruptcy debtor.

20       Undisputed Facts No. 43 and 44 as submitted by the Committee of Tort Litigants
21 make it clear and convincing that either the Parishes paid for the real properties or the
22 Diocese initially paid for the real property and transferred the debt to the Parish as a loan.
23 The Parish affidavits state over and over again that the Parishioners of each Parish paid for
24 the construction and improvements of the Catholic churches and schools. Some of the
25 affidavits indicate that the Parishes also paid for the real property on which the churches and

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 18

schools were built. There was no evidence at all provided by the Committee of Tort Litigants that the Diocese paid for any of the properties, with one exception where the acquisition monies were advanced as a loan to the Parish by the Diocese, but that advance was immediately reflected in a note signed by the acquiring Parish. This practice is reflected by the Tort Litigants Committee's Statement of Undisputed Fact Numbers 45 and 46. Committee Fact Number 45 states:

> **"Money may have been raised at the parish level for the purchase of the property. Or in other cases, the property may have been purchased at the diocesan level and then transferred as a debt to the parish."**

> Committee Fact Number 46 states: **"Recently in Suncrest, the Diocese purchased property for $125,000 that has now become part of the building debt for that parish." "It was purchased at the diocesan level but was transferred to a debt of that parish as part of their building project."** (Emphasis added).

Clearly this demonstrated that the Diocese may have initially paid for the property as a loan to the Parish with the debt reflected by a note from the Parish to the Diocese.

## F. ANALYSIS

The evidence before the Bankruptcy Court and this court is abundant that the costs for the construction of Parish churches and schools on the subject properties were provided by the individual Parishes either through cash on hand or through loans obtained by the Parish and solely paid for by the individual Parish and its members. The evidence is that all costs for the operation and maintenance of the Parish properties were and are paid for by the individual Parish, including any stipend, maintenance, or salary of the Parish Priests, who the evidence indicated, were assigned to the individual Parish after consultation between the Parish and the Bishop.

The individual Parishes raise their funds through regular contributions from its individual members and those funds are retained in accounts in the Parish's name. Each Parish maintains and solely controls its own separate bank account. When the Diocese is in need of a contribution from communicants to the Diocese, an individual collection or fund

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 19

drive is created for that purpose. When Parish property or a portion thereof is sold, the proceeds of any such sale go to that Parish.

Several of the affidavits submitted to the Bankruptcy Court urged the court to consider Canon Law in making its determination. The court did not do so. This court finds that it may consider Canon Law in making a determination of the parties' intent when purchasing real property, constructing churches and making improvements on the real property. However, the many affidavits and documents filed in this case do more to provide facts concerning the parties' intent than Canon Law Principles would.

The posture of this case is to be distinguished from one in which a bona fide purchaser, discussed in the Bankruptcy Court Opinion, without notice of the interest of a beneficiary or other claimant to the property, purchases real property from the record title holder. It would be difficult to imagine that a purchaser (assuming that there were one) of Parish property would not be on notice of the interest of the Parish in the property since a purchaser is charged with notice of the interest, if any, of the occupant of real property, even though in this case, prior to the initiation of the bankruptcy, there were no notices recorded as to the individual Parish properties for which the Diocese held title to only as a trustee. In this case, of course, the parties represented by the Tort Litigants Committee or the Tort Claimant Committees, are not in the posture of a bona fide purchaser nor are they in the posture of judgment creditors of the Diocese or any individual Parish, since none of the underlying claims have been litigated or reduced to judgment. The rights of creditors to property of a debtor cannot be more than the interest of the debtor in that property. In addition, this case is clearly different from the circumstances of a person conducting ongoing business with the Diocese and relying on the alleged nominal assets of the Diocese as security for the performance by the Diocese of a contractual obligation or payment.

## G. CONCLUSION

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 20

The uncontroverted affidavits and records submitted in this matter make it clear to the court that the Bankruptcy Court erred in granting summary judgment in favor of the Tort Litigants Committee that the Diocese of Spokane was the unencumbered owner of the individual Parish properties and that the individual Parishes had failed to submit relevant and material evidence that the Parishes were, at a minimum, the beneficial owners of the real property on which their churches and schools stand. This court must therefore reverse the Bankruptcy Court Order Granting Summary Judgment holding to the contrary and remand to the Bankruptcy Court for further proceedings consistent with this court's oral and written Opinions.

**It Is Hereby Ordered** that the finding of the Bankruptcy Court granting summary judgment to the Plaintiffs is **Reversed** and this matter is **Remanded** to the Bankruptcy Court for further proceedings consistent with this Opinion. Because of the remaining factual issues referred to, *supra*, the Bankruptcy Court's denial of the Diocese's Cross-Motion for Summary Judgment is **Affirmed.** This court previously affirmed the denial of the Parishes' Motions to Dismiss.

**IT IS SO ORDERED**. The Clerk is directed to enter this Memorandum Opinion and Order,forward copies to counsel and to the Bankruptcy Court for the Eastern District of Washington and close this file.

**DATED** this 30th day of June, 2006.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE

MEMORANDUM OPINION AND ORDER REVERSING
IN PART AND REMANDING TO BANKRUPTCY COURT 21